FILED

2018 AUG 27   AM 9:02

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DISTRICT

**IN THE**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DISTRICT**

| | |
|---|---|
| SCOTT MEIDE,<br>      Plaintiff,<br><br>v.<br><br>PULSE EVOLUTION CORPORATION,<br>JOHN TEXTOR,<br>GREGORY CENTINEO,<br>JULIE NATALE,<br>DANA TEJEDA,<br>AGNES KING,<br>JOHN KING,<br>EVOLUTION AI CORPORATION,<br>JORDAN FIKSENBAUM,<br>LAURA ANTHONY,<br>MICHAEL POLLACCIA,<br>    a/k/a MICHAEL ANTHONY,<br>FRANK PATTERSON,<br>          Defendants. | Case No. 3:18-cv-1037-J-31MCR<br><br>**COMPLAINT FOR DAMAGES**<br>**JURY TRIAL DEMAND**<br>F. R. Civ. P. 38(b)<br><br>**REQUEST TO CONVENE**<br>**FEDERAL GRAND JURY**<br>F. R. Cr. P. 6(a) |

## STATEMENT OF THE CASE

Plaintiff Scott Meide has been the (repeated) victim of a series of scams perpetrated by the Defendants. Defendants apparently have a history of mail fraud and wire fraud activities, in which the civil courts have not so much as slowed them down, hence the request for this Court to convene a federal grand jury to investigate their crimes.

Rule 6(a)(1) of the Federal Rules of Criminal Procedure reads as follows:

> **(1) *In General.*** When the public interest so requires, the court must order that one or more grand juries be summoned. A grand jury must have 16 to 23 members, and the court must order than enough legally qualified persons be summoned to meet this requirement.
>
> Rule 6. The Grand Jury.

1

## The Case Law

A district judge is authorized to convene a grand jury when he thinks best, (Rule 6(a)) and discharge it when he thinks proper—within the eighteen months limitation (Rule 6(g)).  He determines its size (Rule 6(a)). He appoints a Foreman and a Deputy Foreman (Rule 6(c)).  *He can direct disclosure (Rule 6(e)) of testimony contrary to the usual policy of secrecy of grand jury proceedings, once the good cause, as used in Rule 34, has been demonstrated.*

*Application of Johnson*, 484 F.2d 791, 796 n. 6 (7th Cir. 1973) (emphasis in original).

[I]t is the district court which has the authority under Rule 6(a) of the Federal Rules of Criminal Procedure to summon the grand jury to which the government's evidence must be presented in order to secure an indictment. *See* Fed.R.Crim.P. 6(a)("The court shall order one or more grand juries to be summoned at such time as the public interest requires.").

*United States v. Salgado*, 250 F.3d 438, 454 (6th Cir. 2001).

## JURISDICTION

1.   Jurisdiction of this Court is invoked pursuant to:

    a.   Title 15 U.S.C. §§ 77 and 78, 28 U.S.C. §1658(b);

    b.   A fraud claim, pursuant to Rule 10b-5 of the Securities and Exchange Commission, the Securities Exchange Act of 1934;

    c.   Title 28 U.S.C. §1331, the general federal question statute;

    d.   Title 28 U.S.C.§§ 2201 and 2202, for declaratory and injunctive relief; and

    e.   Title 28 U.S.C.§1367(a), the supplemental jurisdiction statute.

## PARTIES

2.   Plaintiff Scott Meide has an address of 4446-1 Hendricks Avenue, Suite 327, Jacksonville, Florida 32207.

3.   Defendant Pulse Evolution Corporation, incorporated on May 31, 2013, filed

as a Foreign Profit Corporation (Nevada) with the Florida Secretary of State on July 24, 2014. The principle and mailing address is Dufourstrasse 60, 8702 Zollikon, Zurich CH (Switzerland) and its Registered Agent is Edwin C. Lunsford at 2000 PGA Boulevard, Suite 3200, Palm Beach Gardens, Florida 33408-2700.

4.    Defendant John Textor is the President, Secretary, Treasurer, and sole Director of Evolution AI Corporation and has an address of 153 Gomez Road, Hobe Sound, Florida 33455-2430. The 2017 Annual Report for Pulse Evolution Corporation filed on March 16, 2017 with the Florida Secretary of State listed John Textor as CEO, President, Director (1 of 3), Secretary (1 of 2). The 2017 Amended Annual Report filed on October 23, 2017, no longer listed John Textor as an Officer or Director, but only as Director (withdrawing) on the bottom signature line.

5.    Defendant Gregory Centineo has an address of 8872 Maple Hill Court, Boynton Beach, Florida 33473-4855.

6.    Defendant Julie Natale has an address of 8872 Maple Hill Court, Boynton Beach, Florida 33473-4855.

7.    Defendant Dana Tejeda has an address of 245 NE 14th Street, Apartment 3808, Miami, Florida 33132-1641.

8.    Defendant Agnes King has an address of 213 North Bridge Creek Drive, Saint Johns, Florida 32259-8883.

9.    Defendant John King has an address of 213 North Bridge Creek Drive, Saint Johns, Florida 32259-8883.

10.   Defendant Evolution AI Corporation is a Florida Profit Corporation filed with the Florida Secretary of State on October 31, 2017, with a principal and mailing address of 11450 SE Dixie Highway, Hobe Sound, Florida 33455, and its registered agent is Wyndcrest

3

Holdings, LLC, 9995 SE Federal Highway, #1955, Hobe Sound, Florida 33455 (a post officer address). Textor Ventures, Inc. is the manager for Wyndcrest Holdings, LLC with the same post office address. John Textor, the Registered Agent for Textor Ventures, Inc., uses the same post office box, but his home address is 153 Gomez Road, Hobe Sound, Florida 33455-2430.

11. Defendant Jordan Fiksenbaum is the President and the Secretary of Pulse Evolution Corporation with an address of 11450 SE Dixie Highway, Hobe Sound, Florida 33455 (from current Nevada Secretary of State Business Entity Information) *or* the Chief Executive Officer of Pulse (from current Florida Secretary of State Business Entity Information) with an address of 8275 South Eastern Avenue, Suite 200, Las Vegas, Nevada 89123 with the Registered Agent is Edwin C. Lunsford at 2000 PGA Boulevard, Suite 3200, Palm Beach Gardens, Florida 33408-2700.

12. Defendant Laura Anthony has an address of 330 Clematis Street, Suite 217, West Palm Beach, Florida, 33401-4602.

13. Defendant Michael Pollaccia, also known as Michael Anthony, has an address of 330 Clematis Street, Suite 217, West Palm Beach, Florida 33401-4602.

14. Defendant Frank Patterson has a business address of Pinewood Atlanta Studios, 461 Sandy Creek Road, Fayetteville, Georgia 30214.

## STATEMENT OF FACTS

15. In late 2013, Plaintiff Scott Meide (hereinafter, "Meide") was contacted by Defendant John King (hereinafter, "King"). Meide knew King because King was a member of a core fundraising team led by Defendant Greg Centineo (hereinafter, "Centineo"). This team also included Defendant Julie Natale (hereinafter, "Natale"), Dana Tejeda (hereinafter, "Tejeda") and at other times included additional individuals and finders. These individuals

4

worked as a team (hereinafter, "Centineo team") to excite potential investors about financial opportunities as well as working in concert to help close those investors.

16.   Meide knew the Centineo team as he had invested previously through them. The purpose of King's call was to urge Meide to look into hologram technology through a company called Pulse Evolution Corporation (hereinafter, "Pulse").

17.   Every time King wanted Meide to look at a company, it was because King wanted Meide to invest.   King was the individual who usually called Meide about investments from the Centineo team and acted as a finder.

18.   Typically, King would initiate contact then Centineo would be brought in afterwards, whereby the two of them would continue to solicit Meide to invest and would make extravagant claims on the technology or the merits of the company and management.

19.   These calls with Centineo and King had but one mission—to close Meide as an investor.   Occasionally, Tejeda and Natale would also be on the calls or be involved in setting up the calls.

20.   In addition, both Tejeda and Natale would extol the virtues of investing in the latest opportunities.   It is Meide's understanding that none of the members of the Centineo team are registered brokers.   Meide visited Centineo and Natale in Del Ray Beach, approximately 2 or more years ago.

21.   During lunch at BurgerFi Natale told Meide that she and Centineo could not believe Meide was still friends with them and still talking to them since a previous investment involving an animated feature film, *Legends of Oz: Dorothy's Return* (hereinafter, "*Oz*") had bombed at the box office, costing Meide almost three million dollars.

22.   After Meide had invested in Pulse the first time, Centineo told Meide that he was proud of him because Meide got back up on his feet and did not quit or allow the failure

1  of *Oz* to negatively influence his investing decisions.

2      23.   Both King and Centineo mentioned Meide needed to meet the Pulse's founder

3  and owner, Defendant John Textor (hereinafter, "Textor").   Information on Textor can be

4  found at www.johntextor.com.

5      24.   Pulse puts itself forward as a company "*established to produce specialized,*

6  *high-impact applications of computer-generated human likeness for utilization in*

7  *entertainment, life sciences, education and telecommunication, founded by the world's*

8  *leading producers of photo-realistic digital humans,*" according to their website at

9  http://www.pulse.co/.

10      25.   Subsequently, Meide learned that both Pulse and Textor have been mired in

11  lawsuits with allegations of fraud and securities violations being the most predominant

12  claims against them.

13      26.   Textor informed Meide via telephone in early 2014 on how Pulse would be

14  different than most tech companies.  Pulse, instead of just being paid for an individual job,

15  would also be involved with the productions and be able to get royalties from the shows.

16  I.e. Pulse would own part of the productions.   Also, Textor would own part of the

17  productions and have ongoing revenues.

18      27.   Centineo and King told Meide on the telephone in late 2013 that Pulse would

19  be showcasing a hologram of Michael Jackson at the 2014 Billboard Music Awards and had

20  already done a hologram of rapper Tupac Shakur at the 2012 Coachella Concert. These are

21  on the www.pulse.co website, as well as on the www.johntextor.com website.

22      28.   Whenever King/Centineo and their team wanted Meide to invest, they always

23  stated the following:

24          a.   That the opportunity in some way was exclusive to Meide or a small

group of insiders.

> *Comment:* After Meide had invested in Pulse, when they wanted additional investors, they would call the information they gave Meide "insider information" hoping to persuade Meide to put additional investments in Pulse. At that time Meide never truly understood what "insider information" meant in a legal sense.

b. That by investing in Pulse early, and for other reasons known and unknown, Meide was getting a better deal than most investors.

c. That news was being shared with Meide before it was made public or announced to the public via press releases.

> *Comment:* When Pulse became a publicly traded entity (PLFX), Meide was regularly told of events before they were made publicly available. This was always at a time when they were trying to persuade Meide to invest additional money or wanted Meide to invest in their other deals.

d. That Meide's investment would reap phenomenal returns and the stock would reach ten to fifteen dollars (and beyond) around the time when the Michael Jackson video came out, but Pulse was not public at that time.

> *Comment:* The stock hit a high of $3.75 and currently is trading around $.24, despite a takeover offer of $1.38.

29. Currently the stock has lost over 95% of its value from its high. Many investors, including Meide and especially those who put in substantial investments feel

7

betrayed and were sold their shares with the urgency that they may miss the higher prices. The Centineo team's continual mantra was, "You better get in now before the prices go crazy."

30.     Unknown to Meide at the time, the Centineo team and Textor were engaging in what is known as Microcap stock fraud.  As Centineo and Textor were pumping the stock, they were dumping their personal shares in Pulse and possibly Evolution AI, that they got for free or for fractions of a penny through private sales to investors such as Meide using false and misleading information and concealing material information on the company and its principals.

31.     In late 2013 and early 2014, Meide continued to have conversations with King as well as Textor.  Meide also visited Textor's office in Port St. Lucie in South Florida.  In attendance were Centineo, King (who drove Meide there) Textor, Natale, Tejeda and Frank Patterson (hereinafter, "Patterson") (a Pulse co-founder), who also extolled the great virtues of investing in Pulse.  Patterson is no longer employed by Pulse and is currently employed at Pinewood Atlanta Studios as its first president. a position he has held since November 2016. Textor and Patterson were previously partners.

32.     Before the launch of Meide's previous investment through the Centineo group. *Oz*, Centineo and King told Meide that the value of Pulse was sure to go up because they had a plan: after the successful launch of *Oz*, which the projections Meide was provided suggested it would be a mega-blockbuster, Centineo and King would pitch Pulse to the *Oz* investors.

33.     Centineo and King believed the *Oz* investors would all come over to Pulse and drive up the stock price.  They would also invest in Textor's animation studio in Florida called Tradition Studio.  Meide was told that Centineo would be the head of the animation

8

1    studio.

2        34.   Later Meide learned that both the production company and the distribution

3    company hired for *Oz* had reputations for failure in the case of the former and failure and

4    multiple security violations in the case of the latter.   Both are the subjects of fraud in

5    ongoing lawsuits.

6        35.   The Centineo/King strategy for increasing share value in Pulse was based also

7    on an earlier group of shareholders they had misled and expected them to come over to

8    Pulse. The *Oz* investors put in approximately $110 million and, like most of the schemes in

9    which Meide invested, turned out to be financial failures, mired in fraud and breach of

10   securities allegations.

11       36.   *Oz* turned out to be a monumental flop.   One article stated that, "the movie's

12   producers and fundraisers fared far better than the film's investors, who may have

13   collectively lost up to $100 million, while the producers and fundraisers earned tens of

14   millions of dollars, according to SEC filings." *See* How A Failed 'Wizard of Oz' Remake

15   Became A $100 Million Investor Nightmare, https://www.businessinsider.com/animated-

16   wizard-of-oz-a-100-million-failure-2014-6.

17       37.   Centineo was both a money raiser and an executive producer for *Oz*.   Still

18   Meide decided to invest about two months after the flop because Meide had also been told

19   the following:

20           a.       King, Centineo, and Textor all told Meide on the phone and in person

21                    at Textor's office that Pulse would be doing an initial public offering or

22                    (IPO).

23                         *Comment 1:* Pulse never filed to do an IPO.  According to SEC

24                         filings, there was a public shell by the name of QurApps Inc., a

9

Nevada shell company, controlled by a single person. Later this company was renamed Pulse Evolution Corporation and the single principal resigned and was replaced by Textor and his team.

*Comment 2:* This was not an IPO as it appears the shell was purchased. There is a dramatic difference between a shell doing a registration statement to sell shares and doing an Initial Public Offering. *See* the 50-page registration of August 2, 2013: https://www.sec.gov/Archives/edgar/data/1583138/0001558891 13000158/qurapps-s1_20130802.htm.

b. King, Centineo, and Textor all told Meide on the phone that the Pulse shares would open at two dollars per share.

*Comment:* It appears they actually opened at $ 1.85 per share.

c. Textor told Meide that previously he had been a senior executive at Digital Domain where an institutional investor had lent Digital Domain money. However, a large stakeholder engaged in short-selling the shares and earned triple the amount of the loan by doing so. Textor told Meide that the short selling had cost him twenty million dollars and everything he owned. To prevent this from happening with Pulse, Textor had a plan (which was reiterated by King and Centineo) to control the stock by only allowing the investors to sell a small portion of their shares at a time, at Textor's discretion. This is how Textor intended to control the stock price of Pulse.

*Comment:* It appears the manner in which Textor went about to

10

1  control the stock price was illegal and more will be revealed

2  during discovery.

3  d.    Textor told Meide in person (also told by King and Centineo) that

4  Meide could sell his shares after about a year as they were restricted

5  and after a year would be free trading, meaning that Meide was free to

6  sell them. Patterson, who was the co-founder of Pulse, reiterated this to

7  Meide.

8       *Comment 1:* Meide has since learned that policies in which

9       customers are prohibited or discouraged from selling their

10      stocks is a form of stock fraud, as well as insiders selling their

11      shares using insider information and fraudulent misrepresent-

12      tations and omissions of material information.

13      *Comment 2:* Meide's shares never became free trading.  The

14      fewer free trading shares, the easier it is for Textor to control

15      the price of Pulse.  The scam is clear—sell shares, particularly

16      personal shares, with the promise of free trading in the future to

17      control and manipulate the prices and dump shares before the

18      investors can do so.

19 e.    When Meide bought some of Textor's shares in Evolution AI, Meide

20      was told that the only people with free trading shares would be Textor,

21      King and Meide, once the company went to the New York stock

22      Exchange, which was a sure thing.

23      *Comment 1:* Meide still does not have stock certificates.

24      *Comment 2:* Textor should not have made a representation

11

before it happened or was approved

f. King told Meide before Meide invested that some big company such as Google would likely purchase Pulse. He would always stress it was his belief.

g. Agnes King, King's wife (hereinafter, "Mrs. King"), would be present with King on many occasions. Meide socialized with the couple as they would watch football games at the Kings and attend meetings together. Mrs. King would always reinforce the value of investing in the Pulse opportunity, and others such as *Oz*.

h. Most importantly, Meide was told that his investment in Pulse would make him "whole" and make up for his staggering losses in *Oz*, the biggest animation flop in Hollywood history, of which Centineo boasts he raised most of the $110 million and was also one of three executive producers.

*Comment 1:* By investing seven times through the Centineo team, Meide had given them almost three million dollars. If the stock value of Pulse had gone to $10-$15 dollars per share, they were correct that the gain would have more than compensated for the earlier staggering loss.

*Comment 2:* There was no doubt in the minds of and representations made by the Centineo team that not only would this be a $10-15 stock and beyond, the company would be purchased by the likes of Google or some other well-known technology giant.

12

38. Meide's initial investment was for $300,000 paid to a law firm, Eavenson, Fraser, Lunsford & Ivan, as Meide believed he was purchasing shares from that law firm. The check number was 1013 written on July 18, 2014, for 750,000 restricted shares of Pulse.

39. After writing the check, Natale emailed Meide and said Textor wanted Meide to buy the shares directly from Pulse instead, so they sent Meide new documents and he had to write another check and back date the documents with the appropriate date for the new documents.

40. Before investing any money into Pulse on July 18, 2014, Meide was told by King, Centineo and Textor that Meide's shares would become free trading after approximately one year. Presently, Meide's shares are still not free trading, over four years later.

  a. Had Meide known the shares would not become free trading after one year, Meide would have never invested in Pulse. For instance, on March 21, 2016, the stock hit $3.75 per share with volume being over 100,000 shares.

  b. There were other days where the stock traded far above Meide's purchase price.

  c. This was upsetting to Meide because he was told that he would be able to sell some of the free trading shares and recoup his investment plus still have shares remaining.

  d. Even though *Oz* flopped, King and Centineo informed Meide via the phone (also in 2014) that, because of the loss, they would mention Pulse to only a handful of *Oz* investors. The investors in Pulse who Meide knows are also *Oz* investors are Darcy Hewitt and Michael

1    Abdouch.

2    41.   During Meide's many calls with Centineo via telephone in 2013 through 2015,

3    either Tejeda or Natale, his assistants/associates would conference their calls and be on the

4    actual calls. During most calls both Tejeda and Natale would participate in the discussions.

5    42.   Meide does not know if Tejeda or Natale at that time were working for Pulse

6    or Centineo or both.  Whenever King called, Mrs. King was almost always on the line.

7    When Meide was at King's home and King was talking to another investor, King would put

8    the call on speaker so Mrs. King and Meide could listen.

9    43.   Meide does know that Tejeda and Natale would arrange the calls for King to

10   solicit investment and participate in the calls.  Their email signature lines were:  Dana

11   Tejeda, Business Affairs, Pulse Evolution Corporation; Greg Centineo, Principal, Pulse

12   Evolution Corporation; and Julie Natale, Business Affairs, Pulse Evolution Corporation.

13   44.   Those signature lines suggest that is likely how the Centineo team was getting

14   all the insider information to pitch to investors, which calls into question whether they could

15   legally and ethically collect commissions and finders' fees from investors.  In the latest 10-Q

16   filing, Centineo is listed as having over 5% of Pulse.

17   45.   Meide's second investment was for $400,000 a year later giving Meide

18   800,000 Pulse restricted shares, purchased directly from Centineo's personal shares from

19   which he was a principal of Pulse, as listed on Pulse's website at that time.

20   46.   Meide wrote check number 3013 on July 30, 2015.  At that time Centineo told

21   Meide his shares would become free trading in October 2015, three months later.  However,

22   once the check was written, the emailed excuse came from Natale stating that the shares

23   would NOT be free trading as originally told.

24   47.   Meide was told that all of his purchases of Pulse shares, would be free trading

14

1  and all his purchases in Evolution AI would be free trading on the New York Stock

2  Exchange.

3      48.   Meide purchased these Pulse shares for fifty cents per share and in October

4  when they were promised to be free trading the shares of PLFX traded well above a dollar

5  but Meide could not sell.  Meide never would have purchased those shares if he had known

6  the shares would remain restricted, especially since any investment Meide had ever made

7  through the Centineo team had been liquid or produced anything but a loss.

8      49.   Textor was upset with Centineo doing a private sale of his securities.   In

9  December 2017 Textor told Meide that he had received a bad deal from Centineo and that

10  he, Textor, would make it up to Meide in the future.

11      50.   It appears that Textor was upset because Centineo had sold personal shares to

12  Meide and Textor, at that time, had not.  To take advantage of Textor's deal, all Meide had

13  to do would be to invest more money by purchasing some of Textor's personal shares.  As a

14  director of Pulse, Textor would have to okay the private transfer of shares by Centineo. Not

15  long after that Meide learned there had been a falling out between Centineo and Textor.

16      51.   At this same face to face meeting with these people, Textor informed Meide

17  about his Digital Domain days whereby an institutional investor came in and shorted the

18  Digital Domain stock and eventually Textor lost all he owned, approximately $20 million.

19      52.   In December 2017, King told Meide that Textor had formed a new company

20  called Evolution AI and that Textor was mad at Pulse (Textor owned about a third of the

21  Pulse) because Pulse was not interested in artificial intelligence.

22      53.   This information confused and upset Meide as his first reaction was why did

23  he invest in Pulse? First Textor induces Meide to invest in Pulse, now Textor is saying that

24  his new company, Evolution AI, is the better company.  To induce Meide to invest in

Evolution AI, Meide was told the following:

    a.   Evolution AI was going to IPO on the New York Stock Exchange according to King and Textor. This was reiterated in an e-mail from Textor to Meide, dated June 12, 2018, where Textor admitted this was indeed the plan.

          *Comment 1:* This is reminiscent of Meide being told that Pulse was going to IPO which it never did.

          *Comment 2:* Furthermore, Textor told Meide his $75,000 investment would allow Textor to make things right as he had said that Centineo's transaction with Meide was not fair. Nothing stopped Textor previously in correcting this unfairness. However, this time there was a toll charge for fixing things, meaning Meide had to buy some of his shares.

          *Comment 3:* In hindsight Meide can see that Textor used the Centineo situation to help close his investment. Textor said if Meide put $75,000 into the new company, Evolution AI, he would give Meide a million more shares in the new company which added to Meide's Pulse shares he was would be buying 2.5 million shares.

    b.   Textor told Meide they would do a 10 to 1 reverse stock split and that the shares would be trading at $10-11 per share on the New York Stock Exchange.

    c.   Textor told Meide that he needed this $75,000 to help make Pulse a reporting company again.

*Comment 1:* Meide wondered why his investment was going directly to Textor to purchase his shares and not into Pulse. Discovery and an investigation into the practices of the Defendants will show their representations had no basis on any material facts.

*Comment 2:* Textor did not tell Meide in December 2017 that on November 8, 2017, Pulse, Textor, Rene Eichenberger, and Patterson were being sued for fraud among 14 claims and $25 million by JR Beteiligungs Holding AG, Holotrack AG, Holotrack Ventures Corp.. Miralco Holding AG, and PB Invest Schweiz AG—Case No. 2:17-cv-14390, in the Southern District of Florida.

*Comment 3:* If Textor had disclosed the lawsuit to potential investors, Meide never would have invested again.

    d.    Pulse is now a fully reporting company.

54.    Meide has no idea where his money went and has no stock certificates for that money. Meide asked Textor for stock certificates on June 8, 2018 but has received none. Meide also asked Textor for a refund in lieu of stock certificates but has received nothing.

55.    Among the requirements to be listed on the New York Stock Exchange is that the minimum aggregate pre-tax income for the last three years has to be ten million dollars. It is Meide's understanding that the revenues of Pulse, Evolution AI, and even their potential merger partner. Recall Studios. fall dramatically short of even the minimum threshold. It appears that these companies promoted by the Defendants are merely stock plays where the insiders make money selling shares, but the underlying companies never amount to much.

56.   One of the press releases that came out in 2018 stated, "The new company is offering to purchase Pulse Evolution's unrestricted 'public float' shares at a $1.20." This seems very unusual because currently the shares are trading at twenty-five cents per share.

57.   King informed Meide via telephone on many occasions during 2016-2017 that Pulse stock should be $5.00 per share and Textor shared those sentiments as well. In the interim, the stock slowly started to decline in share price. Meide could not sell any of his shares because they never became free trading as promised when Meide purchased them.

58.   Centineo and King via telephone in late 2016-early 2017 told Meide that Textor and Simon Fuller (hereinafter, "Fuller") were having meetings about producing the Elvis show. Meide was also told by the Centineo team and Textor that Pulse had the rights to Elvis.

59.   Fuller is the mega film and TV producer known for the American Idol franchise. During these calls, King would always state there is no one bigger than Fuller in Hollywood and his net worth is around $750 million and whatever Fuller wants, Fuller gets.

60.   SEC filings state the contracts with the Presley Estate are non-exclusive. That means any of the many similar technology companies can make a deal.   The Elvis show was never completed.

61.   Meide was told by King and Centineo that Textor moved his office into Fuller's suite in Los Angeles, which had been true.  However, on June 11, 2018, Meide called Fuller's offices in California and discovered that Textor was no longer at that address, had not been there for some time, and left no forwarding telephone number.

62.   In 2014-2018, King told Meide many times that Textor was in Zurich pitching ideas to the billionaire investors who had invested in Pulse (the plaintiffs Case No. 2:17-cv-14390 appear to be Swiss companies). The Centineo team would continually talk about all

types of billionaire investors without ever providing names or verification. "The billionaires" were often cited as the excuse for Pulse being non-reporting. I.e., the billionaires wanted it that way.

63.   The public press release that Fuller and Pulse had signed an epic deal came out in April 2017. King had told Meide about it at least six months before while the deal was being negotiated and two to three months later when the deal was signed. Centineo also told Meide about it.

64.   About this time Meide was socializing with the Kings, always alerted Meide either face to face or via telephone as to what was going on with Pulse. King always instructed Meide to never tell anyone as it could be construed as insider trading.

65.   King made these statements all the time and sometimes made these claims in front of Mrs. King or she would be on the phone with King. Meide had already invested in Pulse and by that time and had no interest in buying any more shares.

66.   However, Centineo and the Kings were unrelenting in using the insider information trying to entice Meide to invest even more money because he was a seven-time multiple investor in *Oz*. The more resistant Meide was in not wanting to invest, the more insider information he would be told.

67.   Centineo would tell Meide that what he was disclosing could be considered insider trading but, unlike King, Centineo just told Meide to keep it between them. Meide was also told of the ABBA deal and other deals before they were signed—all part of a continual hype machine. As in the *Oz* investment, the only people who seemed to make money were those who took commissions on the money raised which was pointed out by the numerous articles about the failures of *Oz*.

68.   In late 2017 and early 2018, Textor told Meide along with King that Textor

19

1  could murder Fuller after Fuller had told Textor he was stopping the production of the Elvis

2  show and going with ABBA.   The ABBA news came out on October 26, 2016.

3  https://www.billboard.com/articles/news/7556837/virtual-abba-simon-fuller-universal.

4      69.   Pulse was never once mentioned in the ABBA press release.  This seemed

5  highly unusual as Meide had been pumped up on this Pulse information by the Defendants.

6  Textor, Centineo and King emphasized to Meide that Fuller controlled the press releases,

7  suggesting that was the reason Pulse was not mentioned.  Meide believes Pulse was not

8  mentioned for another reason that Textor, Centineo and King did not want Meide to know.

9      70.   In December 2017, King and Textor told Meide that they had caught Fuller

10  trying to do it on his own. I.e., move forward on productions such as ABBA without Pulse.

11  Meide believes that Pulse had no agreement with Fuller.  It was likely that Textor just gave

12  Fuller some worthless warrants for Fuller to play with the technology, so King and Textor

13  could use Fuller's name to continue to get additional investments.  This was one month after

14  the lawsuit had been filed against Textor, Pulse, and the others.  Many key people resigned

15  from Pulse after the lawsuit was filed.

16      71.   Textor was also irate that Fuller had rented private jets and limousines, etc., for

17  his business meetings and Pulse had to pay for them because Fuller was the producer of the

18  Elvis show.  Fuller may have stopped production of the Elvis show when he learned of the

19  lawsuit against Pulse or Fuller may have discovered that the Pulse technology had not been

20  accepted in the marketplace and the show had been used to lure more investors.

21      72.   An article in the July 2, 2014, issue of Entrepreneur Magazine titled, *"Smoke*

22  *and Mirrors, Why We aren't Seeing More Digital Zombies Like Michael Jackson; The King*

23  *of Pop's digitized performance at the Billboard Music Awards gave the world a glimpse into*

24  *a capturing technology that faces serious hurdles inside and out."*  The article questions the

technology in several ways but not limited to those listed below:

> Pulse Evolution Corporation, a Port St. Lucie, Fla.-based digital human animation and production startup launched last October, says it definitively owns the bragging rights to Jackson's blowout Billboard resurrection.

> But according to this glaringly false CNN report that aired in May and was later removed, British billionaire Alki David and his Beverly Hills-based Hologram USA were behind the Billboard show.

> As the confusion suggests, there is a dispute over the underlying technology. Actually, "dispute" may be too mild a term. In the visual effects industry, there's an all-out war over who owns the rights to what.

> Pulse Chairman John Textor, somewhat of a divisive character in the industry, headed up the Michael Jackson project with Pulse CEO Frank Patterson. The two onboarded several artists formerly of the James Cameron-founded visual effects house Digital Domain, where Textor had served as CEO until the company defaulted on a $35 million dollar loan and went bankrupt in September 2012.

> *Id.* at https://www.entrepreneur.com/article/235142

73. Meide was led to believe by the Defendants that the companies he was investing in had the lock on the technology. The Defendants did not disclose at any time that Pulse's rights to the technology was questioned in the courts.

74. Textor has a reputation as a stock promoter and has been involved in many stock plays, including during the dotcom bust era.

75. Meide was told many times via telephone from 2014 to the present that Pulse was in communications with the Michael Jackson estate and had a deal already signed with them and Pulse owned 40% of the Michael Jackson digital likeness, which was one of the major goals of Pulse.

76. However, nothing has ever materialized for Pulse after Meide had been invested in the company over four years. In the lawsuit filed against Textor and Pulse in 2017 it was alleged that Pulse is a sham and a personal bank for Textor and others and it was

21

very suspect that the much-vaunted Michael Jackson holographic project never moved forward.

77.     Meide was also informed by King and Centineo during the course of his entire investment with Pulse that Textor was in talks with the Marilyn Monroe estate, ABBA, Prince and other high-ranking celebrities, either currently living or their estates if they are deceased.

78.     Meide was told by King and Centineo about some Chinese company investing $10 million in Pulse and other companies as well.  The dates these transpired were at different times during Meide's investment into Pulse and this was normally communicated before the news releases.  Meide only invested after the news was public.

79.     Textor and King, but mostly King, told Meide via telephone since 2015 that there were several billionaires invested in Pulse and the latest number Meide heard in 2018 was six billionaires invested in Pulse and those billionaires did not want Pulse going public from the beginning as those billionaires' companies were private and wanted the same for Pulse.

80.     Textor also told Meide about these mythical billionaires while pitching his new AI company to Meide in late 2017 and early 2018 via telephone.  Textor said the reason that Pulse stopped public filings was that the six billionaires wanted Pulse to become private and this was why Pulse became non-reporting.

81.     Textor told Meide the billionaires were paying the $600,000 per month for Pulse's expenses so Textor felt coerced into the non-reporting status for Pulse as the billionaires did not want the reporting status.  Textor also stated that the billionaires wanted to take the entertainment route with Pulse—doing all the shows revolving around the Michael Jackson, Marilyn Monroe, and other celebrities, while Textor wanted the company

22

1    to concentrate on the artificial intelligence aspect of technology.

2      82.   When Meide heard that he was furious because it was Textor who had helped

3    convince Meide to invest in Pulse and now Textor was arguing that his new company was

4    the better investment.

5      83.   King via the telephone in the summer of 2016 to 2017 said some female Oz

6    investor who had unrestricted shares in Pulse accidentally sold 100,000 shares or shorted the

7    stock and this dropped Pulse's stock price dramatically. Whoever this female Pulse investor

8    was, King told Meide she was friends with Tejeda. Meide had learned that Tejeda had a

9    falling out with the Centineo group and she had absconded with the Oz shareholder list.

10      84.   King also stated he did not know and neither did Textor know how those

11    shares were converted to unrestricted shares. It is preposterous that Textor would not know

12    how that happened as he had the availability of corporate counsel, Defendant Laura

13    Anthony.

14      85.   Defendant Laura Anthony, corporate counsel for Pulse, wrote an article for the

15    Huffington Post on July 24, 2017, *Attorney Laura Anthony Explains the Payment of*

16    *Finders' Fees*, in which she mentioned "the danger of using unregistered finders." Yet

17    Pulse, for which she is legal counsel, has unregistered money raisers who earn finders' fees

18    using "insider information" to help them in their sales pitch to investors.

19      86.   Meide sent an email to Defendant Laura Anthony to which she responded, the

20    text of both is as follows:

21      Original:

22      From: Scott Meide <jsicenterzo@gmail.com>
        Sent: Thursday, July 26, 2018 12:24 PM

23      To: Laura Anthony <LAnthony@legalandcompliance.com>
        Subject: PULSE LAWSUIT

24

Mrs. Anthony:

Please find attached a draft of a lawsuit.  Please consider this an offer of compromise and settlement.
You and your clients have clipped me for over three quarters of a million dollars with your Pulse and related operations.

I have also sent this lawsuit to most of the defendants listed on the lawsuit. Their response was basically that John Textor took it upon himself to report me to law enforcement for "extortion" (not exactly Clarence Darrow or F. Lee Bailey, that one).

Ironically, the same law enforcement official asked me to let them know as soon as the lawsuit is filed so that they can review the claims.

My suggestion is that you get together with the listed defendants you represent and advise them to pay me back, in full, within the next 10 days.

If I am not reimbursed, in full, within the next 10 days, the alternative is that I will add you and your husband to this lawsuit and file it on or before August 10 of this year.

Scott Meide
--------------------------------------------------------

Reply:

From: Laura Anthony <LAnthony@legalandcompliance.com>
Date: July 26, 2018 at 3:05:06 PM EDT
To: Scott Meide <jsicenterzo@gmail.com>
Subject: RE: PULSE LAWSUIT

Scott, not only do I not represent the listed defendants, other than Pulse or Mr. Textor, I've never heard of any of them.  However, your threat to sue me and my husband if you are not paid within 10 days, is clearly extortion.  I suggest you seek competent legal counsel before making such threats.

From the Desk of
Laura Anthony, Esquire
Legal & Compliance, LLC
330 Clematis Street
Suite 217
West Palm Beach, FL. 33401
Office: 561-514-0936 ext 101
Fax: 561-514-0832
Lanthony@legalandcompliance.com
www.LegalandCompliance.com

24

www.SecuritiesLawBlog.com
www.Lawcast.com
http://www.huffingtonpost.com/author/laura-anthony
Follow me on LinkedIn & Facebook

87.   Defendant Michael Anthony Pollaccia, the husband of Defendant Laura Anthony, has not been a registered broker since December 2000 and prior to which, had three customer disputes and two regulatory actions (in Ohio and Florida) in which he was involved, per brokercheck.finra.org (Financial Industry Regulatory Authority, Inc.).

88.   In early 2018 via telephone while pitching AI to Meide, King said the ex-wife of Tiger Woods wanted to put in the remaining 13 million dollars needed to finish the Elvis show according to Textor. That has not happened like almost all things the Centineo team told Meide would happen. Meide now doubts it will ever happen. There were many other names dropped of "A" listers and other celebrities when the Defendants were pitching AI to Meide and others.

89.   In middle 2017 and early 2018, King told Meide Bruno Mars and his manager had done something with three of Michael Jackson's new songs that have never been heard before and will soon be performed in a special television event along with the Michael Jackson hologram. That has not happened.

90.   Textor and King many times via telephone in 2017-2018 said Pulse would only get a five percent royalty for the ABBA show that will take place sometime in 2019. However, Textor said he did not care about such a dismal percentage because it would give huge exposure to Pulse. Yet, in any of the ABBA newswires, there is only mention of Simon Fuller and ABBA and not Pulse. There is nothing about ABBA on the Pulse website or in any disclosures.

91.   Meide was told by Textor and King in December and January 2018 that Simon

25

1   Fuller and Rene Eichenberger were contemplating opening up a production company to cut

2   out Pulse and, when Textor found out, he put an end to that new arrangement.

3   92.   Textor told Meide via telephone along with King that Centineo was listed as a

4   "principal" in the company.  Textor gave Centineo six million shares in the company and

5   when the other board members found out, they were irate because they knew Centineo did

6   absolutely nothing for the company.  While Centineo and his team were pitching investors

7   for the cash-starved Pulse, he was secretly making side deals to sell his restricted shares.

8   93.   In January 2018, while Textor was soliciting funds for his new AI company, he

9   sent Meide an email with a mega-new and improved short video of Michael Jackson, which

10  no other investor or shareholder had seen per Textor.  At the time, it was viewable at

11  https://vimeo.com/146693414 with the password Rockettes.  Textor has since removed the

12  password and made it public.

13  94.   Textor said he really did not have to be working in conjunction with Pulse, as

14  many people now were willing to pay him to speak about holograms because he is

15  considered the foremost expert on holograms.  However, Textor still needed Meide to buy

16  some of his AI shares and, as of last year, Textor was still earning $271,000 per year at

17  Pulse.

18  95.   In January 2018, while pitching his new AI company to Meide via the

19  telephone, Textor told Meide that the new company would concentrate solely on AI,

20  especially producing his idea of a hologram being emitted from a personal cell phone.

21  96.   However, Apple and others already have patents and applications for this

22  technology.  On January 7, 2018, Apple published a teaser video on YouTube for their

23  newest phone to be available in September 2018—"iPhone XI - 3D Hologram (iPhone 11)"

24  —at https://www.youtube.com/watch?v=JGfS3AVta0g.  As Textor did in the sales pitch for

1   Pulse, Textor is again quick to say he has proprietary technology that is actually owned by

2   others.

3       97.   In December 2017 and early 2018 while King and Textor were pitching AI to

4   Meide via telephone, they told Meide that there was still a requirement for roughly $350,000

5   to turn Pulse into a fully reporting company. The sales pitch was that Meide's $75,000

6   investment into AI would help contribute to that happening, contradicting their previous

7   statements that the billionaires did not want Pulse to be a fully reporting company.

8       98.   Meide asked Textor in one of the calls made in January 2018 why Textor could

9   not put any of his own money into AI. Textor's response was that, besides his house, he did

10  not have any money and he was a worker bee, a tech guy and not a money guy.

11      99.   In June 2018 Meide learned about the federal lawsuit filed in December 2017

12  against Textor, Digital Domain, and others making misrepresentations about Pulse, that one

13  of Textor's personal friends sued Textor over a one-million-dollar loan Textor failed to

14  repay, the big salaries of the executives of Pulse and the number and percentage of shares

15  owned by Centineo.

16      100.  On August 10, 2018, Globe Newswire published the following, listing Recall

17  Studios, Inc. as the source:

18  *Recall Studios Completes $200 Million Acquisition of Evolution AI Corporation Including Majority Stake in Pulse Evolution Corporation*

19
20  - Deal includes 150 Million Share Majority Stake in Digital Human, Holographic Entertainment Pioneer Pulse Evolution Corporation (OTC "PLFX")

21  - Acquisition marks First Major Step toward Completion of its planned $1.38 per share Tender Offer to Acquire PLFX

22
23  - Company to leverage Evolution AI's Global Reputation and Key Strategic Shareholders to Establish Worldwide Distribution of AR and VR Applications

24

- Combined Companies Expected to Meet Listing Requirements of NYSE

https://globenewswire.com/news-release/2018/08/10/1550432/0/en/Recall-Studios-Completes-200-Million-Acquisition-of-Evolution-AI-Corporation-Including-Majority-Stake-in-Pulse-Evolution-Corporation.html

101. This takeover by Recall Studios is what is known as a "Pump and Dump", a maneuver that rewards insiders and participants based on market profits instead of company earnings and fundamentals.

102. Pulse, according to its disclosures, has no institutional investors and neither does Recall Studios. Their competition is the crème-de-la crème of the entertainment industry including, but not limited to Sony Pictures Imageworks, Industrial Light and Magic, Weta Digital, and several others. Pulse's technology has failed to interest any of the major players.

103. It appears that the Recall Studios' offer for AI and thus Pulse (AI owns 60%) is a con generated by Textor because both Pulse and AI are laden with debt, barely have any revenues, and is merely a desperate attempt on Textor's part to lure in more money from current and new investors.

104. In the case of unintentional disclosure of material, non-public information to one person, the company must make a public disclosure promptly.  Pulse has never disclosed that information to the public at large.

105. Defendant Jordan Fiksenbaum, as Chief Executive Officer of Pulse, is directly responsible for all governance and adherence to fiduciary and ethical behavior.

. . .

. . .

. . .

28

## LEGAL CLAIMS

### FIRST CAUSE OF ACTION
**Request to Convene a Grand Jury Pursuant to
Rule 6(a) of the Federal Rules of Criminal Procedure
Against All Defendants**

106. The facts in paragraphs 2 through 105, as stated above, are incorporated herein by reference as though fully set forth in this cause of action against all of the Defendants as Plaintiff Scott Meide has full knowledge of many of the actions of the Defendants in violation of the laws of the United States. Plaintiff Scott Meide is willing to inform a federal grand jury of those violations.

107. It has long been accepted in the courts that private citizens have a right and a duty to provide information to a federal grand jury for a full investigation if they deem it worthy of such. The U.S. Supreme Court precedent has stood for over one hundred years.

> ... in this country it is common practice for the grand jury to investigate any alleged crime, no matter how or by whom suggested to them, and after determining that the evidence is sufficient to justify putting the party suspected on trial, to direct the preparation of the formal charge or indictment.

*Frisbie v. United States*, 157 U.S. 160, 163, 15 S.Ct. 586, 39 L.Ed. 657 (1895).

> It is the right and duty and right ... of every citizen to assist in prosecuting, and in securing the punishment of any breach of the peace of the United States.

*In re Quarles*, 158 U.S. 532, 535, 15 S.Ct. 959, 39 L.Ed. 1080 (1895).

108. The Supreme Court has not ruled to the contrary.

> It was simply a housekeeping provision of the Department and was not intended to curtail or limit the well-recognized power of the grand jury to consider and investigate any alleged crime within its jurisdiction.

*Sullivan v. United States*, 348 U.S. 170, 173, 75 S.Ct. 182, 99 L.Ed. 210 (1954) (citations omitted).

29

109. The Circuit Courts have not ruled otherwise.

> [An individual] has a constitutional right to inform the government of violations of federal law. *In re Quarles*, 158 U.S. 532, 15 S.Ct. 959, 39 L.Ed. 1080 (1895) (privilege of citizenship guaranteed by the Fourteenth Amendment); *See Twinings v. New Jersey*, 211 U.S. 78, 97, 29 S.Ct. 14, 18, 53 L.Ed. 97 (1908).

> *E.E.O.C. v. Pacific Press Publishing Association*, 676 F.2d 1272, 1280 (9th Cir. 1982).

110. Several years ago, the United States Court of Appeals for the Eleventh Circuit quoted *Quarles*, confirming a private citizen's right to inform.

> Although "a private citizen lacks a judicially cognizable interest in the prosecution . . . of another." private citizens have the right to inform law enforcement officers of violations of the law. *Leeke v. Timmerman*, 454 U.S. 83, 85-86, 102 S.Ct. 69, 70, 70 L.Ed.2d 65 (1982) (internal quotation marks omitted). *In re Quarles*, 158 U.S. 532, 535-36, 15 S.Ct. 959, 960-61, 39 L.Ed. 1080 (1895).

> *Woody v. Cronic*, 401 Fed.Appx. 509, 512 (11th Cir. 2010).

## SECOND COURSE OF ACTION
## SECURITIES FRAUD
### Against All Defendants

111. The facts in paragraphs 2 through 105, as stated above, are incorporated herein by reference as though fully set forth in this cause of action against all of the Defendants for securities fraud. The Defendants' ongoing misrepresentations of Pulse began in the fall of 2013 and continued until May of 2018 when it became known to Plaintiff Scott Meide to be fraud, which caused the loss for which Plaintiff Scott Meide seeks to recover.

112. The securities fraud statute provides:

> **(a) Use of interstate commerce for purpose of fraud or deceit**
> It shall be unlawful for any person in the offer or sale of any securities (including security-based swaps) or any security-based swap agreement (as defined in section 78c(a)(78)[1] of this title) by the use of any means or instruments of transportation or communication in interstate commerce or by

use of the mails, directly or indirectly—

**(1)** to employ any device, scheme, or artifice to defraud, or

**(2)** to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

**(3)** to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

5 U.S. Code § 77q - Fraudulent interstate transactions

113. The time limitations in this instance under 28 U.S.C. § 1658 are:

**(a)** Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of action accrues.

**(b)** Notwithstanding subsection (a), a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(47)), may be brought not later than the earlier of—

**(1)** 2 years after the discovery of the facts constituting the violation; or

**(2)** 5 years after such violation.

28 U.S. Code § 1658 - Time limitations on the commencement of civil actions arising under Acts of Congress

114. A § 10(b) plaintiff only needs to show that "it is 'as least likely as' not that the defendant acted with the relevant knowledge or intent..." *Merck & Co. v. Reynolds*, 559 U.S. 633, 649, 130 S.Ct. 1784, 176 L.Ed.2d 582 (2010) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 328, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007)).

To state a claim under § 10(b) and Rule 10b-5, a plaintiff must allege:

(1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss [i.e., damages]; and (6) a causal connection between the material misrepresentation or omission and the loss, commonly called "loss causation."

31

1

2  *Id.* at 1236-37 (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005)).

3  *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1295 (11th Cir. 2011) (brackets in original) (footnote omitted).

4

5

**THIRD COURSE OF ACTION**
**AIDING AND ABETTING**

6  **Against Defendants Agnes King, Laura Anthony, and Michael Pollaccia**

7  115. The facts in paragraphs 2 through 105, as stated above, are incorporated herein

8  by reference as though fully set forth in this cause of action against Defendants Agnes King,

9  Laura Anthony, and Michael Pollaccia for aiding and abetting the other Defendants in this

10  action that caused the loss for which Plaintiff Scott Meide seeks to recover.

11  116. Federal courts have generally stated the requirements for aiding and abetting

12  liability in a securities fraud case as (1) the existence of a securities law violation by the

13  primary party, (2) general awareness by the aider and abettor that his role was part of an

14  overall activity that is improper, and (3) substantial assistance by the aider and abettor in the

15  achievement of the primary violation. *See, e.g., IIT v. Cornfeld*, 619 F.2d 909, 922 (2d Cir.

16  1980); *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 94-95 (5th Cir. 1975).

17  This three-part test, with slight variations, has been accepted by every circuit that has considered the issue of aiding and abetting 10b-5 violations.

18

19  *Woods v. Barnett Bank of Fort Lauderdale*, 765 F.2d 1004, 1009 n. 8 (11th Cir. 1985) (citations omitted).

20  117. This district continues to cite *Woodward*.

21  Liability for aiding and abetting is established when "some other party has committed a securities law violation," the defendant "had general awareness

22  that his role was part of an overall activity that is improper," and the defendant "knowingly and substantially assisted the violation." *Woodward v. Metro*

23  *Bank of Dallas*, 522 F.2d 84, 94 (5th Cir. 1975) (quoting *S.E.C. v. Coffey*, 493 F.2d 1304, 1316 (6th Cir. 1974)).

24

1      *S.E.C. v. Risher*, Case No. 6:11-cv-1440-Orl-18GJK (M.D. Fla. 4/25/2013).

2
3
4
5
     [T]o establish aiding and abetting violations of the securities laws, the SEC must show (1) the defendant had knowledge of (2) a primary violation of the securities laws and (3) knowingly rendered substantial assistance. 15 U.S.C. § 78t; *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 97 (5th Cir. 1975);3 SEC v. BIH Corp., No. 2:10-CV-577-FTM-29, 2011 WL 3862530, at *6 (M.D. Fla. Aug. 31, 2011) (citing *SEC v. Monterosso*, 768 F.Supp.2d 1244, 1269 (S.D. Fla. 2011)).

6
7
     *S.E.C. v. Wealth Strategy Partners, LC*, Case No. 8:14-cv-02427-T-27TGW (M.D. Fla. 6/5/2015).

8
9

**FOURTH CAUSE OF ACTION**
**BREACH OF GOOD FAITH AND FAIR DEALING**
**Against All Defendants**

10      117. The facts in paragraphs 2 through 105, as stated above, are incorporated herein

11 by reference as though fully set forth in this cause of action against all of the Defendants for

12 breach of good faith and fair dealing that caused the loss for which Plaintiff Scott Meide

13 seeks to recover.

14
15
16
17
18
     Florida's implied covenant of good faith and fair dealing is a gap-filling default rule. It is usually raised when a question is not resolved by the terms of the contract or when one party has the power to make a discretionary decision without defined standards. Where there are no standards for exercising discretion, the implied covenant of good faith protects contracting parties' reasonable commercial expectations. "Unless no reasonable party in the position of [Publix] would have made the same discretionary decision [Publix] made, it seems unlikely that its decision would violate the covenant of good faith ...."

19
20
     *Publix Super Mkts., Inc. v. Wilder Corp. of Del.*, 876 So.2d 652, 654-55 (Fla. 2d DCA 2004) (citations omitted) (quoting *Sepe v. City of Safety Harbor*, 761 So.2d 1182, 1185 (Fla. 2d DCA 2000)); *see also Meruelo v. Mark Andrew of Palm Beaches, Ld.*, 12 So.3d 247 (Fla. 4th DCA 2009).

21
22
     *Overseas Inv. Group v. Wall St. Electronica, Inc.*, 181 So.3d 1288, 1291 (Fla. 4th DCA 2016).

23      . . .

24      . . .

33

**FIFTH CAUSE OF ACTION**
**BREACH OF FIDUCIARY DUTY**
**Against All Defendants**

118. The facts in paragraphs 2 through 105, as stated above, are incorporated herein by reference as though fully set forth in this cause of action against all of the Defendants for breach of fiduciary duty that caused the loss for which Plaintiff Scott Meide seeks to recover.

> The elements of a claim for breach of fiduciary duty are: the existence of a fiduciary duty, and the breach of that duty such that it is the proximate cause of the plaintiff's damages.
>
> *Gracey v. Eaker*, 837 So.2d. 348. 353 (Fla 2002) (footnote omitted).
> To state a claim for breach of the duty of prudence on the basis of inside information. a plaintiff must plausibly allege an alternative action that the defendant could have taken that would have been consistent with the securities laws and that a prudent fiduciary in the same circumstances would not have viewed as more likely to harm the fund than to help it.
>
> *Fifth Third Bancorp v. Dudenhoeffer*, 134 S.Ct. 2459, 2472 (2014).

**SIXTH CAUSE OF ACTION**
**FRAUD**
**Against All Defendants**

119. The facts in paragraphs 2 through 105, as stated above, are incorporated herein by reference as though fully set forth in this cause of action against all of the Defendants for fraud that caused the loss for which Plaintiff Scott Meide seeks to recover.

> In a fraud claim, there must be evidence of "the [speaker's] knowledge that the representation is false." *Wadlington v. Cont'l Med. Servs., Inc.*, 907 So.2d 631, 632 (Fla. 4th DCA 2005) (quoting *Cohen v. Kravit Estate Buyers, Inc.*, 843 So.2d 989. 991 (Fla. 4th DCA 2003)).
>
> *MDVIP, Inc. v. Beber*, 222 So.3d 555, 562 (2017).

120. However, "[a] promise to deliver an 'exceptional' product or service is a matter of opinion rather than fact, and constitutes non-actionable puffery", *see id.* at 561.

34

Puffery does not apply in this case.

## SEVENTH CAUSE OF ACTION
## CIVIL CONSPIRACY
### Against All Defendants

121. The facts in paragraphs 2 through 105, as stated above, are incorporated herein by reference as though fully set forth in this cause of action against all of the Defendants for civil conspiracy that caused the loss for which Plaintiff Scott Meide seeks to recover.

> Next, we address the plaintiff's civil-conspiracy claim. The elements of the claim under Florida law are as follows:
>
> > (a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy.
>
> *Raimi v. Furlong*, 702 So. 1273, 1284 (Fla. Dist. Ct. App. 1997). "Each coconspirator need not act to further a conspiracy; each 'need only know of the scheme and assist in it in some way to be held responsible for all of the acts of his coconspirators.'" *Charles v. Fla. Foreclosure Placement Ctr., LLC*, 988 So.2d 1157, 1160 (Fla. Dist. Ct. App. 2008) (quoting *Donofrio v. Matassini*, 503 So. 2d 1278, 1281 (Fla. Dist. Ct. App. 1987)).
>
> *Cordell Consultant, Inc. v. Abbott*, No. 13-10143 (11th Cir. 4/1/2014).

## RELIEF REQUESTED

WHEREFORE, Plaintiff Scott Meide requests this Honorable Court to grant him the following relief.

1.    That this Court convene a grand jury, pursuant to Rule 6(a) of the Federal Rules of Criminal Procedure, to investigate the crimes complained of herein;

2.    A jury trial on all issues triable by jury;

3.    Compensatory damages in an amount to be determined by a jury;

4.    Punitive damages in an amount to be determined by a jury;

5.    Plaintiff's costs of this suit;

35

1    6.    A declaratory judgment, pursuant to 28 U.S.C. § 2201, that the actions of the

2    Defendants herein constitute violations of federal criminal law;

3    7.    An injunction, pursuant to 28 U.S.C. § 2202, ordering the Defendants to

4    disgorge their ill-gotten gains and return them to this Plaintiff;

5    8.    Such other relief as this Court deems just, proper and equitable.

6    Respectfully submitted,

     August 27, 2018

7    /s/  Scott Meide
     Scott Meide

8    4446-1 Hendricks Avenue, Suite 327
     Jacksonville, FL  32207

9    Phone: 904-343-1094
     Email:  jsicenterzo@gmail.com

10

11   **VERIFICATION**

12   The undersigned Plaintiff bringing this action, certifies pursuant to 28 U.S.C. § 1746,

13   that he has read the foregoing complaint and declares it to be true and correct, to the best of

14   his knowledge and belief.

15   /s/  Scott Meide

16

17

18

19

20

21

22

23

24