FILED

# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DISTRICT



Nov 1
2019 OCT 02 AM 9:25
CLERK, US DISTRICT C...
MIDDLE DISTRICT OF PL...
JACKSONVILLE DIST...

| | | |
|---|---|---|
| Scott Meide, | ) | |
| Plaintiff | ) | Civil Action No. 3:18-CV-01037 |
| | ) | |
| v. | ) | |
| | ) | **SECOND AMENDED COMPLAINT** |
| Pulse Evolution Corporation | ) | **JURY TRIAL DEMAND** |
| John Textor | ) | **F.R.Civ. P. 38 (b)** |
| Gregory Centineo | ) | |
| Julie Natale | ) | |
| Dana Tejeda | ) | |
| Agnes King | ) | |
| John King | ) | |
| Evolution AI Corporation | ) | |
| Jordan Fiksenbaum | ) | |
| Laura Anthony | ) | |
| Frank Patterson, | ) | |
| Defendants | ) | |

_____/

## Statement of the Case

1. Plaintiff has been the (repeated) victim of a series of "pump and dump" stock scams perpetrated by the Defendants.

1

Defendants apparently have a history of mail fraud and wire fraud activities, in which-- so far—the courts haven't so much as slowed them down.

## Jurisdiction

2. Jurisdiction of this Court is invoked pursuant to

3. 15 U.S.C.§§ 77 and 78,

4. 28 U.S.C.§1658(b),

5. a fraud claim under §10(b) of the Securities Exchange Act of 1934,

6. 28 U.S.C.§1331, the general federal question statute,

7. 28 U.S.C.§§ 2201 and 2202, for declaratory and injunctive relief, and

8. 28 U.S.C.§1367(a), the supplemental jurisdiction statute.

## Parties
### Plaintiff

9. Plaintiff Scott Meide has an address of 4446-1 Hendricks Ave, Ste. 327, Jacksonville FL, 32207.

## Defendants

10. Defendant Pulse Evolution Corporation, now known as Facebank Group, Inc. has an address of 10521 SW Village Center Dr., Suite 201, Port St. Lucie Florida 34987.

11. Defendant John Textor has an address of 9995 SE Federal Hwy., Suite #1995, Hobe Sound, Florida 33455.

12. Defendant Gregory Centineo has an address of 8872 Maple Hill Court, Boynton Beach Florida 33473.

13. Defendant Julie Natale has an address of 8872 Maple Hill Court, Boynton Beach Florida 33473.

14. Defendant Dana Tejeda has an address of 245 NE 14th St., Apt. #3808, Miami FL 33132

15. Defendant Agnes King has an address of 213 Bridge Creek Dr., St. John's Florida 32259

16. Defendant John King has an address of 213 Bridge Creek Dr., St. John's Florida 32259

17. Defendant Evolution AI Corporation has an address of 9995 SE Federal Hwy, Suite 1955, Hobe Sound, Florida 33455.

18. Defendant Jordan Fiksenbaum has an address of 10521 SW Village Center Dr., Suite 201, Port St. Lucie Florida 34987.

19. Defendant Laura Anthony has an address of 625 N. Flagler Drive, Suite 600,

West Palm Beach FL., 33401.

20. Defendant Frank Patterson has an address of Pinewood Atlanta Studios, 461 Sandy Creek Rd, Fayetteville Georgia 30214.

## Factual Allegations Applicable To All Counts
### First Person Account by Plaintiff Scott Meide

21. In approximately November 2013, John King, ("**King**") an unlicensed broker, initiated telephone contact with me and started telling me about a financial opportunity I might be interested in with a hologram technology and artificial intelligence company named Pulse Evolution Corporation ("**Pulse**").

22. King said Pulse produced computer-generated human likenesses which would be utilized in many industries such as education, telecommunication, the military, HVAC, automotive, entertainment, life sciences and the like. This statement was false, misleading and a material misrepresentation and he knew it.

23. These statements sparked my interest in the company.

24. King then asked me if I would like more information and after saying yes, he said he needed to get Gregory Centineo ("**Centineo**") on the phone. He did so by contacting either Dana Tejeda ("**Tejeda**") or Julie Natale ("**Natale**") and it was these two

4

that would arrange many calls with all 5 of us on the line: myself, King, Centineo, Tejeda and Natale.

25. For the next several months, this group of 5 people were on the phone many times in November and December of 2013, even months afterwards also and this point was the beginning of them making extravagant claims on the technology or the merits of the company and the management of Pulse Evolution Corporation. (All claims are delineated below).

26. After many of these calls were over, I'd continue to talk with Tejeda and Natale and have individual calls with them and they would reinforce the extravagant claims King and Centineo were making on these calls.

27. These claims were material misrepresentations, false and misleading, they knew they were false and misleading, and I relied on this information to later invest in the company and therefore was damaged in the amount of $775,000, more fully explained, infra.

28. In November and December 2013, Centineo and King told me numerous times on the telephone that Pulse would be showcasing a hologram of Michael Jackson at the 2014 Billboard Music Awards that and Pulse had already produced a hologram of rapper Tupac Shakur at the 2012 Coachella Concert.

29. They stated this was John Textor's ("**Textor**") technology.

30. These two also informed me about a Mr. Alki David who was suing Textor around the time of the Billboards Music show and the litigation revolved around what I believed to be ownership of the technology. Both shows were performed but I do not know who produced those shows.

31. King and Centineo also said numerous times that Pulse had a signed contract already with the Michael Jackson estate in which they would own 40% of any holographic production of any kind with the Jackson Estate. They both also stated this was exclusive only to Pulse Evolution.

32. These statements were false, misleading and materially misrepresented and they knew they were false.

33. I relied on this information to invest in the Textor's companies and therefore was damaged in the amount of $775,000.

34. In early 2014, King and Centineo set up a meeting in South Florida with Textor, Pulse Evolution's founder and owner in which Tejeda, Natale, King, Centineo and Frank Patterson ("**Patterson**") were all present.

35. Textor and Patterson stated to me at that meeting that Pulse would own a percentage of any hologram production that utilized their technology and would get a big

6

cut of the proceeds, especially Michael Jackson.

36. This would give Pulse ongoing revenues, and this is how Pulse would be different from other similar technology companies.

37. Textor and Patterson explained to me that if I purchased shares in the company, that the shares would be free trading in one year and the company would do an initial public offering, IPO, on a major stock platform.

38. These statements were false and misleading; material misrepresentations and they knew they were false and misleading statements and I relied on this information to invest money in their company.

39. Here it is November 2019, five years after my first investment with the company and not one share is free trading or unrestricted and there was never an IPO as they are on the OTC which is now branded the Pink Open Market, which Investopedia.com states, "Is the lowest and most speculative tier of the three marketplaces for the trading of over-the-counter stocks. All three tiers are provided and operated by the OTC Markets Group. This marketplace offers to trade in a wide range of equities through any broker and includes companies in default or financial distress.

40. At the same meeting, Textor stated he lost 20 million dollars of his own money regarding some type of short sale some stockholder made on Digital Domain, a company Textor used to be involved with. So, to prevent this in the future, Textor said

he had a plan to control the price of the stock and said *if I purchased stock* in the company, he would only allow certain investors to sell a small portion of their shares at a time, at Textor's discretion and this is how Textor would control the stock price.

41. He also made a point that he would only be doing this to investors that King and Centineo brought into the company.

42. In many more conversations with King, Agnes King ("**Agnes**") (She was on some of the calls because she chimed in sometimes and she listened to many calls as King would have the call on speaker phone with her listening), Centineo, Tejeda, Natale and Textor all on the phone in the first half of 2014 before I purchased 750,000 restricted shares of Pulse Evolution Corporation on July 18, 2014 for $300,000, it was stated:

43. That if I purchased shares in the company, they would give me a great deal on the price of the shares that other investors were not getting, and this opportunity was exclusive only to me and a small handful of people that King and Centineo brought into Pulse. [When Textor was on the phone with the other defendants, he would always control the conversation and he would be making most of the deceitful statements and when he was not on the call, King and Centineo would be making most of the deceitful statements.]

44. My shares would become free trading in one year approximately.

8

45. Pulse would be doing an IPO (Initial Public Offering) and would come out on a *major* stock exchange.

46. Pulse was in contract negotiations with big name estates like Marilyn Monroe, Elvis, ABBA, Prince and other high-ranking celebrities, either currently living or deceased and had already signed contracts with multiple estates.

47. Pulse would eventually be bought out by companies such as Google, they all said.

48. King and Agnes expressed the same sentiment to me on many occasions. One of those occasions was at their residence two years ago during the Florida v Tennessee football game on September 21, 2017. At this occasion, extravagant claims about Pulse were being peddled and another fraudulent investment scheme called Legends of Oz; Dorothy's Return was being perpetrated.

49. My investment would reap phenomenal returns as the stock would reach 10-15 dollars per share and beyond because Textor knew how to control the stock price, told to me originally by King and Centineo then Textor on the phone and personally.

50. I had better get in now I was told because this opportunity won't last forever for me. Textor, King and Centineo all told me this.

51. Textor owned an animation studio called Tradition Studios and Centineo would be the head. The massive studio was located next to Textor's Port St. Lucie's office and the studio was somehow built by the State of Florida years ago but was never utilized and that's where the future office of Pulse would be headquartered, told to me by King, Centineo and Textor.

52. My investment, if I chose to invest, would make me "whole" from my staggering losses in my previous investment of Legends of Oz: Dorothy's Return and my Legends of Oz investment is not lost as the franchise and movie will be cleaned up and the movie will be re-released. See *Meide et al v. Centineo et al.*, No. CV19-7171, Central District of California.

53. Told to me numerous times by King, Agnes, Centineo, Textor, Natale and Tejeda on multiple occasions (from 2014 through 2018) on the phone and personally (especially when Centineo and Natale were in Amelia Island in 2016.)

54. I later learned in late 2018 that a really great friend of the Kings, Danny Nesbitt, lost everything he owned due to a land investment deal with King, an investment with King's friend John Sarkela, purchasing a pre-kindergarten school from King and investing everything else he owned into the alleged Legends of Oz franchise/movie. After the Oz movie bombed in May of 2014, Danny Nesbitt and his

wife were told by Agnes, "You just need to let it go, to move on with your lives and stuff like this happens."

55. This same sentiment was texted to me from Agnes the second she learned of this lawsuit against her.

56. All of these statements made by King, Agnes, Centineo, Tejeda, Natale and Textor were all false and misleading, material misrepresentations, they knew they were false and misleading and I relied on this information to make decisions to invest in the company(ies).

> *When visiting the Kings at their residence on many occasions, we always talked about Pulse Evolution and this is when **Agnes King** joined in on all the conversations and perpetrated the fraud, the lies, the deceit and the misrepresentations. * She always talked about how good the technology was, especially mentioning the Billboards Music show and how Textor was smart and would get this done. She told me also that Pulse was years ahead of the competition.*

57. In many more conversations with King, Centineo and Textor on the phone after my first investment on July 18, 2014, the three stated:

58. Other estates were interested in hologram productions and negotiations have ensued with high-ranking celebrities' estates like ABBA and Elvis, for instance. Pulse would get a 5% royalty on the ABBA show but Textor said he didn't care

because this would give Pulse notoriety and that show would make billions of dollars worldwide.

59. Other estates had signed production deals with Pulse, the likes of which I don't remember.

60. A Chinese company invested $10 million into Pulse and King and Textor informed me of this before the press release came out. This news might have been true but was probably false.

61. King and Centineo told me numerous times via the phone or in person that Textor was in Zurich pitching ideas to several billionaires that were huge investors in Pulse.

62. No names were ever given to me.

63. I asked for the names of these billionaires who invested in the company and, to this day, Textor has not provided those names and objected to the question raised (in my Pulse interrogatories.)

64. After Pulse became a publicly traded entity (**PLFX**) sometime in 2015 on the Pink Open Market (not a major stock platform), I was regularly told of events before they were made publicly available.

65. That information given to me they said could be construed as "insider information" and to keep it between ourselves.

66. I was told in early 2017 by King, Textor and Centineo on the telephone and in person many times with John King that Simon Fuller, the mega film and TV producer known for the American Idol franchise, would be working in conjunction with Pulse Evolution to produce an Elvis hologram production.

67. I was told this would be exclusive only with Pulse. This show was never completed.

68. I was told before it was known to the public that Simon Fuller would be producing an ABBA hologram production worldwide (contract was signed) and Textor and Centineo would have offices in Fuller's penthouse office suite in Los Angeles and would be working side by side with Simon Fuller. It's October 2019 and there has been no show.

69. I was told this by King, Centineo and Textor on multiple occasions.

70. The stock price would open around $2.00/ share. It opened at $1.85. Today's stock price hovers around 0.04.

71. My 800,000 shares purchased from Centineo's personal shares on July 30, 2015, according to Centineo would become free trading in three months, in October

2015. That didn't happen.

72. It's November 2019 and those "worthless" shares are still restricted.

73. This was told to me by King and Centineo for three to four weeks before I purchased those shares.

74. They knew this was false and misleading and I relied on this information to purchase those restricted shares and was therefore damaged in the amount described herein.

75. Pulse had a lock on the hologram technology and was years ahead of the competition, if there was any relevant competition. Every single defendant told me this.

76. In late 2017 and early 2018, King and Textor told me that Bruno Mars and his manager had done something with three of Michael Jackson's new songs that have never been heard before and would soon be performed in a special television event along with the Michael Jackson hologram in the first quarter of 2018.

77. That has not happened and it's October 2019.

78. This was a false and misleading statement, lies and a material misrepresentation and I relied on this information to invest in Textor's companies as

14

King would always tell me on the phone and in person that John Textor had Dupont blood and he gets things done. He is 2 out of 3 in accomplishing something great and he would do it again with Pulse.

79. Then came the new company Evolution AI ("**AI**") in which many inducements were made to me.

80. In December 2017, John King told me via the telephone that Textor had formed a new company called AI and that Textor was upset at Pulse (Textor owned about a third of Pulse) because Pulse was not interested in artificial intelligence.

81. In December 2017, King told me via the telephone that the billionaire investors in Pulse wanted to take the entertainment route with Pulse, producing all the shows revolving around Michael Jackson, Marilyn Monroe, Elvis and other celebrities, while Textor wanted the company to concentrate on the artificial intelligence aspect of technology.

82. Textor also repeated this to me in December 2017 and January 2018 via the telephone.

83. These statements were false and misleading, and they knew they were false and misleading, and I relied on this information to invest in AI and therefore was additionally damaged in the amount of $75,000.

15

84. In December 2017 and early 2018 while King and Textor were pitching AI to me via telephone, they both told me that there was still a requirement for roughly $350,000 to turn Pulse into a fully reporting company again.

85. At some point in time, Pulse was a fully reporting company and I was told by Textor on these same calls that the Switzerland billionaires who invested into Pulse and who were giving Textor and his company $600,000 a month to keep the company afloat, wanted Pulse to change their status with the SEC to a non-reporting company because all of the billionaire Switzerland investors all owned private companies (therefore non reporting companies) and that's what they wanted Pulse to be.

86. Since they were paying $600,000 monthly to Textor, he said he basically had to abide by their wishes.

87. These statements were utterly false and misleading and they both knew they were false and misleading, and I relied on this information to invest $75,000 into AI, therefore being damaged an additional $75,000.

88. In January 2018 via telephone while pitching AI to me, King said Tiger Wood's x-wife wanted to put in 13 million needed to finish the Elvis show.

89. The Elvis show never happened and King and Textor knew it would

never happen and I relied on this information to invest an additional $75,000 into AI and was therefore additionally damaged $75,000.

90. Although I did invest in AI, it was this statement that led me to start thinking that something was truly wrong here and subsequently around May of 2018, I learned that both Pulse and Textor have been mired in numerous lawsuits with allegations of fraud and securities violations being the most predominant claims against them.

91. I therefore asked Textor for a refund and he refused and came back at me with other lies and deceit. See Exhibit A, attached hereto.

92. I asked Textor on a call with King in January 2018 why Textor could not put any of his own money into AI? Textor's response was that, besides his house, he did not have any money and he was a worker bee, a tech guy and not a money guy.

93. In January 2018, Textor and King told me via the telephone that Evolution AI was going to IPO on the NYSE, and the only people who would have free trading shares were myself, King, and Textor. See Exhibit B, letter of John Textor dated December 11, 2017, attached hereto.

94. Textor said if I put $75,000 into the new company, Evolution AI, he would give me a million more shares in the new company which, added to my Pulse shares, I would be buying 2.5 million shares.

95. Textor told me they would do a 10 to 1 reverse stock split and that the shares would be trading at $10-11 per share on the New York Stock Exchange.

96. Textor told me that he needed this $75,000 to help make Pulse a fully reporting company again.

97. Textor told me that if I put $75,000 into the new AI company, then Textor would make things right as he said my $400,000 transaction with Centineo for 800,000 Pulse restricted shares on July 30, 2015 with me was not fair and he wanted to make it right.

98. All of these statements were material misrepresentations, lies, false and misleading and they knew they were false and misleading upon which I relied. I relied on these falsehoods to invest in Textor's companies. I claim damages of $775,000 from these actions.

### Jordan Fiksenbaum

99. Defendant Jordan Fiksenbaum, as Chief Executive Officer of Pulse, is directly responsible for all governance and adherence to fiduciary and ethical behavior.

### Dana Tejeda and Julie Natale

100. Tejeda and Natale arranged many calls with and participated on many calls

with the Kings, Centineo, Textor and me commencing approximately November of 2013. As stated previously, this was the beginning of them making extravagant claims on the technology or the merits of the company and the management of Pulse.

101. After some of these calls, while the Kings, Centineo and Textor would hang up, I would have individual conversations with Tejeda and Natale and they would reinforce the extravagant claims King and Centineo made on the calls. These claims were material misrepresentations, false and misleading, they knew they were false and misleading, and I relied on this false and misleading information to invest in the companies and therefore was damaged in the amount of $775,000.

## Agnes King

102. On many phone conversations with King, Centineo, Tejeda, Natale and Textor, Agnes was on some of the calls because she chimed in sometimes in the middle of the conversation and she listened to many calls as John King would either have a conference call with her on the line or she was listening at their residence.

103. I cannot detail which calls she was on, but she was on them, participated in them, and therefore knew about their false and misleading statements.

104. I relied on these conversations to purchase shares in this fraudulent company and was therefore damaged in the amount of $775,000.

105. In addition, the Kings had monthly GIN (Global Information Network) meetings at their residence for approximately two years with an average attendance of 20 people and it was at these meetings that both the Kings would perpetrate the fraud, the lies, the deceit and the material misrepresentations and the extravagant claims of the Pulse technology described herein.

106. In attendance at most of these meetings were my brother Jeff Meide, King's longtime friend Larry Thomas (who also invested in Oz in the amount of $300,000 and was also solicited for the Pulse investment) and another investor Kirk Luchman and his wife Virginia.

107. George and Chris Salameh who are in the insurance industry were solicited by the Kings to invest $100,000 into Legends of Oz and Pulse (but never did) and to take both investments to all of their clients and try to obtain a $100,000 investment from them.

### Laura Anthony

108. Laura Anthony ("**Anthony**") as the Compliance Officer for Pulse appears to be the enabler of the scam that victimized Plaintiff. Anthony's position as Pulse and AI counsel is attached hereto as Exhibit C, letter dated February 1, 2018 to O.T.C. Markets Group and Exhibit D.

109. Her participation in numerous stock frauds appears to be well-known. One example from the internet summarizes her activities succinctly:

## 110. Laura Anthony Deficient Opinion Letter

Laura Anthony provided the attorney letter for PLFX vouching for the information in the OTC disclosures (including all the missing disclosures involving share issuances and lawsuits, misleading information about current business operations, and the accounting errors). According to her attorney letter the financials were prepared by Arnand Gupta. The Anthony Attorney letter described Arnand Gupta as being based in New York and having extensive experience preparing financial statements for public companies. I could find no other public companies that Gupta had done any work for up to this point. I looked up his background, and Gupta does have a Bachelor's Degree in Accountancy from Oxford Brookes University and is a member of the American Institute of Certified Public Accounts. He spent almost his entire career working in the accounting departments for Media companies including BDO Stoy Hayward from 1991 - 1996, Warner Brothers from 2005 - 2011, and HBO from 2011 - 2013 before ultimately joining Al Jazeera Media Network in September of 2013 until the network was wound down in early 2016. It must have been at that point that Gupta started working for small public companies like PLFX. John Textor must have really appreciated the shady accounting work provided for him by Anand Gupta because Textor would end up making Gupta his CFO when he moved his forward looking virtual human business venture into his next shell - Recall Studios Inc (BTOP) - more on this later.

By providing the Opinion Letter for PLFX despite all the shortcomings and misstatements in the OTC disclosures, Laura Anthony was giving a false aura of legitimacy to corrupt publicly traded company. That bogus opinion would only serve to further the John Textor cause of raising money from private investors.

**Laura Anthony** of **Legal & Compliance LLC** became the legal counsel for PLFX at the same time that John Textor and his group took over control of the QurApps Inc public shell. Anthony assisted with the reverse merger transaction of Pulse into the QurApps Inc shell. Laura Anthony is also located in West Palm Beach, Florida (same area as John Textor and Edwin Lunsford). Laura Anthony is the wife of infamous shell hijacker Michael Anthony (fka Michael Anthony Pollaccia). Her firm, Legal & Compliance LLC has been involved in lots of public Issuers that have been engaged in

pump & dump activity and even fraud. <u>Many Issuers she represented have ended up suspended by the SEC and many have seen insider Indicted for Securities Fraud</u>. In an email response to an investor that claims that he got ripped off by John Textor and PLFX, Anthony replied that she represented both Pulse Evolution as a company and John Textor as an individual (more on this later). Anthony is still the PLFX legal counsel to this day. She also provided <u>the attorney letter for OTC markets</u> after PLFX stopped reporting to the SEC.

111. Laura Anthony is apparently not above trying to "lie her way out of" the

instant action.

112. From: Laura Anthony <LAnthony@legallandcompliance.com>
Date: July 26. 2018 at 3:05:06 PM EDT
To: Scott Meide <jsicenterzo@gmail.com>
Subject: RE: Pulse Lawsuit

Scott, not only do I not represent the listed defendants, other than Pulse or Mr. Textor, I never heard of any of them. However, your threat to sue me and my husband if you are not paid within 10 days, is clearly extortion. I suggest you seek competent legal counsel before making such threats.

From the desk of
Laura Anthony, Esquire
Legal and Compliance, LLC
330 Clematis St
Suite 217
West Palm Beach, FL. 33401
Office: 561-514-0936
Fax: 561-514-0832
Lanthony@ legallandcompliance.com
www. LegallandCompliance.com

I.e., first she assists other liars, then she tries to lie her way out of her own

involvement. Note the "other than" words in her email.

22

113.  It appears that the Defendants violated S.E.C. Rule 506 as well:

114.  **The Rule 506 Bad Actor Blacklist**

The SEC's final disqualification of bad actors in 506 offerings covers the issuer, including its predecessors and affiliated issuers, as well as:
♦ Directors and certain officers, general partners, and managing members of the issuer.
♦ 20 percent beneficial owners of the issuer.
♦ Promoters.
♦ Investment managers and principals of pooled investment funds.
♦ Persons compensated for soliciting investors as well as the general partners, directors, officers, and managing members of any compensated solicitor.

115.  <u>**Disqualifying Events l Bad Actor Status in Rule 506 Offerings**</u>

Under the final rule, a "disqualifying event" for purposes of a Rule 506 offering includes:
♦ Criminal convictions in connection with the purchase or sale of a security, making of a false filing with the SEC or arising out of the conduct of certain types of financial intermediaries. The criminal conviction must have occurred within 10 years of the proposed sale of securities (or five years in the case of the issuer and its predecessors and affiliated issuers)
♦ Court injunctions and restraining orders in connection with the purchase or sale of a security, making of a false filing with the <u>SEC,</u> or arising out of the conduct of certain types of financial intermediaries. The injunction or restraining order must have occurred within five years of the proposed sale of securities.
♦ Final orders from the Commodity Futures Trading Commission, federal banking agencies, the National Credit Union Administration, or state regulators of securities, insurance, banking, savings associations, or credit unions that (i) bar the issuer from associating with a regulated entity, engaging in the business   of securities, insurance or banking, or engaging in savings association or credit union activities, or (ii) are based on fraudulent, manipulative, or deceptive conduct and are issued within 10 years of the proposed sale of securities.

♦ Certain SEC disciplinary orders relating to brokers, dealers, municipal securities dealers, investment companies, and investment advisers and their associated persons.
♦ SEC cease-and-desist orders related to violations of certain anti-fraud provisions and registration requirements of the federal securities laws.
♦ SEC stop orders and orders suspending the Regulation A exemption issued within five years of the proposed sale of securities.
♦ Suspension or expulsion from membership in a self-regulatory organization (SRO) or from association with an SRO member.
♦ U.S. Postal Service false representation orders issued within five years before the proposed sale of securities.

### Reasonable Care Exception in Rule 506 Offerings

The final rule provides an exception from disqualification when the issuer can show it did not know and, in the exercise of reasonable care, could not have known that a covered person with a disqualifying event participated in its 506 offering.

### Disclosure of Pre-Existing Disqualifying Events

Disqualification applies only for disqualifying events that occur after the effective date of the amendments to Rule 506. But matters that existed before the effective date of the rule and would otherwise be disqualifying are subject to a mandatory disclosure requirement to investors.

## First Cause of Action

## Securities Fraud Against All Defendants

116. Plaintiff re-alleges and adopts by reference herein, Paragraphs 1 – 115 above, and further alleges: Defendants owed a duty of care to Plaintiff to adequately prevent the losses he suffered.

117. Plaintiff suffered damages as a result of the Defendants to follow federal law regarding the sale of securities, more fully addressed, infra.

118. Defendants, by acts of both omission and commission, breached their duty of care to the Plaintiff.

119. As a direct and proximate result of Defendants' breach of their duties to Plaintiff, Plaintiff has suffered damages.

120. The elements of a private securities fraud claim are (1) material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation and the purchase or sale of a company's stock; (4) reliance on the misrepresentation; (5) economic loss; (6) and loss causation. Id. "Whether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance." The elements of a private securities fraud claim are (1) material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation and the purchase or sale of a company's stock; (4) reliance on the misrepresentation; (5) economic loss; and (6) loss causation. Id. " Whether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance." Id. This case is no exception.

121. Reliance is not an element of every private claim. See, e.g., *Clark*, 915 F.2d at 443 (reliance not among elements for insider trading violations of Rule 10b-5).

*S.E.C. v. Rana Research Inc.*, 8 F.3d 1358
(9th Cir. 11/031993)

122. To plead a § 10(b) securities fraud claim, a plaintiff must allege: "(1) material misrepresentation or omission; (2) made with scienter; (3) a connection between the misrepresentation and the purchase or sale of a security; (4) reliance on the misrepresentation or omission; (5) economic loss [i.e. damages]; and (6) a casual connection between the material misrepresentation or omission and the loss, commonly called 'loss causation'". *FindWhat Investor Grp. V. FindWhat.com*, 658 F.3d 1282, 1295 (11th Cir. 2011).

123. Under 28 U.S.C. §1658(b), a fraud claim under § 10(b) of the Securities Exchange Act of 1934, must be filed within the earlier of "2 years after the discovery of the facts constituting the violation; or 5 years after such violation." 28 U.S.C. §1658(b)(2012)[8] . A § 10(b) plaintiff only needs to show that "it is 'as least likely as' not that the defendant acted with the relevant knowledge or intent..." *Merck & Co. v Reynolds*, 559 U.S. 633, 649 (2010) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 328 (2007)).

124. The Securities fraud statute provides:

(a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading or

(3) to engage in any transaction, practice or course of business which operates or would operate as fraud or deceit upon the purchaser.

15 U.S.C. §77q

footnote 1: Section 10(b) of the Exchange Act provides: It shall be unlawful for any person, directly or indirectly,… [t]o use or employ, in connection with the purchase or sale of any security… any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the **public interest** or for the protection of investors. 15 U.S.C. § 78j(b). Section 20(a) of the Exchange Act provides for liability of "controlling persons" who aid and abet "any person liable under any provision of this chapter or of any rule or regulation thereunder."

15 U.S.C. § 78t(a)

125. WHERERFORE, Plaintiff Scott Meide demands entry of a judgment against the Defendants named herein, for the amount within the jurisdictional limits of this court, including an award of interest, attorneys' fees and costs.

126. Plaintiff re-alleges and adopts by reference herein, Paragraphs 1 – 115 above, and further alleges: Defendants owed a duty of care to Plaintiff to adequately prevent the losses he suffered.

## Second Cause of Action

## Breach of Good Faith and Fair Dealing Against All Defendants

127. Plaintiff re-alleges and adopts by reference herein, Paragraphs 1 – 115 above, and further alleges: Defendants owed a duty of care to Plaintiff to adequately prevent the losses he suffered.

128. Plaintiff suffered damages as a result of the Defendants to follow federal law regarding the sale of securities, more fully addressed, infra.

129. Defendants, by acts of both omission and commission, breached their duty of care to the Plaintiff.

130. As a direct and proximate result of Defendants' breach of their duties to Plaintiff, Plaintiff has suffered damages.

131. Florida's implied covenant of good faith and fair dealing is a gap-filled default rule. It is usually raised when a question is not resolved by the terms of the contract or when one party had the power to make a discretionary decision without defined standards. Where there are no standards for exercising discretion, the implied covenant of good faith protects contracting parties' reasonable commercial expectations." Unless no reasonable party in the position of [Publix] would have made the same discretionary decision [Publix] made, it seems unlikely that it's decision would violate the covenant of good faith...." *Publix Super Mkts., Inc. v. Wilder Corp. of Delaware,*

876 So.2d 652, 654-55 (Fla 4th DCA 2004) (citations omitted) (quoting *Sepe v. City of Safety Harbor,* 761 So.2d 1182, 1185 (Fla 2nd DCA 2000)); see also *Meruelo v. Mark Andrew of Palm Beaches, Ltd.,* 12 So.3d 347 (Fla. 4th DCA 2009).

132. WHERERFORE, Plaintiff Scott Meide demands entry of a judgment against the Defendants named herein, for the amount within the jurisdictional limits of this court, including an award of interest, attorneys' fees and costs.

### Third Cause of Action
### Breach of Fiduciary Duty Against All Defendants

133. Plaintiff re-alleges and adopts by reference herein, Paragraphs 1 – 115 above, and further alleges: Defendants owed a duty of care to Plaintiff to adequately prevent the losses he suffered.

134. Plaintiff suffered damages as a result of the Defendants to follow federal law regarding the sale of securities, more fully addressed, infra.

135. Defendants, by acts of both omission and commission, breached their duty of care to the Plaintiff.

136. As a direct and proximate result of Defendants' breach of their duties to Plaintiff, Plaintiff has suffered damages.

137. The elements of a claim for breach of fiduciary duty are: the existence of a fiduciary duty, and the breach of that duty such that it is the proximate cause of the Plaintiff's damages." *Gracey v. Eaker*, 837 So.2d. 348. 353 (Fla 2002) (citations omitted).

## Fourth Cause of Action
### Fraud Against All Defendants

138. Plaintiff re-alleges and adopts by reference herein, Paragraphs 1 – 115 above, and further alleges: Defendants owed a duty of care to Plaintiff to adequately prevent the losses he suffered.

139. Plaintiff suffered damages as a result of the Defendants to follow federal law regarding the sale of securities, more fully addressed, infra.

140. Defendants, by acts of both omission and commission, breached their duty of care to the Plaintiff.

141. As a direct and proximate result of Defendants' breach of their duties to Plaintiff, Plaintiff has suffered damages.

142. The elements of fraud are: (1) a false statement concerning a specific material fact; (2) the Makers knowledge that the representation is false; (3) an intention that the representation induces another's reliance; and (4) consequent injury by the other party

acting in reliance on the representation. *Waddington v. Cont'l Med. Servs.*, 907 So.2d 631, 632 (Fla. 4th DCA 005).

143. WHEREFORE, Plaintiff Scott Meide demands entry of a judgment against the Defendants named herein, for the amount within the jurisdictional limits of this court, including an award of interest, attorneys' fees and costs.

## Fifth Cause of Action
## Civil Conspirary Against All Defendants

144. The elements of the claim under Florida law are as follows: (a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts doe under the conspiracy.

145. Plaintiff suffered damages as a result of the Defendants to follow federal law regarding the sale of securities, more fully addressed, infra.

146. Defendants, by acts of both omission and commission, breached their duty of care to the Plaintiff.

147. As a direct and proximate result of Defendants' breach of their duties to Plaintiff, Plaintiff has suffered damages.

148. See *Raimi v. Furlong*, 702 So.2d 1273, 1284 (Fla. Dist. Ct. App. 1997). "Each coconspirator need not act to further a conspiracy; each 'need only know of the scheme and assist in it in some way to be held responsible for all of the acts of his conspirators.'" *Charles v. Fla. Foreclosure Placement Ctr., LLC*, 988 So.2d 1157, 1160 (Fla. Dist. Ct. App. 2008) (quoting *Donofrio v. Matassini*, 503 So.2d 1278, 1281 (Fla. Dist. Ct. App. 1987)).

149. WHEREFORE, Plaintiff Scott Meide demands entry of a judgment against the Defendants named herein, for the amount within the jurisdictional limits of this court, including an award of interest, attorneys' fees and costs.

## Sixth Cause of Action

### Right of Rescission Against Pulse Evolution Corporation, Evolution AI Corporation, and John Textor

150. Plaintiff was never informed of his right of rescission. Fla Stat. 517.061.

151. Plaintiff suffered damages as a result of the Defendants to follow federal law regarding the sale of securities, more fully addressed, infra.

152. Defendants, by acts of both omission and commission, breached their duty of care to the Plaintiff.

153. As a direct and proximate result of Defendants' breach of their duties to Plaintiff, Plaintiff has suffered damages.

154. The Defendants engaged in the sale of securities through unregistered individuals who were paid commissions on sales of securities.    Fla Stat. 517.211.

155. They failed to disclose the payment of all commissions to unregistered parties. Fla Stat. 517.301.

156. A Florida Court of Appeals case gives a succinct summary:

> The FSIPA makes it unlawful to, "in connection with the offer, sale, or purchase of any investment or security, . . . obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, . . . not misleading." § 517.301, Fla. Stat. (2012). The FSIPA provides for a remedy of rescission for all violations of section 517.301 "if the plaintiff still owns the security." *Id.* § 517.211. Joint and several liability under section 517.301 extends to any "director, officer, partner, or agent [of the seller who] has personally participated or aided in making the sale or purchase." *Id.*
>
> In *E.F. Hutton & Co. v. Rousseff*, 537 So.2d 978, 979 (Fla. 1989), the Florida Supreme Court analogized claims under section 517.211(3) seeking rescission to claims under section 12 of the Securities Act of 1933, which is codified at 15 U.S.C. § 77(*l*) (2016), as well as common law claims for rescission. Section 517.211(2) limits liability to persons involved directly in the sale of the security and damages are limited to the consideration paid. 537 So.2d at 981. A claim for rescission under section 517.211 includes: 1) a misrepresentation or omission, 2) of a material fact, 3) on which the buyer relied.[17] *See Kashner Davidson Sec. Corp. v. Desrosiers*, 689 So.2d 1106,
>
> 1107 (Fla. 2d DCA 1997) (citing *Rousseff*, 537 So.2d at 981).

157. WHERERFORE, Plaintiff Scott Meide demands entry of a judgment against the Defendants named herein, for the amount within the jurisdictional limits of this court, including an award of interest, attorneys' fees and costs.

## Relief Requested

1. A jury trial on all issues triable by jury,

2. Compensatory damages in an amount to be determined by a jury,

3. Punitive damages in an amount to be determined by a jury,

4. Plaintiff's cost of this suit,

5. A declaratory judgment, pursuant to 28 U.S.C. § 2201, that the actions of the defendants herein constitute violations of federal criminal law,

6. An injunction, pursuant to 28 U.S.C. § 2202, ordering the Defendants to disgorge their ill-gotten gains and return them to this Plaintiff,

7. Such other relief as this Court deems just, proper and equitable.

Respectfully submitted,

November 1, 2018

_(signature)_

Scott Meide
4446-1 Hendricks Ave Ste. 327
Jacksonville FL, 32207
904. 343. 1094.
jsicenterzo@gmail.com

## Verification

The undersigned Plaintiff bringing this action certifies pursuant to 28 U.S.C.

§1746, that he has read the foregoing complaint and declares it to be true and correct, to

the best of his knowledge and belief.

_(signature)_

Scott Meide

# Certificate of Service

This certifies that I have on this 1st day of November, 2019, placed a true and correct copy of my

## SECOND AMENDED COMPLAINT

in the U.S. Mails, first-class postage prepaid, addressed and emailed to

Michael D. Lee, Florida Bar No.: 495336
Liles Gavin, P.A.
*Attorneys for Defendants Gregory Centineo, Julie Natale, Agnes King and John King*
301 W. Bay St. Suite 1030
Jacksonville, Florida 32202
(904) 634-1100
mlee@thelilesfirm.com

Richard George Salazar, Florida Bar No.: 0899615
Buchanan Ingersoll & Rooney
*Attorneys for Defendants Pulse Evolution Corporation, Evolution AI Corporation.*
*Jordan Fiksenbaum, Frank Patterson and John Textor*
401 E. Jackson St., Suite 2400
Tampa, Florida 33602-5236
(813) 222- 8180
richard.salazar@bipc.com

Dana Tejeda, Defendant
245 NE 14th Street, Apt. 3808
Miami, Florida 33132-1641
Dana.t@icloud.com

Robert Francis Salkowski
Zarco, Einhorn, Salkowski and Brito, PA

*Attorneys for Defendants Laura Anthony and Michael Pollaccia, aka Michael Anthony*
2 Southern Biscayne Blvd, Suite 3400
Miami, Florida   33131
(305) 374- 5418
rsalkowski@zarcolaw.com

Scott Meide