UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

SCOTT MEIDE,

        Plaintiff,

v.

PULSE EVOLUTION CORP., *et al.*,

        Defendants.

_____/

Civil Action File Number
**3:18-CV-1037-MMH-MCR**

AMENDED COMPLAINT

## PLAINTIFF'S SECOND AMENDED COMPLAINT FOR DAMAGES, RECISSION, SHAREHOLDER'S DERIVIATIVE ACTION AND INJUNCTIVE RELIEF

COMES NOW Jacksonville Injury Center, LLC as the real party in interest and along with a Motion to Substitute Real Party in Interest filed contemporaneously with this Second Amended Complaint states as follows:

1. This is an action for damages or recission based upon Defendant's intentional misrepresentations that fraudulently induced Plaintiff to invest in and purchase securities from Defendant Pulse Evolution Corporation ("PEC").

2. Additionally, Plaintiff seeks injunctive and equitable relief associated with and through a Shareholder Derivative action, pursuant to FLA. STAT. §607.0742.

3. Plaintiff/Real Party in Interest Jacksonville Injury Center, LLC (hereinafter, "JIC") is a Florida limited liability company with principal offices in Jacksonville, Florida, and is wholly owned by the JIC Management Trust.

4. Scott Meide is the Trustee and beneficiary of the JIC Management Trust.

## PARTIES

5. Scott Meide is the beneficial owner of the shares owned by Plaintiff/Real Party in Interest, JIC, and maintains an address of 4446-1 Hendricks Avenue, Suite 327, Jacksonville, Florida 32207.

6. Defendant Pulse Evolution Corporation, maintains a corporate presence in the State of Florida through its Registered Agent, Edwin C. Lunsford at 2000 PGA Boulevard, Suite 4 3200, Palm Beach Gardens, Florida 33408-2700.

7. Defendant John Textor is the Chief Executive Officer of Face Bank Group, Inc., formerly Pulse Evolution Group, formerly Recall Studios, Inc. and maintains an address of 153 Gomez Road, Hobe Sound, Florida

8. Defendant Gregory Centineo has an address of 8872 Maple Hill Court, 13 Boynton Beach, Florida 33473-4855.

9. Defendant John King has an address of 213 North Bridge Creek Drive, Saint 21 Johns, Florida 32259-8883.

10. Defendant Evolution AI Corporation is a Florida for Profit Corporation filed with the Florida Secretary of State on October 31, 2017 with an effective

date of November 1 2017, with a principal and mailing address of 11450 SE

Dixie Highway, Hobe Sound, Florida 33455. Its registered agent is

Wyndcrest Holdings, LLC, 9995 SE Federal Highway, #1955, Hobe Sound,

Florida 33455 (a post office address).

11. Defendant Jordan Fiksenbaum is the CEO of PEC with an address of 11450

SE Dixie Highway, Hobe Sound, Florida 33455.

12. Defendant Laura Anthony has an address of 330 Clematis Street, Suite 217,

14 West Palm Beach, Florida, 33401-4602.

13. Defendant Frank Patterson has a business address of Pinewood Atlanta

Studios, 461 Sandy Creek Road, Fayetteville, Georgia 30214.

14. Defendant Face Bank Group is a foreign for profit corporation maintaining

its principal offices at 1115 Broadway, 12th Floor, New York, New York

10010.  Face Bank Group may be served through its Registered Agent,

Frank Esposito at 5550 Glades Road, Suite 500, Boca Raton, Florida.

## Venue and Jurisdiction

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and

Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as a substantial part of the

acts, events, or omissions that effectuated the frauds giving rise to the claims

pleaded herein occurred in this District, and Plaintiff JIC maintains its principal

offices in this District.

16.     The amount at issue exceeds $75,000.00 and diversity as well as subject matter jurisdiction exists.

## Facts Common to All Causes of Action

17. Pulse Evolution Corporation (PEC) was incorporated on May 31, 2013 under the laws of the State of Nevada as a shell company under the name "QurApps, Inc." The company changed its name to Pulse Evolution Corporation effective May 8, 2014, in anticipation of a change of control transaction which closed May 15, 2014, and which resulted in Defendant Textor controlling the company and supported by two co-founders, Defendant Frank Patterson and Rene Eichenberger.

18. Defendant Textor was PEC's largest shareholder and held a plurality of the common stock.  Presently, Mr. Textor is the CEO of FaceBank Group.

19. PEC describes itself as a company "*established to produce specialized, high-impact applications of computer-generated human likeness for utilization in entertainment, life sciences, education and telecommunication, founded by the world's leading producers of photo-realistic digital humans.*"

20. PEC authorized 300 million shares of common stock. As of January 31, 2018, PEC reported 206,553,546 of the 300 million shares were Outstanding.

21. On May 18, 2014, PEC created a "holographic" performance of Michael Jackson at the Billboard Music Award Show. The production used a

technology the ownership of which was disputed by Hologram USA, Inc., which claimed patent rights, and MDH Hologram, Ltd., which claimed rights through license with Hologram USA. These parties sued in United States District Court, District of Nevada, Case Number: 2:14-CV-00772 to protect their claimed patent rights. PEC was subsequently dismissed from the case, and thereafter, the case was settled with the remaining defendants with the settlement terms confidential. The Michael Jackson performance was the last known public use of the technology by PEC.

22. Nonetheless, the technology used to produce the Michael Jackson holographic performance and the performance itself are still being advertised by PEC and its current "owner" FaceBank Group, Inc. as important assets of the company.

23. In late May and early June of 2014, Defendant John King contacted Scott Meide on behalf of PEC and solicited Mr. Meide's investment in PEC.

24. Upon information and belief, Defendant King was at all times relevant to this Amended Complaint an agent and/or employee of PEC. On December 19, 2016, PEC conveyed 300,000 shares of common stock to Defendant King as part of an "Employee Stock Plan" distribution. On June 15, 2018, PEC conveyed an additional 500,000 shares of common stock to Defendant King as part of the "Employee Stock Plan" distribution.

25. Defendant Gregory Centineo was at all times relevant to this Complaint, a "Principal" and agent of PEC and worked with and directed Defendant King in the solicitation of Scott Meide for investment into PEC.

26. On behalf of PEC, and with the deliberate intention of inducing Mr. Meide to invest money into PEC, Defendants King, Centineo and Textor made intentional misrepresentations to Mr. Meide about PEC including, but not limited to the following:

   a. Defendants King, Centineo and Textor each told Scott Meide via telephone and in person at Textor's office that PEC would be doing an initial public offering.

   b. Defendants King, Centineo and Textor each told Scott Meide on multiple occasions that initially the shares he would purchase would be restricted, but that in about one year, they would become free trading and that he would be able to sell them at his discretion. These misrepresentations were later modified to state that the shares would become free trading within one year.

   c. Defendants King, Centineo and Textor each told Scott Meide that PEC had a "lock" on the hologram technology used to produce the Michael Jackson hologram performance during the Billboard Music Awards Show in May

2014. No disclosure was made regarding the claims and lawsuit filed by Hologram USA and MDH Hologram, Ltd.

27. Scott Meide owns and controls the limited liability company Jacksonville Injury Center, LLC (JIC) through his ownership and control of the sole member of JIC, the JIC Management Trust. But for the fraudulent misrepresentations of Defendants King, Centineo and Textor, Mr. Meide would not have invested in PEC.

28. Relying on the representations of King, Centineo and Textor, Mr. Meide decided to purchase shares of PEC using JIC as the purchasing entity.

29. Through JIC, Scott Meide purchased on July 18, 2014, 750,000 restricted shares of common stock in PEC from PEC for $300,000.00 or $0.40 per share. JIC is the legal owner of the shares. Mr. Meide is the beneficial owner.

30. Through JIC, Scott Meide purchased on July 30, 2015 an additional 800,000 restricted shares of common stock in PEC from Defendant Greg Centineo for $ 400,000, or $0.50 per share. JIC is the legal owner of the shares. Mr. Meide is the beneficial owner.

31. PEC never lifted the restrictions on JIC's shares of common stock so that it could become free trading.

32. On March 21, 2016, the price of shares of PEC common stock hit $3.75 per share.

33. The March 21, 2016 stock price corresponded with PEC's acquisition of a company that developed a human animation technology, After August, Inc. PEC valued the technology obtained from the After August acquisition at $16,879,500.00.

34. As of December 2018, PEC had depreciated the value of the After August technology and placed its value at $11 million.

35. On June 22, 2017, Defendant Textor removes himself as CEO of PEC and places his friend, Defendant Jordan Fiksenbaum, into the position. Textor remains as Chairman of the Board of PEC.

36. In a press release dated June 22, 2017, Defendant Textor states: "I am truly overjoyed that my great friend and long-time Pulse advisor, Jordan, has accepted responsibility for full-time leadership of Pulse as the company can now transform from a technology-focused development stage company to a globally relevant producer of entertainment content across all traditional and alternative display environments. In the coming weeks, we look forward to bringing even more leadership resources to our board and to our management team, in support of Jordan's mandate and the Company's overall mission."

37. In that same press release, Defendant Fiksenbaum stated: "I have been in awe of Pulse's creative team since I first saw the remarkable virtual Michael Jackson concert performance at the Billboard Music awards which generated

worldwide headlines and interest. Pulse's technology has been further optimized since then, and we are now poised to launch a series of immersive productions and ground-breaking entertainment projects that will astonish audiences worldwide."

38. Less than one month later, on July 13, 2017, Defendant John Textor resigned his position as Chairman of PEC.

39. On August 31, 2017, PEC filed Form 15 with the Securities and Exchange Commission (SEC) providing notification that is was terminating the registration of the stock and suspending any duty to report under Sections 13 and 15(d) of the Securities and Exchange Act of 1934. As a result, none of what follows had to be reported.

40. On November 1, 2017, Defendant Textor forms Evolution AI as a corporate entity formed under the laws of the State of Florida.  Textor is the sole director of the company and also serves as he President, Secretary and Treasurer. Textor authorizes 1 million shares of common stock with no par value listed.

41. Approximately one month later, on December 11, 2017, Textor sends a letter to Scott Meide detailing plans for a share exchange that would result in Evolution AI becoming the majority shareholder of PEC.

42. Defendant Textor engages in a deliberate take over of the stock, hard assets and intellectual property of PEC and Jordan Fiksenbaum does nothing on

behalf of PEC to stop it. Defendant Fiksenbaum is complicit in the scheme to acquire PEC and its assets.

43. Textor's plan is to convince PEC shareholders to exchange their PEC shares for the shares of a company he creates at a ratio of 10 PEC shares for 1 share of the new company. Textor offers as an incentive the opportunity to acquire free trading shares of stock that Textor had previously denied to PEC shareholders, including JIC. Textor identifies the new company for the purpose of the acquisition as Pulse Acquisition Corporation ("PAC").

44. Defendant Fiksenbaum never tries to make PEC shareholders remain with the company, never discusses with PEC shareholders the possibility of PEC acting to made their restricted shares free trading, or what opportunities may thereafter exist to engage in an IPO. Fiksenbaum simply goes along with Textor's raid of PEC assets and technology.

45. On January 2, 2018, Mr. Meide signs on behalf of JIC a Securities Purchase Agreement with Evolution AI (the "SPA") for the purchase of 100,000 shares of common stock in Evolution AI for $0.75 per share.

46. Section 1(b) of the SPA states: "Buyer shall have the right to exchange its Pulse Shares into shares of PAC [Pulse Acquisition Corporation] pursuant to the **Exchange Agreement** [Share Exchange Agreement by an among Pulse

Acquisition Corporation and The Shareholders of Pulse Evolution Corporation]." (Emphasis added).

47. The "Share Exchange Agreement" was represented by Defendant Textor as a separate agreement purporting to be between PEC shareholders and the separate company, PAC.

48. The Share Exchange Agreement (hereinafter, "Exchange Agreement") contains the date January 2, 2018 on its cover page. The preamble to the agreement contains the date of the "_____ day of January 2017, and Mr. Meide appears to sign the purported agreement on January 11, 2018.

49. The Exchange Agreement states outright: The Company [PAC] agrees to acquire up to 150,000,000 of the issued and outstanding shares of PEC (representing a majority of PEC's issued and outstanding common stock) from the PEC Shareholders in exchange for the issuance of shares of the Company's Common Stock for shares of PEC's common stock (the "Exchange").

50. Section 1(c) of the Evolution AI SPA represents it has the authority to bind PAC to a contractual obligation entered into between Evolution AI and a buyer of its stock when it states: Buyer shall have the additional benefit of having the [Evolution AI] Shares and the Pulse [PEC] Shares, subject to

completion of exchange included in the Company's [Evolution AI's] and/or

**PAC's** first registration statement(s) to be filed with the SEC."

51. At Section 4(c) of the SPA, Evolution AI warrants that the "authorized capital of the Company consists of a total of up to 50,000,000 shares of common stock [with a] $0.0001 par value per share, of which, 16,500,000 are currently issued and outstanding.

52. At Section 4(d) of the SPA, Evolution AI warrants that the "Shares are duly authorized …."

53. At the time the SPA was prepared by Evolution AI and signed by Scott Meide, Evolution AI had only issued 1 million shares of common stock. Evolution AI would not authorize 50 million shares until July 2, 2018.

54. Defendant John Textor was the sole officer and director of Evolution AI at the time the SPA was prepared and submitted to Scott Meide for signature, and also at the time that Evolution AI actually authorized 50 million shares six (6) months later.

55. On January 11, 2018, Scott Meide, on behalf of JIC, signs the Exchange Agreement purportedly with PAC.

56. Mr. Meide, as part of the signing process of the Exchange Agreement, also signed "Transfer Instructions to Globex Transfer, LLC" authorizing the transfer of PEC shares to PAC.

57. JIC was not the only PEC shareholder to sign the purported Exchange Agreement with PAC. On information and belief, PEC shareholders representing more than 140 million shares of PEC and constituting more than Fifty-Eight Percent (58%) of PEC outstanding shares signed the Exchange Agreement purportedly with PAC, and the Transfer Instructions to Globex Transfer, LLC.

58. Through this supposed transfer of shares, PAC purportedly acquires a majority interest in PEC.

59. Thereafter, PAC purports to transfer its shares to Evolution AI purportedly giving Evolution AI a majority interest in PEC.

60. At the time PAC purports to acquire PEC shares and transfer them to Evolution AI pursuant to contract, PAC does not exist. PAC is not created as a corporate entity until September 18, 2018.

61. When PAC is incorporated under the laws of the State of Nevada on September 18, 2018, the sole director is Defendant Textor and the sole officer is Defendant Textor.

62. At the time of the purported Share Exchange, PAC is not an entity capable of contract and is not an entity capable of receiving and holding PEC shares of common stock.

63. The purported Share Exchange between PAC and the shareholder of PEC is void *ab initio.*

64. Evolution AI could not have acquired a majority interest in PEC through PAC because PAC was not capable of acquiring and thereafter transferring that interest.

65. Evolution AI never acquired any PEC shares through the PAC Exchange Agreement.

66. Upon information and belief, Jordan Fiksenbaum knew that PAC did not exist and was not capable of any stock acquisition, but he did nothing on behalf of PEC to stop the sham transaction.

67. Defendant Textor knew that PAC was not capable of transferring PEC shares to Evolution AI because he did not form PAC until September 18, 2018. Nonetheless, Textor represented Evolution AI owned a majority interest in PEC.

68. On August 8, 2018, Textor completed the PEC takeover scheme. Working with a company, Recall Studios, Inc., Textor orchestrated Recall Studios' acquisition of 99.7% of Evolution AI ("EAI") and, purportedly, 58% of Pulse Evolution (Pulse) for a purchase value consideration of $211,500,000, by issuing 1,000,000 Series X preferred shares that would be convertible into

450,000,000 shares of common stock with a traded market value of $0.47 per share.

69. Recall Studios could not actually complete the acquisition as of August 8, 2018 because it had not yet authorized the issuance of the convertible 1,000,000 shares of Series X preferred stock. That authorization did not occur until January 9, 2019.

70. In actuality, no money changed hands. Recall Studios had no money with which to make any purchase of Evolution AI stock.

71. On December 30, 2017, Recall Studios reported $86,000.00 in total assets against $3,185,000.00 in liabilities. On April 16, 2018, Recall Studios reported 85,670,158 shares outstanding resulting in a negative shareholder equity of ($0.036) per share.

72. Recall Studios did not engage in any significant business between December 30, 2017 and August 8, 2018 and the financial picture of the company remained unchanged during that period.

73. Defendant Textor orchestrated Recall Studios' "acquisition" of Evolution AI by representing a **market** value for Recall Studios common stock of $0.47 per share despite the negative equity of the existing shares, and despite the stock earmarked for acquisition not having issued.

74. Thereafter, Recall Studios claimed ownership of PEC's technology.

75. On October 24, 2018, an independent auditor listed the value of PEC's Acquired Technology, **as of June 30, 2018,** at $11,453,946. This represents the human animation technology acquired from After August, Inc., less depreciation.

76. After the purported acquisition of a majority interest in PEC, Recall Studios listed the value of its Acquired and Licensed Technology at the close of the third quarter of 2018, as of September 30, 2018 at $140,889,639.00.

77. Before the close of the third quarter of 2018, Recall Studios also acquired Brick Top Holdings, Inc., and South Fork Ventures, Inc. However, they had no technological assets that would have contributed to the nearly $141 million valuation.

78. Evolution AI also had no technological assets to contribute to the Acquired and Licensed Technology valuation.

79. In its quarterly report for the third quarter of 2018, Recall Studios states that the $140,889,639 valuation of Acquired and Licensed Technology referred solely to the assets acquired from Evolution AI and PEC.

80. At the close of Recall Studios' acquisition of Evolution AI, the largest asset of the company was the technology belonging to PEC.

81. In less than six (6) weeks, the value of PEC assets rose from $11, 453,946 to $140,889,639.00.

82. As a result of the acquisition, Defendant Textor becomes the largest shareholder of Recall Studios, holding 36.1% of voting shares. The next nearest shareholder is Brick Top Holdings, Inc. at 16.2%.

83. Recall Studios appoints Textor CEO of the company on September 17, 2018. One day later, on September 18, 2018, Textor finally incorporates PAC.

84. Textor is provided an employment package that includes a yearly base salary of $500,000.00 plus a yearly bonus guaranteed to be no less than $100,000.00.

85. On February 28, 2019, Recall Studios changed its name to Pulse Evolutions Group, and subsequently to Face Bank Group, Inc.

86. On FaceBank's website, the company claims ownership of PEC and describes PEC as follows: Pulse Evolution Corporation, a majority owned subsidiary of FaceBank Group, is a technology and intellectual property company, and the most globally recognized developer of hyper-realistic digital humans – computer generated assets that appear to be human and can perform in live shows, virtual reality, augmented reality, holographic, 3D stereoscopic, web, mobile, interactive and artificial intelligence applications.

87. Face Bank does not own a majority interest in PEC because Recall Studios never acquired the majority interest, because PAC never transferred shares to Evolution AI because PAC never existed as of the time of the transfer or Recall Studios acquisition of Evolution AI.

88. At all times relevant to the above-described acts, Defendant Laura Anthony was the attorney for PEC and oversaw compliance on behalf of the company.

89. Upon information and belief, Laura Anthony prepared the exchange documents despite knowing, or having should have known that the Share Exchange was not in the best interest of PEC and constituted the theft of PEC technology valued at more than $140 million.

90. These allegations show Textor's complete disregard for shareholders and any corporate form. Textor at all times was acting individually and for his own interests and not the interests of any shareholder of PEC.

91. Mr. Textor has a history of this kind of behavior. He used PEC to enrich himself personally, and then, in the face of a series of lawsuits against him personally, he induced PEC shareholders to alienate their shares of PEC and blunt any claims that might be brought on behalf of PEC and/or pursuant to fraudulent actions associated with PEC.

92. Textor and Patterson, personally, and through Defendant's King and Centineo solicited investments from Plaintiff and other investors promising that those funds would go towards Pulse's business operations, but then used those funds to pay themselves personally and replace old debt with new debt in order to keep the sham enterprise going.

93. As an example, Defendant Textor through his control of PEC during the period of January and February 2016, caused the disbursement of approximately $500,000.00 in cash payments companies Textor controlled, or to friends and family, with no legitimate business purpose for PEC as follows: a. On January 11, 2016, Textor cause PEC to wire $45,000 to Mr. Textor's American Express account.

b. On January 20, 2016, Textor causes PEC to wire $29,166.67 to Clematis Properties, a company owned and controlled by an associate of Mr. Textor with no relationship to PEC or PEC business.

c. On January 26, 2016, Textor cause PEC to wire $50,000 to Alternative Holdings, a company owned and controlled by an associate of Mr. Textor with no relationship to PEC or PEC business.

d. On January 29, 2016, Textor caused PEC to wire 50,000 to Alternative Holdings, a company owned and controlled by an associate of Mr. Textor.

e. On January 29, 2016, Textor caused PEC to wire $50,000 to Textor Ventures, a company owned and controlled by Mr. Textor with no relationship to PEC or PEC business.

     f.  On February 1, 2016, Textor cause PEC to wire $50,000 to Mr. Textor individually.

     g.  On February 3, 2016, cause PEC to wire $180,000 to Dale O. Lovett, Mr. Textor's mother.

     h.  On February 19, 2016, Textor cause PEC to wire $25,000 to Mr. Textor's E*Trade Account.

94. These payments from PEC were made without corporate approval and contrary to PEC corporate bylaws.

## Additional Derivative Allegations

93.    In addition to the facts alleged herein, Plaintiff brings this action for the benefit of PEC to redress injuries suffered as a result of the Individual Defendants' breaches of fiduciary duties and violations of law, as well as the aiding and abetting thereof.

94.    Plaintiff is and has been a PEC shareholder during the entire Relevant Period of the Complaint because JIC has continuously owned PEC common stock since July 18, 2014. Plaintiff will therefore adequately and fairly represent the interests of PEC in enforcing and prosecuting its rights.

95.   Plaintiff has not made any demand on the Board of Directors of PEC prior to the institution of this action because, for the reasons set forth below, such demand would be a futile and useless act.

## Demand Futility Allegations

96.   Demand for action to the PEC Board of Directors would be futile because the Board was complicit in the active raiding and takeover of PEC technology assets by its former CEO, John Textor.

97.   Officers and Directors of PEC knew that Textor was taking control over PEC and its assets valued at more than $140 million, but did nothing to stop it, even when the officers and directors knew that the company purporting to facilitate a share exchange from PEC to Evolution AI did not exist and all contracts were void.

## Count I
## Securities Fraud Against Defendants Textor, Patterson King, Centineo, and PEC
## Violations of Section 10(b) of the Exchange Act

98. Plaintiff restates, re-alleges, and incorporates by reference the prior allegations of this Complaint as if fully set forth herein.

99. Defendants employed devices, schemes, and artifices to defraud; made untrue statements of material facts and omitted material facts necessary to make the

statements made, in the light of the circumstances under which they were made, not misleading; and engaged in acts, practices, and courses of business which have operated as a fraud upon the Plaintiff as a purchaser of PEC's securities.

100.    Defendants, individually and in concert, directly and indirectly, by use of interstate commerce, and of the mails and wires, engaged and participated in a continuous course of conduct to disseminate false and misleading information, as more fully described above.

101.    Defendants fraudulently induced the Plaintiffs to make investments in PEC, which resulted in the purchase and sale of PEC securities, based on knowingly false and misleading statements.

102.    Defendants engaged in and or allowed the payments of corporate funds to Textor and others without any underlying business reason or corporate authorization.

103.    Defendants deceived Plaintiff and caused him to purchase of and later prevent the selling of Pulse securities in reliance on the intentionally deceptive acts and statements described above.

104.    Defendants knew or should have known that the statements and omissions of fact related herein were materially false and misleading, because they misrepresented how the Plaintiff's investments would be managed and

controlled, misrepresented how the Plaintiff's investments would be disbursed and appropriated, and misrepresented Defendants' intentions in honoring PEC's corporate formalities and protocols.

105.    As a direct and proximate result of the Plaintiff's reasonable and justifiable reliance on these fraudulent statements and omissions of material fact, Plaintiff has suffered damages, and is entitled to rescission and/or damages, in an amount to be determined at trial, as well as an award of punitive damages and attorneys' fees and costs.

## COUNT II

## Securities Fraud Against Defendant Textor and
## Violations of Section 20(a) of the Exchange Act (15 S.C. § 78T)

106.    Plaintiff restates, re-alleges, and incorporates by reference the prior allegations of this Complaint as if fully set forth herein.

107.    As fully alleged above, Defendant Textor violated Exchange Act Section 20(a).

108.    During the relevant period, Mr. Textor had the power, both direct and indirect, to control PEC and did in fact exercise such control, and was therefore a "controlling persons" within the meaning of Section 20(a) of the Exchange Act.

109.    Mr. Textor was a control person because:

    a. Mr. Textor, throughout the relevant period, was the chairman of PEC's Board of Directors;

    b. Mr. Textor was PEC's largest individual shareholder and held a plurality of Pulse's common stock;

    c. Mr. Textor directed PEC's operations and therefore had knowledge of, made, and caused PEC to make the false and misleading statements and omissions disseminated to the Plaintiff;

    d. Mr. Textor had the power to influence and control, and did influence and control, the decision-making of PEC, including the content and dissemination of the false and misleading statements and omissions described herein;

    e. Mr. Textor supervised and directed the day-to-day operations of PEC; and

    f. Mr. Textor had intimate knowledge of the finances of PEC and the financial statements prepared by PEC.

110.    Plaintiff has been damaged by Mr. Textor's wrongful and fraudulent conduct through his control of PEC, which conduct caused Plaintiff to invest in PEC and purchase PEC securities. Mr. Textor is personally liable for all damages or losses suffered by the Plaintiff during the relevant period,

including without limitation rescission damages, relating to his and PEC's violations of the Exchange Act.

## COUNT III
### Securities Fraud Against Defendants, Textor and PEC
### Violations of Florida's Securities and Investor Protection Act
### (Fla. Stat. §§ 517.011, *et seq.*)

111.    Plaintiff restates, re-alleges, and incorporates by reference the prior allegations of this Complaint as if fully set forth herein.

112.    Plaintiff restates, re-alleges, and incorporates by reference the prior allegations of this Complaint as if fully set forth herein.

113.    Defendants employed devices, schemes, and artifices to defraud; made untrue statements of material facts and omitted material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; and engaged in acts, practices, and courses of business which have operated as a fraud upon the Plaintiff as a purchaser of PEC's securities.

114.    Defendants, individually and in concert, directly and indirectly, by use of interstate commerce, and of the mails and wires, engaged and participated in a continuous course of conduct to disseminate false and misleading information, as more fully described above.

115.     Defendants fraudulently induced the Plaintiffs to make investments in PEC, which resulted in the purchase and sale of PEC securities, based on knowingly false and misleading statements.

116.     Defendants engaged in and or allowed the payments of corporate funds to Textor and others without any underlying business reason or corporate authorization.

117.     Defendants deceived Plaintiff and caused him to purchase of and later prevent the selling of Pulse securities in reliance on the intentionally deceptive acts and statements described above.

118.     Defendants knew or should have known that the statements and omissions of fact related herein were materially false and misleading, because they misrepresented how the Plaintiff's investments would be managed and controlled, misrepresented how the Plaintiff's investments would be disbursed and appropriated, and misrepresented Defendants' intentions in honoring PEC's corporate formalities and protocols.

119.     As a direct and proximate result of the Plaintiff's reasonable and justifiable reliance on these fraudulent statements and omissions of material fact, Plaintiff has suffered damages, and is entitled to rescission and/or damages, in an amount to be determined at trial, as well as an award of punitive damages and attorneys' fees and costs.

## COUNT IV
## Fraud and Fraudulent Inducement Against Defendants Textor, King, Centineo and PEC

98.   Plaintiff restates, re-alleges, and incorporates by reference the prior allegations of this Complaint as if fully set forth herein.

99.   Defendants by acts of both omission and commission, made false and misleading statements of material facts to Plaintiff, which the Plaintiff relied upon to its detriment and which caused Plaintiff to invest money in PEC, including but not limited to representations that the restricted shares offered would become freely trading within one year and that PEC had a "lock" on technology the ownership of which was being actively disputed

100.   Defendants individually and in concert, directly and indirectly, by use of interstate commerce, and of the mails and wires, engaged and participated in a continuous course of conduct to disseminate false and misleading information, as more fully described above.

101.   Defendants fraudulently induced Plaintiff to make investments in PEC and lend PEC money based on knowingly false and misleading statements.

102.   Defendants deceived the Plaintiff and caused it to purchase and later prevented it from selling PEC securities, in reliance on the intentionally deceptive acts and statements described above.

103. Defendants effectuated this fraud by making statements and omissions of material fact, during the periods of negotiation for the investments identified in this Complaint.

104. The statements and omissions made by Defendants as described herein were purportedly made on behalf of PEC, and Textor, Centineo and King always represented that they were acting in their capacity as representatives of PEC.

105. As a direct and proximate result of Plaintiff's reasonable and justifiable reliance on these fraudulent statements and omissions of material fact, Plaintiff has suffered damages.   Therefore, Plaintiff is entitled to recission or damages in an amount to be determined at trial, as well as an award of punitive damages and attorneys' fees and costs.

106. In addition, Textor, King and Centineo are personally liable to Plaintiff for PEC's fraudulent acts under the corporate veil piercing theories of liability discussed in this Complaint.

## COUNT V
## Aiding and Abetting Fraud Against Defendants Patterson, Anthony and Fiksenbaum

107. Plaintiff restates, re-alleges, and incorporates by reference the prior allegations of this Complaint as if fully set forth herein.

108.     Patterson, Anthony and Fiksenbaum had knowledge of the fraud committed by Mr. Textor, and PEC by virtue of their positions in and/or relationship with the company.

109. Patterson, Anthony and Fiksenbaum substantially assisted Mr. Textor, and PEC in perpetuating the fraudulent and unlawful acts described herein by repeatedly approving Textor's directorship despite knowledge of Mr. Textor's fraudulent scheme, and failing to remove from his position at PEC despite knowledge of the acts of Textor in violation of Textor's fiduciary duty to PEC and its shareholders, including Textor's blatant actions to alienate PEC's shareholders and PEC from its technology assets.

110. As a direct and proximate result of Patterson's, Anthony's and Fiksenbaum's aiding and abetting, Plaintiff was injured and suffered damages.

111. Plaintiff is entitled to damages, in an amount to be determined at trial, as well as an award of punitive damages and attorneys' fees and costs.

## COUNT VI
## Violations of Florida's Deceptive and Unfair Trade Practices Act Against All Defendants (Fla. Stat. §§ 501.201-501.213)

112. Plaintiff restates, re-alleges, and incorporates by reference the prior allegations of this Complaint as if fully set forth herein.

113. Chapter 501, Fla. Stat., Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") is to be liberally construed to protect consumers from those

who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.

114. Plaintiff is a consumer within the meaning of FDUTPA.

115. Defendants engaged in trade and commerce within the meaning of FDUTPA.

116. While FDUTPA does not define "deceptive" and "unfair," it incorporates by reference the Federal Trade Commission's interpretations of these terms. The FTC has found that a "deceptive act or practice" encompasses "a representation, omission or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment."

117. As described throughout this Complaint, Defendants engaged in deceptive and unfair business practices that harmed Plaintiff.

118. Defendants fraudulently induced Plaintiffs into investing in and purchasing securities from PEC by disseminating materially false and misleading statements.

119. As a result of the Defendants improper and unlawful misconduct, including the statutory violations contained in Counts I, II, III, and IV of this Complaint, Plaintiff has been damaged by, among other things, losing money that was invested and being precluded from receiving a positive return on those investments.

120. Therefore, the Defendants engaged in unfair and deceptive trade practices in violation of FDUTPA.

121. Pursuant to FDUTPA, Plaintiff is entitled to recover fromDefendants the reasonable amount of their attorneys' fees and costs.

122. Defendant Textor is personally liable to Plaintiff for PEC's violations of FDUTPA under the corporate veil piercing theories of liability discussed above.

## COUNT VII

### Shareholder Derivative Request for
### Declaratory Relief as to Defendant FaceBank Group, Inc.

123. Plaintiff restates, re-alleges, and incorporates by reference the prior allegations of this Complaint as if fully set forth herein.

124. FaceBank Group, Inc. was named Recall Studios, Inc. at the time the company acquired Evolution AI, and claims rights to PEC technology valued at more than $140 million based upon a non-existent share exchange between a company, PAC, that was not in existence at the time of the exchange and Evolution AI.

125. FaceBank Group, Inc. assertion of control over PEC and its technology is null and void because Evolution AI did not have ownership of PEC shares at the time Recall Studios acquired it.

126. The officers and directors of PEC, including Jordan Fiksenbaum and Frank Patterson allowed their friend John Textor to raid the assets of PEC and assume control of PEC technology without any compensation to PEC.

127. On behalf of PEC, Plaintiff requests an order of the Court determining PEC's rights to its technology and to its autonomy.

**COUNT VIII**
**<u>Shareholder Derivative Request for Equitable Accounting</u>**

128. Plaintiff restates, re-alleges, and incorporates by reference the prior allegations of this Complaint as if fully set forth herein.

129. Through the intentional disregard of PEC corporate officers and directors, and dule to the intentional fraudulent actions of Defendant Textor, PEC has been deprived of the value of its technology since August 8, 2018.

130. FaceBank Group, Inc. has had access to, and use of PEC technology without having to provide any compensation to PEC.

131. An accounting of the Books and Records of FaceBank Group, Inc. and all of its several affiliates, and including its alter ego Defendant Textor is required to ascertain the full extent of the damages PEC has suffered from the wrongful expropriation of PEC technology by Defendant Textor and FaceBank Group, Inc., including but not limited to investments acquired by FaceBank Group, Inc. and its predecessors through the wrongful

representation of ownership and control of PEC technology and revenue generated by use of the technology.

## COUNT IX

### Shareholder Derivative Claim for
### Violation of Fiduciary Duty as to Jordan Fiksenbaum

132. Plaintiff restates, re-alleges, and incorporates by reference the prior allegations of this Complaint as if fully set forth herein.

133. As CEO of PEC at the time of the purported Share Exchange between PEC and PAC, and thereafter, between PAC and Evolution AI, Defendant Fiksenbaum owed a fiduciary duty to PEC to protect it against the raid John Textor committed against it by inducing PEC shareholders to exchange their shares for non-existent PAC shares and thereby facilitate the wrongful acquisition of PEC technology.

134. Fiksenbaum did nothing to stop the raid of PEC assets. Rather, Fiksenbaum acted to facilitate the raid by deliberately ignoring the fact that PAC did not exist and could not participate in any share exchange associated with PEC.

135. Fiksenbaum worked with and conspired with John Textor to raid PEC technology and assisted Textor in gaining control over the technology.

136. In so acting, Fiksenbaum violated the fiduciary duty he owes to PEC as its CEO and is personally liable to PEC for PEC's loss of the technology.

## COUNT X

### Shareholder Derivative Claim for Tortious Interference with a Business Relationship: Textor and Fiksenbaum

137. Plaintiff restates, re-alleges, and incorporates by reference the prior allegations of this Complaint as if fully set forth herein.

138. Defendant Textor deliberately acted to induce PEC shareholders to trade their shares in PEC for shares in the non-existent company, PAC, with the goal of gaining control over PEC technology.

139. To facilitate the inducement, Textor represented to PEC shareholders that their shares would not become free trading, even though Textor no longer had control of PEC and any decision as to whether to release the restrictions on its common stock.

140. Textor's representations would not have had any force but for Defendant Fiksenbaum's collaboration with Textor to take no action to assist PEC shareholders in efforts to have shares become free trading.

141. Working in tandem, Defendants Textor and Fiksenbaum acted to entice PEC shareholders away from the company and thereby acquire control over PEC assets.

142. PEC is entitled to damages to be proven for Defendants' tortious interference with PEC's business relationships with its shareholders.

## COUNT XI

### **Punitive Damages**

143. Plaintiff restates, re-alleges, and incorporates by reference the prior allegations of this Complaint as if fully set forth herein.

144. Defendants King, Centineo and Textor acted intentionally and deliberately to fraudulently induce Plaintiff to invest more than $700,000.00 into PEC by misrepresenting to Plaintiff's owner, Scott Meide that the restricted shares of common stock in PEC would become free trading within one year and that PEC had an undisputed lock on the hologram technology that was the cornerstone of PEC's business model.

145. Plaintiff is entitled to punitive damages for these Defendant's intentional acts.

146. Defendants Textor and Fiksenbaum acted intentionally through fraud and misrepresentation to deprive PEC of its shareholder and technology, and to acquire PEC technology with compensation.  PEC is entitled to punitive damages against Textor and Fiksenbaum for their intentional acts.

147. Defendant Laura Anthony owed a fiduciary duty to PEC as compliance counsel but did nothing to stop the wrongful acquisition of PEC shares and technology.  PEC is entitled to punitive damages against Ms. Anthony for her intentional acts.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

**WHEREFORE**, Plaintiff respectfully demands judgment in its favor and against the Defendants as follows:

A.  Awarding damages as described in each of the above claims, in favor of the Plaintiff and against the Defendants in amounts to be determined at trial.

B.  Awarding to Plaintiff on its behalf and on behalf of Pulse Evolution Corporation the equitable and injunctive relief requested herein.

C.  Awarding punitive damages in favor of the Plaintiffs and against the Defendants in an amount to be determined at trial.

D.  Awarding the Plaintiffs pre-judgment and post-judgment interest, and its attorneys' fees, costs, and other expenses incurred in this action.

E.  Granting the Plaintiffs such other and further relief as this Court deems just and proper.

## VERIFICATION

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

_____

Jacksonville Injury Center, LLC
By: Scott Meide
Trustee of JIC Management Trust

Respectfully submitted this 29th day of June, 2020.

MCLEAN LAW, P.A.

William H. McLean/s
_____

William H. McLean
Fla. Bar No. 0784699
653 West 23rd Street
Unit No. 305
Panama City, Florida 32405
404-664-6561 Office
850-373-4825 Facsimile
Whmclean58@hotmail.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Second

Amended Complaint was served upon Defendants through counsel via E-Service;

United States Mail postage paid, and/or by email to Defendant's counsel's offices

at:

Richard G. Salazar
BUCHANAN, INGERSOLL & ROONEY, P.C.
401 East Jackson Street
Suite 2400
Tampa, FL 33602
Richard.salazar@bipc.com

Michael J. Lufkin
ROGERS TOWERS, P.A.
1301 Riverplace Boulevard
Suite 1500
Jacksonville, Florida 32207
mlufkin@RTlaw.com

For Defendant Pulse Evolution Corporation
For Defendant John Textor
For Defendant Evolution AI Corporation
For Defendant Jordan Fiksenbaum
For Defendant Frank Patterson

Michael Devon Lee
THE LILES FIRM, P.A.
301 West Bay Street
Suite 1030
Jacksonville, Florida 32202
mlee@thelilesfirm.com

Richard Kyle Gavin
Office of the General Counsel
117 West Duval Street
Suite 480
Jacksonville, Florida 32202
kgavin@coj.net

For Defendant Greg Centineo
For Defendant Julie Natale
For Defendant Agnes King
For Defendant John King

Dana Tejeda
245 N.E. 14th Street
Number 3808
Miami, Florida 33132
Appearing *pro se*

Robert Francis Salkowski
ZARCO, EINHORN, SALKOWSKI & BRITO, P.A.
2 South Biscayne Boulevard
Suite 3400
Miami, Florida 33131
rsalkowski@zarcolaw.com
For Defendant Laura Anthony

on this 29th day of June 2020.

William H. McLean/s
William McLean
Fla. Bar No. 0784699