**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

SCOTT MEIDE,

        Plaintiff,

                                          Case No. 3:18-cv-1037-J-34MCR

vs.

PULSE EVOLUTION CORPORATION,
et al.,

        Defendants.

_____/

# O R D E R

**THIS CAUSE** comes before the Court on three motions to dismiss.  See Defendant Laura Anthony's Motion to Dismiss Second Amended Complaint With Prejudice (Doc. 96; Anthony Motion) and Defendants Centineo, Natale, Agnes King and John King's Motion to Dismiss Second Amended Complaint (Doc. 94; Centineo Motion), both filed November 15, 2019; Motion to Dismiss Second Amended Complaint and Incorporated Memorandum of Law of Defendants Pulse Evolution Corporation, John Textor, Evolution AI Corporation, Jordan Fiksenbaum, and Frank Patterson (Doc. 98; Pulse Motion), filed November 22, 2019 (collectively, Motions to Dismiss).  Plaintiff Scott Meide, proceeding pro se, filed responses in opposition to these Motions.  See Plaintiff's Opposition to Defendant Laura Anthony's Motion to Dismiss (Doc. 107; Response to Anthony) and Plaintiff's Opposition to Defendants Centineo et al Motion to Dismiss (Doc. 109; Response to Centineo), both filed December 31, 2019; Plaintiff's Opposition to Defendant Pulse et al Motion to Dismiss

(Doc. 115; Response to Pulse), filed March 2, 2020. Accordingly, this matter is ripe for review.

**I.      Procedural History**

On August 27, 2018, Meide initiated this action, pro se, by filing a seven-count Complaint for Damages (Doc. 1; Initial Complaint) against the following Defendants: Pulse Evolution Corporation, John Textor, Gregory Centineo, Julie Natale, Dana Tejeda, Agnes King, John King, Evolution AI Corporation, Jordan Fiksenbaum, Laura Anthony, Michael Pollaccia, and Frank Patterson. In the Initial Complaint, Meide alleged a variety of claims, including a federal securities fraud claim. See generally Initial Complaint. Defendants filed motions to dismiss (Docs. 22, 24, 28, 31), to which Meide responded (Docs. 30, 32, 34, 37), and on July 24, 2019, the Court held a hearing on the pending motions. See Minute Entry (Doc. 75; Hearing); see also Transcript of Motion Hearing (Doc. 77; Tr.), filed July 31, 2019. At the Hearing, the Court explained to Meide, at length, the pleading standards required to state a claim for relief in federal court, as well as the heightened requirements applicable to his securities fraud claim under the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u-4 et seq., and to his fraud claims generally under Rule 9(b), Federal Rules of Civil Procedure (Rule(s)). See Tr. at 7-11, 15-21. Because Meide's Initial Complaint failed to comply with these standards, and for the reasons stated on the record at the Hearing, the Court dismissed the Initial Complaint without prejudice to Meide filing an amended complaint that complied with the Court's directives at the Hearing. See Order (Doc. 76), entered July 25, 2019.[1] The Court strongly encouraged Meide to seek

---

[1] In the Initial Complaint, Meide also included a request that the Court "convene a Grand Jury" (Count I) and a claim for aiding and abetting securities fraud (Count III). For the reasons stated at the Hearing, the Court dismissed those claims with prejudice. See Order (Doc. 76) at 1-2.

legal counsel before filing an amended complaint and, so that he would have adequate time to do so, the Court set a thirty-day deadline for the filing of the amended pleadings. See Tr. at 25-26, 32.  On August 23, 2019, Meide filed a motion requesting additional time to file his amended complaint, which the Court granted by extending the deadline another month and encouraging Meide to use the additional time to consult with legal counsel. See Order (Doc. 84).  On September 24, 2019, Meide filed his First Amended Complaint (Doc. 85; Amended Complaint).  Upon review of the Amended Complaint, the Court struck it because Meide again had failed to comply with the pleading standards required in federal court.  See Order (Doc. 86), entered October 4, 2019.  In the October 4, 2019 Order, the Court cautioned Meide that he had "one final opportunity" to properly state his claims, see Order (Doc. 86) at 2-3, and on November 1, 2019, Meide filed the Second Amended Complaint (Doc. 88; SAC), which is the operative pleading at this time.

In the Second Amended Complaint, Meide asserts claims against all of the Defendants except one, Michael Pollaccia.  In Count I, Meide reasserts his claim for federal securities fraud against all remaining Defendants.  In Counts II through V, he raises state law claims, specifically breach of good faith and fair dealing, breach of fiduciary duty, fraud, and civil conspiracy.  Last, in Count VI, Meide asserts a "Right of Rescission" against Defendants Pulse Evolution Corporation, Evolution AI Corporation and John Textor.  With the exception of pro se Defendant Dana Tejeda, who has not responded to the Second Amended Complaint, all Defendants have moved for dismissal of the Second Amended Complaint in its entirety.  See generally Anthony Motion; Centineo Motion; Pulse Motion.

## II.     Motion to Amend & Motion to Substitute

Prior to addressing the merits of the pending Motions to Dismiss, the Court first considers Meide's recent request to restart this lawsuit with the substitution of a new plaintiff, Jacksonville Injury Center, LLC (JIC) and the filing of a third amended complaint. This request follows Meide's belated decision to hire an attorney to represent him in this matter.  See Notice of Appearance (Doc. 116), filed June 11, 2020.  Simultaneously with the filing of a Notice of Appearance, Meide's new counsel also filed Plaintiff's Motion for Extension of Time to Substitute Real Party-in Interest, File an Amended Complaint and Otherwise Respond to Outstanding Motions (Doc. 117; Motion for Extension).  The Court struck the Motion for Extension on June 15, 2020, for failure to comply with the Local Rules of the United States District Court, Middle District of Florida (Local Rule(s)).  See Order (Doc. 118).  Specifically, the Motion for Extension failed to comply with Local Rule 3.01(g), which requires conferral in good faith with the opposing party prior to filing a motion, and Local Rule 3.01(a), which requires litigants to include a memorandum of legal authority with any motions.  See id. at 1-2.  And, to the extent the Motion for Extension requested leave to amend the pleadings, counsel also failed to include a copy or description of the proposed third amended complaint, as required under Eleventh Circuit precedent.  See id. at 2.

On June 29, 2020, Meide's counsel filed a Motion for Substitution of Real Party in Interest (Doc. 119) and Real Party in Interest Jacksonville Injury Center, LLC's Motion for Leave to File Second Amended Complaint (Doc. 120).  Counsel also provided his proposed third amended complaint, although he improperly filed the document as a separate entry on the docket rather than as an attachment to the Motion.  See Plaintiff's [Proposed Third]

4

Amended Complaint for Damages, Recission [sic], Shareholder's Deriviative [sic] Action and Injunctive Relief (Doc. 121; Proposed Complaint).  Once again, however, the Court found that Meide's counsel had failed to comply with the Local Rules of this Court, and directed him to file a supplement indicating his compliance with Local Rule 3.01(g).  See Endorsed Order (Doc. 126), entered June 30, 2020.  On July 7, 2020, Meide, through counsel, filed Plaintiff's Supplement to Motion for Substitution of Real Party in Interest with Certification of Good-Faith Conference (Doc. 127; Motion to Substitute) and Plaintiff's Supplement to Motion for Leave to File Second Amended Complaint with Certification of Good Faith Conference (Doc. 128; Motion to Amend).  Defendants filed responses in opposition to these Motions on July 20, 2020.[2]  See Defendant Laura Anthony's Memorandum of Law in Opposition to Motion for Substitution of Real Party in Interest (Doc. 134); Defendants Gregory Centineo and John King's Memorandum in Opposition to Plaintiff's Motion for Leave to File Second Amended Complaint (Doc. 135); Defendants Centineo, Natale, Agnes King and John King's Memorandum in Opposition to Motion for Substitution of Real Party in Interest (Doc. 136); Pulse Defendants' Memorandum of Law in Opposition to Motion for Substitution of Real Party in Interest (Doc. 138); Pulse Defendants' Memorandum of Law in Opposition to Motion for Leave to File Amended Complaint for Jacksonville Injury Center LLC (Doc. 139).  Upon due consideration, the Court finds that both of these Motions are due to be denied.

In the Motion to Amend, Meide, through counsel, requests leave to file a third amended complaint.  See generally Motion to Amend.  Notably, while dropping some of Meide's state law claims and Defendants Agnes King, Dana Tejeda and Julie Natale, the

---

[2] Because the Proposed Complaint no longer names Defendants Agnes King, Dana Tejeda, and Julie Natale, these Defendants did not join in the Responses opposing Meide's request for leave to amend.

Proposed Complaint includes additional claims, not previously raised, as well as a new defendant.  See generally Proposed Complaint.  In support of his Motion to Amend, Meide states that he and JIC "retained counsel to respond to the Court's concerns regarding the sufficiency of the Complaint previously filed against the Defendants," and that "JIC has endeavored to plea[d] with particularity facts supporting its allegations of fraud . . . ."  See Motion to Amend at 2.  Despite the Court's previous admonition, see Order (Doc. 118), Meide's counsel fails to include a memorandum of legal authority in support of the Motion to Amend as required by Local Rule 3.01(a).  Indeed, counsel for Meide does not even acknowledge the specific rules of civil procedure that apply to his request and fails to include any legal authority in support of his request.  See generally Motion to Amend.  Moreover, the Proposed Complaint is a quintessential shotgun complaint, a form of pleading which contains "multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint."  See Weiland v. Palm Beach Cnty. Sheriff's Office, 792 F.3d 1313, 1321 & n.11 (11th Cir. 2015) (collecting cases); see also Proposed Complaint ¶¶ 106, 111, 98,[3] 107, 112, 123, 128, 132, 137, 143.  This manner of pleading is "altogether unacceptable" in the Eleventh Circuit.  See Cramer v. State of Florida, 117 F.3d 1258, 1263 (11th Cir. 1997).  Significantly, the Court previously explained the problem with shotgun pleadings and cited the relevant Eleventh Circuit precedent during the July 24, 2019 Hearing.  See Tr. at 7-11.  Having repeatedly instructed Meide that he must comply with the Local Rules of this Court, and given him multiple opportunities to comply with the pleading standards in federal court, the Court could deny the Motion to

---

[3] The paragraphs of the Proposed Complaint are numbered 1-119, at which point counsel inexplicably reverts back to 98 and from there continues sequentially to 147.  See Proposed Complaint at 26-27.

Amend for these reasons alone.  Regardless, the Motion to Amend is due to be denied as Meide fails to show any good cause for the untimeliness of his requested relief.

When the Court has established a specific deadline for amendments to pleadings, the movant must first establish good cause for seeking leave to amend after that deadline pursuant to Rule 16(b).  See Walters v. Altec Indus., Inc., No. 3:01-CV-371-J-12TEM, 2003 WL 22012046, at *1 (M.D. Fla. Mar. 3, 2003); Perez v. Pavex Corp., No. 801CV0069T27MSS, 2002 WL 31500404, at *1 (M.D. Fla. Oct. 18, 2002).  "This good cause standard precludes modification unless the schedule cannot 'be met despite the diligence of the party seeking the extension.'"  See Sosa v. Airprint Systems, Inc., 133 F.3d 1417, 1418 (11th Cir. 1998) (quoting Fed. R. Civ. P. 16 advisory committee's note).  Indeed, "'[i]f [a] party was not diligent, the [good cause] inquiry should end.'"  Id. (second and third alteration in original) (quoting Johnson v. Mammoth Recreations, Inc., 975 F.2d 604, 609 (9th Cir. 1992)).  A plaintiff lacks diligence not only when it "has full knowledge of the information with which it seeks to amend its complaint before the deadline passes," but also when a plaintiff fails to "seek the information it needs to determine whether an amendment is in order."  See S. Grouts & Mortars, Inc. v. 3M Co., 575 F.3d 1235, 1241 n.3 (11th Cir. 2009).

The Court entered a Case Management and Scheduling Order (Doc. 48; CMSO) in this case nearly two years ago on November 21, 2018.  In the CMSO, the Court set a deadline of September 4, 2019, for motions to add parties or amend the pleadings.  See CMSO at 1.  As set forth above, the Court held a Hearing on July 24, 2019, at which time the Court explained to Meide, at length, the pleading standards applicable to his claims and, given the complexity of the matter, encouraged Meide to seek legal counsel.  See

7

Minute Entry (Doc. 75; Hearing); <u>see also</u> Transcript of Motion Hearing (Doc. 77), filed July 31, 2019.  Meide elected not to do so, and after obtaining an extension of time, filed his Amended Complaint on September 24, 2019.  <u>See</u> Order (Doc. 84); Amended Complaint (Doc. 85).  The Court promptly struck the Amended Complaint due to serious pleading defects and set a deadline of November 1, 2019, for Meide to file a second amended complaint.  <u>See</u> Order (Doc. 86), entered October 4, 2019.  In doing so, the Court twice cautioned Meide that this was his "<u>one final opportunity</u> to properly state his claims" and instructed Meide to carefully review the Transcript of the July 24, 2019 Hearing.  <u>See</u> <u>id.</u> at 2, 3.  On November 1, 2019, Meide, still opting to proceed pro se, filed the operative Second Amended Complaint.  At no point did Meide inform the Court that he was attempting to obtain counsel or seek additional time in which to do so.

Nearly a year after the Hearing, over seven months after filing the Second Amended Complaint, and with the Motions to Dismiss fully briefed and pending before the Court, Meide seeks leave to amend his pleadings a third time.  Notably, Meide makes no attempt in the Motion to Amend to establish good cause or show that he acted with due diligence in making this request.  Meide does not assert that any of the allegations in the Proposed Complaint are premised on newly discovered evidence.  Rather, Meide appears to contend that amendment is warranted because he seeks to comply with the Court's directives issued at the July 24, 2019 Hearing.  <u>See</u> Motion to Amend at 2.  Thus, the sole justification for the untimeliness of the Motion to Amend appears to be Meide's belated decision to hire counsel to represent him in this case.  <u>See</u> <u>id.</u> at 2.  But, Meide's long delay in obtaining counsel does not establish due diligence or good cause.  The Court cautioned Meide over a year ago that he would be well-advised to seek legal representation in this matter, and

8

Meide offers no justification for his failure to obtain legal counsel in this case prior to June 11, 2020, long after the filing of the Second Amended Complaint, the Motions to Dismiss, and his Responses.  Absent any basis for a finding of good cause, Meide's untimely request to amend his pleadings is due to be denied.

In the Motion to Substitute, Meide seeks leave to substitute JIC as the plaintiff in this lawsuit in place of Meide.[4]  Meide asserts that JIC, as the actual purchaser of the securities at issue in this litigation, is the real party in interest.  See Motion to Substitute at 2-3.  Notably, Defendants filed motions to dismiss the Initial Complaint in September and October of 2018, in which several Defendants argued that Meide lacked standing to pursue his securities fraud claim because it was JIC that actually purchased the securities at issue.  Although the Court addressed this issue with Meide at the Hearing, see Tr. at 5-7, 21-24, Meide nevertheless filed the Amended Complaint and Second Amended Complaint in his own name.  As such, in the instant Motions to Dismiss, Defendants reassert the standing challenge.  See Centineo Motion at 8-9; Pulse Motion at 9-10.  Meide acknowledged the standing argument in his Responses to the Motions to Dismiss, filed in December 2019 and March 2020, but made no attempt to seek substitution at that time.  Not until June of 2020, well over a year after Defendants first raised the issue and long after the Court addressed the problem with Meide at the Hearing, did Meide file the Motion to Substitute in an attempt to avoid the standing problem.  Thus, JIC and Meide undoubtedly have had "reasonable time" to seek substitution of the named plaintiff in this action.  See Rule 17(a)(3).  Nevertheless, the Court need not resolve the Motion to Substitute because this action is due to be dismissed in its entirety.  For the reasons set forth below, the Court finds

---

[4] It is unclear whether, absent leave to amend the pleadings, Meide would still seek to substitute JIC as the plaintiff in this action.  Regardless, the Motion to Substitute is due to be denied.

that regardless of whether Meide is in the class of plaintiffs authorized to sue under the PSLRA,[5] his securities fraud claim is due to be dismissed as Meide fails to allege this claim with the requisite particularity.  Absent a viable federal claim, the Court finds it appropriate to decline to exercise supplemental jurisdiction over Meide's remaining state law claims and will dismiss them without prejudice to being refiled in state court.  As such, the Court need not address Defendants' arguments about whether Meide or JIC is the proper party, and will deny the Motion to Substitute as moot.

Accordingly, the Court proceeds to address the merits of the pending Motions to Dismiss.

## III.    Factual Allegations

Plaintiff Scott Meide alleges that he is the victim of an investment scam arising out of his purchase of stock in Defendants Pulse Evolution Corporation and Evolution AI Corporation.  As set forth in the Second Amended Complaint, Meide contends that Defendant John King (J. King) contacted him in November 2013 about a "financial opportunity" involving "hologram technology" and an "artificial intelligence company named Pulse Evolution Corporation."  See Second Amended Complaint ¶ 21. J. King told Meide that "Pulse produced computer-generated human likenesses which would be utilized in

---

[5] In Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975), the Supreme Court held that only "actual purchasers and sellers of securities" may bring an action for private damages under § 10(b) and Rule 10b-5.  See Blue Chip Stamps, 421 U.S. at 730-31.  In reliance on Blue Chip Stamps, the Eleventh Circuit instructs that "a person who alleges a violation of Rule 10b-5 must demonstrate that he is an actual purchaser or seller, or that he was party to a legally enforceable contract to purchase or sell securities."  See Pelletier v. Stuart-James Co., Inc., 863 F.2d 1550, 1554-55 (11th Cir. 1989).  Defendants argue that Meide lacks standing to pursue his securities fraud claim because JIC, not Meide, was the actual purchaser of the securities.  See Pulse Motion at 9-10; Centineo Motion at 12-13.  However, this argument is more appropriately framed as a question of whether Meide falls within the "class of plaintiffs whom Congress has authorized to sue under" the PSLRA, or "[i]n other words" whether Meide "has a cause of action under the statute."  See Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 127 (2014).  Significantly, this challenge "'does not implicate subject-matter jurisdiction, i.e., the court's statutory or constitutional power to adjudicate the case.'"  Id. at 128 n.4 (quoting Verizon Md. Inc. v. Public Serv. Comm'n of Md., 535 U.S. 635, 642-43 (2002)).

many industries such as education, telecommunication, the military, HVAC, automotive, entertainment, life sciences and the like." Id. ¶ 22.  Meide alleges that "[t]his statement was false, misleading and a material misrepresentation and he knew it," id., although Meide does not allege any facts explaining how or why this statement was false or misleading at the time it was made, or the basis for his contention that J. King knew of its falsity.

When Meide expressed interest in receiving more information, J. King contacted Defendants Dana Tejeda and Julie Natale to set up a phone call with Meide, Tejeda, Natale, J. King and Defendant Gregory Centineo.  Id. ¶ 24.  Meide participated in phone calls with this group of people over the next several months during which they would make "extravagant claims on the technology or the merits of the company and the management of Pulse Evolution Corporation."  Id. ¶ 25.  Meide asserts that the claims made during these phone calls were "material misrepresentations, false and misleading," and according to Meide, these individuals "knew they were false and misleading."  Id. ¶ 27.  Meide asserts that he "relied on this information to later invest in the company" resulting in damages of $775,000.  Id.  Meide identifies the following false or misleading statements:

- In November and December of 2013, Centineo and King told Meide that "Pulse would be showcasing a hologram of Michael Jackson at the 2014 Billboard Music Awards" and "Pulse had already produced a hologram of rapper Tupac Shakur at the 2012 Coachella Concert."  Id. ¶ 28.  Notably, Meide concedes that "[b]oth shows were performed" but he "does not know who produced those shows."  Id. ¶ 30.

- Centineo and King told Meide that the technology belonged to John Textor.  Id. ¶ 29.  However, Meide asserts that Centineo and King also informed him that "a Mr. Alki David" was suing Textor over the ownership of the technology.  Id. ¶ 30.

- Centineo and King "also said numerous times that Pulse had a signed contract already with the Michael Jackson estate in which they would own 40% of any holographic production of any kind with the Jackson Estate" and that this "was exclusive only to Pulse Evolution."  Id. ¶ 31.

11

Meide maintains that these statements were "false, misleading and materially misrepresented [sic]," and that "they knew they were false," but does not explain how these statements were false, misleading, or misrepresentative, nor does he provide facts demonstrating when or how these individuals knew of the falsity.

Meide also identifies certain alleged false or misleading statements that were made at a meeting in South Florida in early 2014. See id. ¶ 34. According to Meide, he attended a meeting with Pulse Evolution's founder and owner, Defendant John Textor, at which Tejeda, Natale, J. King, Centineo and Defendant Frank Patterson were all present. Id. Meide alleges that the following statements were made at this meeting:

- Textor and Patterson stated that "Pulse would own a percentage of any hologram production that utilized their technology and would get a big cut of the proceeds, especially Michael Jackson," and this "would give Pulse ongoing revenues" making it "different from other similar technology companies." Id. ¶¶ 35-36.

- Textor and Patterson explained that if Meide "purchased shares in the company" those shares "would be free trading in one year and the company would do an initial public offering, IPO, on a major stock platform." Id. ¶ 37.

- Textor explained that he had previously lost $20 million "of his own money regarding some type of short sale some stockholder made on" a company Textor used to be involved with, and as such, to prevent this in the future Textor "had a plan to control the price of the stock . . . ." Id. ¶ 40. According to Meide, Textor told him that if he purchased stock in Pulse Evolution, Textor "would only allow certain investors to sell a small portion of their shares at a time, at Textor's discretion" and in doing so, "would control the stock price." Id. Textor "also made a point that he would only be doing this to investors that King and Centineo brought into the company." Id.

According to Meide, "[t]hese statements were false and misleading; material misrepresentations and they knew they were false and misleading statements and [Meide] relied on this information to invest money in their company." Id. ¶ 38. In support of his contention that these statements were false, Meide asserts that "five years after [his] first

investment," the shares are still not "free trading or unrestricted and there was never an IPO as they are on the OTC [over-the-counter] which is now branded the Pink Open Market . . . ." Id. ¶ 39.  According to Meide, quoting "Investopedia.com," this is "'the lowest and most speculative tier of the three marketplaces for the trading of over-the-counter stocks.'" Id.

Meide had additional phone conversations in the first half of 2014 before he decided to purchase "750,000 restricted shares of Pulse Evolution Corporation on July 18, 2014 for $300,000 . . . ." Id. ¶ 42.  These conversations included J. King, Defendant Agnes King (A. King), Centineo, Tejeda, Natale, and Textor.  Id.  According to Meide, when Textor was on the call he would make "most of the deceitful statements," but if Textor was not on the call, then J. King and Centineo would make "most of the deceitful statements." Id. ¶ 43.  Meide asserts that the following statements were made during those phone calls:

- "They would give [Meide] a great deal on the price of the shares that other investors were not getting" and only Meide and a "small handful of people" were getting this "exclusive" opportunity.  Id. ¶ 43.

- Meide's shares would "become free trading in one year approximately." Id. ¶ 44.

- "Pulse would be doing an IPO (Initial Public Offering) and would come out on a major stock exchange." Id. ¶ 45.

- "Pulse was in contract negotiations with big name estates like Marilyn Monroe, Elvis, ABBA, Prince and other high-ranking celebrities, either currently living or deceased and had already signed contracts with multiple estates."  Id. ¶ 46.

- "Pulse would eventually be bought out by companies such as Google . . . ." Id. ¶ 47.

- J. King, Centineo, and Textor told Meide that his "investment would reap phenomenal returns as the stock would reach 10-15 dollars per share and beyond because Textor knew how to control the stock price . . . ." Id. ¶ 49.

- J. King, Centineo, and Textor told Meide that he "better get in now . . . because this opportunity won't last forever for [Meide.]" Id. ¶ 50.

13

- J. King, Centineo, and Textor told Meide that "Textor owned an animation studio called Tradition Studios and Centineo would be the head.  The massive studio was located next to Textor's Port St. Lucie's [sic] office . . . and that's where the future office of Pulse would be headquartered . . . ."  Id. ¶ 51.

- If Meide chose to invest, the investment would make him "'whole' from [his] staggering losses in [his] previous investment of Legends of Oz: Dorothy's Return and [his] Legends of Oz investment is not lost as the franchise and movie will be cleaned up and the movie will be re-released."  Id. ¶ 52.  Although it is unclear to which statement he is referring, Meide appears to allege that this statement was "[t]old to [Meide] numerous times by King, Agnes, Centineo, Textor, Natale and Tejeda on multiple occasions (from 2014 through 2018) on the phone and personally . . . ."  Id. ¶ 53.

- According to Meide, A. King "joined in on all the conversations" and "always talked about how good the technology was, especially mentioning the Billboards Music show and how Textor was smart and would get this done."  She also told Meide that "Pulse was years ahead of the competition."  Id. ¶ 56.

Meide alleges that all of these statements were "false and misleading, material misrepresentations, they knew they were false and misleading and [Meide] relied on this information to make decisions to invest in the company(ies) [sic]."  Id. ¶ 56.

After his initial investment on July 18, 2014, Meide had "many more conversations with [J. King], Centineo and Textor on the phone . . . ."  Id. ¶ 57.  Meide recalls that the following statements were made during those conversations:

- "Other estates were interested in hologram productions and negotiations have ensued with high-ranking celebrities' estates like ABBA and Elvis, for instance," and "Pulse would get a 5% royalty on the ABBA show" and that show "would give Pulse notoriety" and "make billions of dollars worldwide."  Id. ¶ 58.  Although Meide does not remember which ones, he was told that "[o]ther estates had signed production deals with Pulse," as well.  Id. ¶ 59.

- "A Chinese company invested $10 million into Pulse," which "might have been true but was probably false."  Id. ¶ 60.

- King and Centineo told Meide on multiple occasions that "Textor was in Zurich pitching ideas to several billionaires that were huge investors in Pulse."  Id. ¶ 61.  Meide has asked for the names of these billionaires, but has never been told who they were.  Id. ¶¶ 62-63.

14

According to Meide, "Pulse became a publicly traded entity (PLFX) sometime in 2015 on the Pink Open Market . . . ." <u>Id.</u> ¶ 64.  At some point, Meide was told that "[t]he stock price would open around $2.00/share," but it actually "opened at $1.85" and "[t]oday's stock price hovers around 0.04." <u>Id.</u> ¶ 70.  On July 30, 2015, Meide purchased 800,000 of "Centineo's personal shares . . . ." <u>Id.</u> ¶ 71.  Prior to this purchase, J. King and Centineo told Meide for "three to four weeks" that the shares "would become free trading in three months in October 2015." <u>Id.</u> ¶ 71.  According to Meide, "[t]hey knew this was false and misleading and [Meide] relied on this information to purchase those restricted shares and was therefore damaged . . . ." <u>Id.</u> ¶ 74.  As of November 2019, those shares are "still restricted." <u>Id.</u> ¶ 72.

In addition, Meide alleges that he was told about the following events after Pulse began trading on the "Pink Open Market" in 2015:

- In early 2017, J. King, Textor and Centineo told Meide many times that "Simon Fuller, the mega film and TV producer known for the American Idol franchise, would be working in conjunction with Pulse Evolution to produce an Elvis hologram production," <u>id.</u> ¶ 66, but "[t]his show was never completed," <u>id.</u> ¶ 67.

- J. King, Centineo and Textor told Meide on multiple occasions that "Simon Fuller would be producing an ABBA hologram production worldwide (contract was signed) and Textor and Centineo would have offices in Fuller's penthouse office suite in Los Angeles and would be working side by side with Simon Fuller." <u>Id.</u> ¶¶ 68, 69.  As of October 2019, "there has been no show." <u>Id.</u> ¶ 68.

- "In late 2017 and early 2018, King and Textor told me Bruno Mars and his manager had done something with three of Michael Jackson's new songs that have never been heard before and would soon be performed in a special television event along with the Michael Jackson hologram in the first quarter of 2018." <u>Id.</u> ¶ 76.  As of October 2019, this has not happened. <u>Id.</u> ¶ 77.

According to Meide, every Defendant told him that "Pulse had a lock on the hologram technology and was years ahead of the competition, if there was any relevant competition."

Id. ¶ 75.  Meide also alleges that "J. King told [him] on the phone and in person that John Textor had Dupont blood and he gets things done.  He is 2 out of 3 in accomplishing something great and he would do it again with Pulse."  Id. ¶ 78.  Meide again generally asserts that he relied on this false and misleading information to invest in Textor's companies.  Id.

It appears that sometime in 2018, Meide invested with Textor a third time by purchasing shares in a new company Evolution AI, for $75,000.  See id. ¶¶ 79, 82-89.  Meide alleges that he was induced to invest in Evolution AI by the following false and misleading statements:

- In December 2017, J. King told Meide via telephone that "the billionaire investors in Pulse wanted to take the entertainment route with Pulse, producing all the shows revolving around Michael Jackson, Marilyn Monroe, Elvis and other celebrities, while Textor wanted the company to concentrate on the artificial intelligence aspect of technology."  Id. ¶ 81.  Textor told Meide the same thing over the telephone in December 2017 and January 2018.  Id. ¶ 82.

- J. King and Textor both told Meide in December 2017 and January 2018 that "there was still a requirement for roughly $350,000 to turn Pulse into a fully reporting company again."  Id. ¶ 84.

- Textor told Meide on these same calls that "the Switzerland billionaires who invested into Pulse and who were giving Textor and his company $600,000 a month to keep the company afloat, wanted Pulse to change their status with the SEC to a non-reporting company because all of the billionaire Switzerland investors all owned private companies (therefore non reporting companies) and that's what they wanted Pulse to be."  Id. ¶ 85.  Textor said he had to abide by these wishes since the billionaires "were paying $600,000 monthly to Textor . . . ."  Id. ¶ 86.

According to Meide, "[t]hese statements were utterly false and misleading and they both knew they were false and misleading, and [he] relied on this information to invest $75,000 into [Evolution AI] . . . ."  Id. ¶ 87.  J. King also told Meide in January 2018 that "Tiger Wood's x-wife [sic] wanted to put in 13 million needed to finish the Elvis show," id. ¶ 88,

but according to Meide, "[t]he Elvis show never happened and King and Textor knew it would never happen . . . ." Id. ¶ 89.

As further inducement to invest in Evolution AI, Meide alleges that in January 2018, Textor and J. King told him over the telephone that "Evolution AI was going to IPO on the NYSE, and the only people who would have free trading shares were myself, [J. King], and Textor." Id. ¶ 93, Ex. B.  Textor allegedly told Meide that:

- If Meide "put $75,000 into the new company, Evolution AI, he would give me a million more shares in the new company which, added to [Meide's] Pulse shares, [Meide] would be buying 2.5 million shares." Id. ¶ 94.

- "[T]hey would do a 10 to 1 reverse stock split and that the shares would be trading at $10-11 per share on the New York Stock Exchange." Id. ¶ 95.

- "[Textor] needed this $75,000 to help make Pulse a fully reporting company again." Id. ¶ 96.

- "[I]f [Meide] put $75,000 into the new AI company, then Textor would make things right as he said [Meide's] $400,000 transaction with Centineo for 800,000 Pulse restricted shares on July 30, 2015 with [Meide] was not fair and [Textor] wanted to make it right." Id. ¶ 97.

Meide repeats that "[a]ll of these statements were material misrepresentations, lies, false and misleading and they knew they were false and misleading upon which [Meide] relied." Id. ¶ 98.  Following his $75,000 investment in Evolution AI, in approximately May of 2018, Meide "learned that both Pulse and Textor have been mired in numerous lawsuits with allegations of fraud and securities violations being the most predominant claims against them." See id. ¶ 90.  As a result, Meide asked Textor for a refund, which Textor refused. Id. ¶ 91, Ex. A.[6]

---

[6] Meide represents Exhibit A to be a copy of messages exchanged between Meide and Textor.  This alleged exchange does support Meide's allegation that he requested a refund of his $75,000, but includes no mention of the other lawsuits that allegedly spawned the refund request.  See id., Ex. A.  Meide contends that Textor responded to his refund request with "other lies and deceit," but fails to explain why the statements reflected in Exhibit A are false.  Id. ¶ 91.

Finally, as to Defendants Jordan Fiksenbaum and Laura Anthony, Meide does not specifically identify any false or misleading statements on which he relied that were made by those individuals.  However, he alleges that Fiksenbaum is the Chief Executive Officer of Pulse and "directly responsible for all governance and adherence to fiduciary and ethical behavior."  Id. ¶ 99.  In addition, according to Meide, Anthony is the "Compliance Officer for Pulse" and "appears to be the enabler of the scam that victimized [Meide]."  Id. ¶ 108.  Although unclear, Meide appears to contend that Anthony "enabled" the scam because she provided an "attorney letter" for Pulse "vouching for the information in the [over-the-counter] disclosures," despite "all the shortcomings and misstatements in the OTC disclosures," which gave a "false aura of legitimacy to corrupt publicly traded company." Id. ¶ 110.

## IV.    Standard of Review

In ruling on a motion to dismiss, the Court must accept the factual allegations set forth in the complaint as true.  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508 n.1 (2002); see also Lotierzo v. Woman's World Med. Ctr., Inc., 278 F.3d 1180, 1182 (11th Cir. 2002).  In addition, all reasonable inferences should be drawn in favor of the plaintiff.  See Randall v. Scott, 610 F.3d 701, 705 (11th Cir. 2010).   Nonetheless, the plaintiff must still meet some minimal pleading requirements.  Jackson v. Bellsouth Telecomm., 372 F.3d 1250, 1262-63 (11th Cir. 2004) (citations omitted).  Indeed, while "[s]pecific facts are not necessary[,]" the complaint should "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  Further, the plaintiff must allege "enough facts to

state a claim that is plausible on its face." Twombly, 550 U.S. at 570. "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). A "plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" Twombly, 550 U.S. at 555 (internal quotations omitted); see also Jackson, 372 F.3d at 1262 (explaining that "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal") (internal citation and quotations omitted). Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions[,]" which simply "are not entitled to [an] assumption of truth." See Iqbal, 556 U.S. at 678, 680. Thus, in ruling on a motion to dismiss, the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face[.]'" Id. at 678 (quoting Twombly, 550 U.S. at 570).

In addition to the minimal pleading requirements outlined above, Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." "The particularity rule serves an important purpose in fraud actions by alerting defendants to the 'precise misconduct with which they are charged' and protecting defendants 'against spurious charges of immoral and fraudulent behavior.'" Durham v. Bus. Mgmt. Assocs., 847 F.2d 1505, 1511 (11th Cir. 1988) (quotation omitted). Thus, Rule 9(b) "'ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of . . . [and] protects defendants

from harm to their goodwill and reputation.'" <u>Wagner v. First Horizon Pharm. Corp.</u>, 464 F.3d 1273, 1277 (11th Cir. 2006) (quotation omitted) (alterations in <u>Wagner</u>). Although "'alternative means are also available[,]'" the requirements of Rule 9(b) may be satisfied by specific allegations as to "'date, time or place.'" <u>See</u> <u>Tello v. Dean Witter Reynolds, Inc.</u>, 494 F.3d 956, 972-73 (11th Cir. 2007) (quoting <u>Durham</u>, 847 F.2d at 1511). Thus, a complaint satisfies Rule 9(b) if it

> sets forth "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud."

<u>Id.</u> at 972 (quoting <u>Ziemba v. Cascade Int'l, Inc.</u>, 256 F.3d 1194, 1202 (11th Cir. 2001)). Nonetheless, "Rule 9(b) does not require a plaintiff to allege specific facts related to the defendant's state of mind when the allegedly fraudulent statements were made[,]" and thus, for purposes of Rule 9(b), "it is sufficient to plead the who, what, when, where, and how of the allegedly false statements and then allege generally that those statements were made with the requisite intent." <u>Mizzaro v. Home Depot, Inc.</u>, 544 F.3d 1230, 1237 (11th Cir. 2008).

## V. Pleading Standards of the Private Securities Litigation Reform Act (PSLRA)

Pursuant to § 10(b) of the Exchange Act, it is

> unlawful for any person, directly or indirectly, . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). In accordance with this section, the Securities and Exchange Commission (SEC) promulgated Rule 10b-5 which provides in relevant part: "It shall be

unlawful for any person, directly or indirectly, . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . ." 17 C.F.R. § 240.10b-5(b).  The elements of a claim under § 10(b) and Rule 10b-5 are:

> "(1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss [i.e., damages]; and (6) a causal connection between the material misrepresentation or omission and the loss, commonly called 'loss causation.'"

FindWhat Investor Grp. v. FindWhat.com, 658 F.3d 1282, 1295 (11th Cir. 2011) (alteration in original) (quoting Mizzaro, 544 F.3d at 1236-37).  Significantly, to state a claim for relief under § 10(b), a plaintiff must satisfy not only the federal notice pleading requirements and the Rule 9(b) fraud pleading requirements set forth above, but also the additional heightened pleading standards imposed by the PSLRA.  See FindWhat Investor Grp., 658 F.3d at 1296.

The PSLRA requires that for Rule 10b-5 claims based on allegedly false or misleading statements or omissions, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  In addition, where a Rule 10b-5 action requires proof of scienter, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind [i.e., scienter]."  15 U.S.C. § 78u-4(b)(2).  As such, in a private securities fraud action such as this, "a plaintiff can no longer plead the requisite scienter

element generally, as he previously could under Rule 9(b)."  See Mizzaro, 544 F.3d at 1238.  Moreover, while a court may aggregate the factual allegations to infer scienter, "scienter must be alleged with respect to each defendant and with respect to each alleged violation of the statute."  FindWhat Investor Grp., 658 F.3d at 1296.  The PSLRA provides that if these requirements are not met, the court "shall" dismiss the complaint.  15 U.S.C. § 78u-4(b)(3)(A).

     "Although the PSLRA substantially raised the pleading standard for scienter, it did not change any substantive intent requirements."  Mizzaro, 544 F.3d at 1238.  Thus, to demonstrate scienter for purposes of § 10(b) and Rule 10b-5, a plaintiff must show "either an 'intent to deceive, manipulate or defraud,' or 'severe recklessness.'"  Id. (quoting Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1282 (11th Cir. 1999)).  The Eleventh Circuit defines "severe recklessness" as:

> "those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."

Id. (quoting Bryant, 187 F.3d at 1282 n.18).  The heightened pleading requirements of the PSLRA and the substantive scienter case law together yield a "stringent standard" that Meide must satisfy in order to survive the Motions to Dismiss.  Id.  Specifically, Meide "must (in addition to pleading all of the other elements of a § 10(b) claim) plead 'with particularity facts giving rise to a strong inference' that [Defendants] either intended to defraud investors or were severely reckless when they made the allegedly materially false or incomplete statements."  Id.

Significantly, "[t]o qualify as 'strong' . . . an inference of scienter must be more than merely plausible or reasonable–it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314 (2007).  The Supreme Court has prescribed a three step analysis for determining whether a pleading raises a "strong inference" of scienter at the motion to dismiss stage of the proceedings. See id. at 322-23.  First, courts must "accept all factual allegations in the complaint as true." Id. at 322.  Second, "courts must consider the complaint in its entirety as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Id.  Indeed, the strong-inference inquiry asks "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Id. at 322-23.  Notably, however, "omissions and ambiguities count against inferring scienter." Id. at 326.  Finally, the Supreme Court instructs that courts "must take into account plausible opposing inferences." Id. at 323.  Specifically, the Supreme Court explains that:

> To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, i.e., of the "smoking-gun" genre, or even the "most plausible of competing inferences," . . . . Yet, the inference of scienter must be more than merely "reasonable" or "permissible"—it must be cogent and compelling, thus strong in light of other explanations.

Id. at 323-24 (internal citations omitted).  In sum, the question before this Court is: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" Id. at 326.

## VI.    Discussion

### A.  Count I: Securities Fraud – Section 10(b) and Rule 10b-5

In their Motions, Defendants contend that Meide's securities fraud claim is due to be dismissed because he fails to satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA as to each purportedly misleading statement or omission and each Defendant.  See Pulse Motion at 5-9; Anthony Motion at 3-6; Centineo Motion at 8-9.  In his Responses to Pulse and Centineo, Meide contends that "Defendants are more than well aware of what they stand accused of," quibbles with whether such "hyper-technical" pleading standards are appropriate, maintains that he could not possibly know "who said what and when" unless he had known in advance he was being defrauded and illegally recorded the conversations, and asserts that "[s]cienter in this case should be self-evident" as the "'man on the street' could easily infer scienter in this action."  See Response to Centineo at 3; Response to Pulse at 7-9.  As to Anthony, Meide responds that "[a]ddressing each lie told to Plaintiff" would be impossible and that Anthony knows what she's been accused of.  See Response to Anthony at 2-3.  Meide also appears to invoke control person liability as to Anthony.  Id. at 3.

Upon careful review of the allegations in the Second Amended Complaint, the Court finds that Meide has once again failed to plead his securities fraud claim with the particularity required by the PSLRA.   In the Second Amended Complaint and as summarized above, Meide alleges that Defendants made numerous statements which he maintains were false and misleading and on which he relied in making his investment

decisions.  Meide also asserts throughout the Second Amended Complaint that "they knew" these statements were false and misleading.  See SAC ¶¶ 27, 32, 38, 56, 74, 83, 98.  While Meide does make some effort to specifically identify the statements at issue, he continues to utilize only conclusory allegations regarding the false or misleading nature of those statements and Defendants' intent when the statements were made.  Such vague and conclusory allegations are entirely insufficient to meet the PSLRA's stringent pleading standards, both as necessary to show the falsity of the statements at the time they were made and that Defendants acted with the requisite scienter.  See 15 U.S.C. § 78u-4(b)(1)-(2).  To the extent Meide attempts to premise his claim on an omission, Meide fails to allege sufficient details about the information Defendants allegedly failed to disclose or identify what statements, if any, gave rise to a duty to disclose the omitted information.  In addition, many of the purportedly misleading statements in the Second Amended Complaint are not actionable because the statements are immaterial puffery.  Thus, for the reasons explained below, Meide's claim for securities fraud under the PSLRA is due to be dismissed.

### 1.  Puffery

To establish "a violation of Rule 10b-5(b), a plaintiff must identify a misrepresentation or an omission of a material fact."  See Fried v. Stiefel Labs., Inc., 814 F.3d 1288, 1294 (11th Cir. 2016) (emphasis added).  "The test for materiality in the securities fraud context is 'whether a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action.'"  SEC v. Merchant Capital, LLC, 483 F.3d 747, 766 (11th Cir. 2007) (quoting SEC v. Carriba Air, 681 F.2d 1318, 1323 (11th Cir. 1982)); see also Carvelli v. Ocwen Fin. Corp., 934 F.3d 1307, 1317 (11th Cir. 2019) ("A misrepresentation or omission is material if, 'in the light of the facts existing at

the time,' a 'reasonable investor, in the exercise of due care, would have been misled by it.'" (quoting <u>FindWhat Investor Grp.</u>, 658 F.3d at 1304)).  However, as quoted in <u>Carvelli</u>, "'there are some kinds of talk which no sensible man takes seriously, and if he does he suffers from his credulity.'"  <u>See</u> <u>Carvelli</u>, 934 F.3d at 1319 (quoting <u>Vulcan Metals Co. v. Simmons Mfg. Co.</u>, 248 F. 853, 856 (2d Cir. 1918) (Hand, J.)).  This sort of talk, known as puffery, is characterized as "generalized, vague, nonquantifiable statements of corporate optimism."  <u>See</u> <u>id.</u> at 1319.  Because "a 'reasonable investor' exercising due care," would not rely on "[e]xcessively vague, generalized, and optimistic comments" in making his investment decision, such statements are generally considered immaterial.  <u>Id.</u> at 1320; <u>see</u> <u>Mogensen v. Body Cent. Corp.</u>, 15 F. Supp. 3d 1191, 1211 (M.D. Fla. 2014) ("'Reasonable' investors do not base their investing decisions on corporate 'puffery'— generalized, non-verifiable, vaguely optimistic statements.") (collecting cases); <u>Rosenzweig v. Azurix Corp.</u>, 332 F.3d 854, 869 (5th Cir. 2003) ("The generalized, positive statements about the company's competitive strengths, experienced management, and future prospects are not actionable because they are immaterial.").  Notably, immaterial puffery is nonactionable regardless of a defendant's state of mind, because "[w]hether a statement was made in bad faith or without a reasonable basis is irrelevant to the question whether the statement is nonetheless so airy as to be insignificant."  <u>See</u> <u>Carvelli</u>, 934 F.3d at 1321; <u>see</u> <u>also</u> <u>Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.</u>, 594 F.3d 783, 795-96 (11th Cir. 2010) ("The anti-fraud provisions of the securities laws are plainly disinterested with immaterial statements, no matter the state of mind of the speaker.").

Upon review, many of the statements described in the Second Amended Complaint constitute the type of generalized, vague and non-verifiable puffery that courts have

dismissed as immaterial.  Meide maintains that he was misled by "extravagant" statements about the merits of the company, its technology and management.  See SAC ¶¶ 25, 26, 48, 100, 101, 105.  Meide was allegedly told that Pulse's technology would be utilized in a wide-swath of industries, Pulse was "years ahead of the competition," and would eventually be bought out by a company like Google.  See id. ¶¶ 22, 47, 56, 75.  Meide also asserts that he was misled by vague statements about the "exclusive" opportunity and "great deal" he was receiving, promises of "phenomenal returns," and glowing descriptions of Textor's skills as a businessman and investor.  Id. ¶¶ 43, 49-50, 56, 78.  None of these statements assert the type of "specific, verifiable facts that reasonable investors would rely on in deciding whether to buy or sell [a company's] securities."  See Philadelphia Fin. Mgmt. of San Francisco, LLC v DJSP Enters., Inc., 572 F. App'x 713, 716 (11th Cir. 2014) (finding statements "about the 'rigor' of [the company's] processes, the 'efficiency' and 'accuracy' of its operations, and its 'effective' staff training were not material"); see also IBEW Local 595 Pension & Money Purchase Pension Plans v. ADT Corp., 660 F. App'x 850, 857 (11th Cir. 2016) (finding defendants' statements that a plan was "'thoughtful,' 'effective,' and 'optimal,' among other descriptors," to be nonactionable puffery); City of Monroe Emps. Retirement Sys. v. Bridgestone Corp., 399 F.3d 651, 670-71 (6th Cir. 2005) ("[S]uch statements describing a product in terms of 'quality' or 'best' or benefitting from 'aggressive marketing' are too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision.") (collecting cases).  The Court acknowledges that materiality is a mixed question of law and fact, often dependent on context, nevertheless the vague and hyperbolic misrepresentations set forth above are "'so obviously unimportant to a reasonable investor

that reasonable minds could not differ on the question of their importance.'"  See Carvelli, 934 F.3d at 1320-21 (quoting Ganino v. Citizens Util. Co., 228 F.3d 154, 162 (2d Cir. 2000)).  As such, these statements cannot give rise to a claim for securities fraud under the PSLRA.[7]

### 2.  Omission

Although unclear, Meide also appears to premise his claim for securities fraud on material omissions.  See SAC ¶ 118.  Neither his Second Amended Complaint nor his Responses to the Motions to Dismiss specifically identify the alleged omission(s) that form the basis of the claim.  Nevertheless, upon review, the Court identifies one allegation of an omission that may form the basis for this theory of relief.  Specifically, in paragraph 90, Meide alleges that "around May of 2018, I learned that both Pulse and Textor have been mired in numerous lawsuits with allegations of fraud and securities violations being the most predominant claims against them."  See SAC ¶ 90.

Significantly, "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5."  See In re Galectin Therapeutics, Inc. Securities Litig., 843 F.3d 1257, 1274 (11th Cir. 2016).  Indeed, "[s]ection 10(b) of the Exchange Act and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information."  See In re Galectin, 843 F.3d at 1274.  Rather, the omission of a fact, even a material fact, is actionable only if Defendants had a duty to disclose the information.  See Carvelli, 934 F.3d at 1317 ("[A]bsent a duty, material information needn't be disclosed unless its omission would

---

[7] Notably, to the extent any of these statements could be considered material, they largely constitute statements of opinion.  To hold a speaker liable for a false statement of opinion, Meide must show either that the speaker did not actually believe the statement, or that the statement carried embedded facts which were untrue.  See Carvelli, 934 F.3d at 1322-23.  However, as explained in the analysis that follows, Meide fails to allege specific facts demonstrating the falsity of any alleged factual statements in the Second Amended Complaint, nor does he plead sufficient facts to raise a strong inference that Defendants did not truly believe these statements at the time they were made.  Id. at 1323.

render misleading other information that an issuer <u>has</u> disclosed."). As relevant here, "[t]he omission of facts is actionable only to the extent that the absence of those facts would, under the circumstances, render another reported statement misleading to the 'reasonable investor in the exercise of due care.'" <u>In re Galectin</u>, 843 F.3d at 1275 (quoting <u>FindWhat Investor Grp.</u>, 658 F.3d at 1305).

Thus, while Rule 10b-5 does not create an affirmative duty of disclosure, it does prohibit "any omissions of material fact 'necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" <u>See FindWhat Investor Grp.</u>, 658 F.3d at 1305 (quoting 17 C.F.R. § 240.10b-5(b)). In <u>FindWhat Investor Group</u>, the Eleventh Circuit explained this duty to disclose as follows:

> By voluntarily revealing one fact about its operations, a duty arises for the corporation to disclose such other facts, if any, as necessary to ensure that what was revealed is not "so incomplete as to mislead." "[E]ven absent a duty to speak, a party who discloses material facts in connection with securities transactions assumes a duty to speak fully and truthfully on those subjects." In sum, "a defendant may not deal in half-truths."

<u>Id.</u> (internal citations omitted).

Here, Meide's single allegation about his discovery of "numerous lawsuits" involving Textor and Pulse involving "fraud and securities violations" fails to comport with the level of specificity required under Rule 9(b) and the PSLRA. Meide fails to include any details about these purported lawsuits such as when they were filed, who filed them, what they were about, or who knew about them. Moreover, Meide does not identify what statements, if any, were rendered false or misleading by the failure to disclose the existence of these lawsuits. Indeed, Meide's Responses are devoid of any argument or legal authority supporting the viability of his securities fraud claim on a theory of a misleading omission such that it is unclear whether Meide is pursuing this theory of relief at all. Given the lack

of any details in the Second Amended Complaint specifically identifying the purportedly omitted information, or any allegation that Defendants had a duty to disclose this information, the Court finds that Meide fails to state a claim for securities fraud premised on a material omission.  See Carvelli, 934 F.3d at 1323 n.8 ("The [plaintiff] doesn't allege that [the defendant] had a specific duty to disclose specific information, or that anything [the defendant] said created a duty to disclose anything in particular. Thus, it failed to state a claim for any material omission.").

### 3.  Falsity

Next, the Court considers the specific, factual statements identified in the Second Amended Complaint that Meide contends were false or misleading.  For example, Meide alleges that various Defendants told him about existing contract deals and ongoing negotiations with celebrities, as well as meetings with, and investments by, "billionaire Switzerland investors," among others.  See SAC ¶¶ 28, 31, 46, 58, 60, 61, 66-68, 76, 81, 85, 88.  While these representations do appear to be material, Meide fails to allege with particularity any facts showing that these statements were actually false or misleading at the time they were made.  Instead, throughout the Second Amended Complaint, Meide merely repeats the conclusory assertion that the statements described were "false and misleading" or "material misrepresentations."  See SAC ¶¶ 27, 32, 38, 56, 74, 78, 83, 87, 98.  However, pursuant to the PSLRA, Meide must not only specify each statement alleged to have been misleading, which he has endeavored to do at length, but also "'the reason or reasons why the statement is misleading,'" which he has entirely failed to do.  See Edward J. Goodman Life Income Trust, 594 F.3d at 789 (quoting 15 U.S.C. § 78u-4(b)(1)); see also Metzler Inv. GMBH v. Corinthian Colleges, Inc., 540 F.3d 1049, 1070 (9th Cir.

2008) ("The PSLRA has exacting requirements for pleading 'falsity.'"); <u>City of Westland Police & Fire Retirement Sys. v. MetLife, Inc.</u>, 129 F. Supp. 3d 48, 67 (S.D.N.Y. 2015) ("To plead falsity, however, Section 10(b) plaintiffs 'must do more than simply assert that a statement is false—they must demonstrate with specificity why that is so.'" (quoting <u>In re Lululemon Sec. Litig.</u>, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014))).

To adequately allege that a statement of fact is false, a plaintiff must plead "facts that, if true, would be sufficient to show . . . that the statement is, in fact, false . . . ." <u>See City of Westland</u>, 129 F. Supp. 3d at 69. Similarly, a statement is misleading if "'<u>in the light of the facts existing at the time of the [statement]</u> . . . [a] reasonable investor, in the exercise of due care, would have been misled by it.'" <u>See FindWhat Investor Grp.</u>, 658 F.3d at 1305 (emphasis added) (quoting <u>SEC v. Tex. Gulf Sulphur Co.</u>, 401 F.2d 833, 863 (2d Cir. 1968) (en banc)). Here, Meide identifies numerous statements of fact which he contends were false or misleading, but fails to include any facts showing how or why the statements were false or otherwise inconsistent with "the facts existing at the time" the given statement was made. For example, Meide alleges that King and Centineo told him that Pulse had an exclusive contract with the Michael Jackson estate in which "they would own 40% of any holographic production of any kind with the Jackson Estate." <u>See</u> SAC ¶ 31. Although Meide alleges that this statement was "false, misleading and materially misrepresented," he does not allege <u>why</u> it was false or offer any factual support for this otherwise conclusory assertion. <u>Id.</u> ¶ 32. Is it Meide's contention that no such contract ever existed? Did the contract exist but not in the terms stated? Perhaps the contract did exist at one time but was later repudiated? Or maybe Meide believes the statement to be misleading because although such a contract did exist, nothing ever came of it? Without more information, the

Court is unable to discern whether Meide's allegations of falsity have any plausible factual basis. This pattern is repeated throughout the Second Amended Complaint.[8]

As aptly stated in Metzler Investment GMBH, Meide has mistaken quantity for quality, such that he sets forth a "considerable number of alleged false statements," but his "explanation of how and why the statements were false is decidedly vague." Metzler Inv. GMBH, 540 F.3d at 1070. By offering only "[a] litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false," Meide has failed to meet the pleading standards of the PSLRA. See Metzler Inv. GMBH, 540 F.3d at 1070; see also Theoharous v. Fong, 256 F.3d 1219, 1224-25 (11th Cir. 2001) ("Because the plaintiffs failed to plead any particular facts indicating whether or how any of these statements were false or misleading, these paragraphs failed to state a claim under the PSLRA and failed to comply with Fed.R.Civ.P. 9(b)." (emphasis added) (internal footnotes omitted)) abrogated on other grounds by Merck & Co., Inc. v. Reynolds, 559 U.S. 633, 130 S. Ct. 1784, 1793, 1798 (2010); Carvelli, 934 F.3d at 1329 n.13.

### 4. Scienter

Rather than plead facts demonstrating falsity, Meide appears to rely on a theory that the statements made to him were false or misleading because the promised or projected events never came to pass. For example, Meide includes allegations throughout the Second Amended Complaint about future productions using Pulse technology that never materialized. See SAC ¶¶ 46, 58, 66-68, 76-77, 88-89. Meide also alleges that various Defendants made false assurances that restrictions on his ability to trade his shares in

---

[8] Notably, some of Meide's allegations indicate that he does not actually know whether a given statement was true or false. Compare SAC ¶ 28 (alleging that he was told Pulse had or would be producing holograms at two shows) with id. ¶ 30 ("Both shows were performed but I do not know who produced those shows."); see also id. ¶ 60 ("This news might have been true but was probably false.").

Pulse or Evolution AI would be lifted in the future, as well as misrepresentations that at some point in the future these companies would go public and their shares would be traded on a major stock platform.  Id. ¶¶ 37, 40, 44-45, 93, 95.  According to Meide, these projections or promised events never happened.  However, to state a claim for securities fraud premised on these purportedly false future projections, Meide must allege with particularity facts showing that Defendants made the statements with the requisite scienter. Thus, as to each statement and each Defendant, Meide must show that the speaker made the particular promise or projection with an intent to deceive, manipulate, or defraud, or with severe recklessness.  Mizzaro, 544 F.3d at 1238.[9]

Throughout the Second Amended Complaint, Meide attempts to allege scienter by repeating the conclusory assertion that "they," presumably one or more of the Defendants, "knew [the statements] were false."  See SAC ¶¶ 32, 38, 74, 83, 87, 98, 101.  However, "merely alleging scienter in general, conclusory terms does not meet the particularity requirement" of the PSLRA.  See Garfield v. NDC Health Corp., 466 F.3d 1255, 1270 (11th Cir. 2006).  While Meide takes issue with the "hyper-technical" pleading requirements applicable to his securities fraud claim and insists that Defendants' fraudulent intent is "self-evident," see Response to Centineo at 3; Response to Pulse at 8, the Court is nevertheless required to apply the statutory requirements of the PSLRA.  Because Meide fails to allege any facts indicating that at the time these representations were made, the Defendant who made the statement knew or was severely reckless in not knowing that the future event

---

[9] In the Motions to Dismiss, Defendants do not invoke the PSLRA safe-harbor and as such, the Court does not consider its application in this case.

would not or could not occur, Meide's securities fraud claim as premised on those statements fails as well.[10]

Significantly, in <u>Tellabs</u>, the Supreme Court instructs courts to consider competing inferences in determining whether a party has sufficiently pled scienter. <u>See</u> <u>Tellabs</u>, 551 U.S. at 323-24.  In this case, the facts alleged raise the competing inference that, as Defendants developed Pulse and attempted to launch it, they over-promised and under-delivered as a result of misguided optimism, a misreading of the market, or unanticipated roadblocks.  In the absence of any particularized facts related to Defendants' intent, the Court finds that, while it is possible Defendants acted with scienter, the stronger inference is that the myriad problems in launching the Pulse and Evolution AI enterprises are attributable to negligence, mismanagement, or simply the inevitable difficulties in launching a new business.  <u>See</u> <u>Kadel v. Flood</u>, 427 F. App'x 778, 780 (11th Cir. 2011) ("[T]he Complaint cites differences of opinion, conjecture and innuendo in an attempt to make [defendant's] behavior look suspicious, but it conspicuously omits any facts that would

---

[10] To the extent some of these forward-looking statements could be characterized as promises, "[i]t is well-settled that '[t]he failure to carry out a promise made in connection with a securities transaction is normally a breach of contract' and does not justify a Rule 10b-5 action."  <u>See</u> <u>Gurary v. Winehouse</u>, 235 F.3d 792, 801 (2d Cir. 2000) (quoting <u>Mills v. Polar Molecular Corp.</u>, 12 F.3d 1170, 1176 (2d Cir. 1993)); <u>Reese v. BP Exploration (Alaska) Inc.</u>, 643 F.3d 681, 691 (9th Cir. 2011) ("[T]he breach of a contractual promise of future performance typically does not constitute a misrepresentation that will support an action for fraud."); <u>Wortley v. Camplin</u>, 333 F.3d 284, 294 (1st Cir. 2003) ("[M]ere breach of a promise is not itself enough to establish fraudulent intent for a federal securities law violation.").  Indeed, failure to perform a promise "does not constitute fraud pursuant to 10b-5 unless, when the promise was made, the defendant secretly intended not to perform or knew that he could not perform." <u>Gurary</u>, 235 F.3d at 801(internal quotations omitted); <u>see also</u> <u>Capital Mgmt. Select Fund Ltd. v. Bennett</u>, 680 F.3d 214, 226 (2d. Cir. 2012) ("Private actions may succeed under Section 10(b) if there are particularized allegations that the contract itself was a misrepresentation, <u>i.e.</u>, the plaintiff's loss was caused by reliance upon the defendant's specific promise to perform particular acts while never intending to perform those acts."); <u>Ferland v. Orange Groves of Fla., Inc.</u>, 377 F. Supp. 690, 706 (M.D. Fla. 1974) ("[A] promissory representation, whether asserted in a common law fraud action, . . . or an action under . . . Rule 10b-5, should only be considered a misrepresentation of fact where the evidence shows that the promise was made without the intent to perform.").  The Second Amended Complaint includes no particularized allegations that, at the time any promises were made to Meide about his shares in Pulse and Evolution AI, the speaker secretly intended not to uphold the promise or knew the promised outcome would not happen.

require one to rule out an innocent explanation for the alleged behavior.").  While the Court expresses no opinion on whether Meide may have some other legal basis for the return of his investments, the facts of this case as pled in the Second Amended Complaint do not raise the inference of scienter necessary to state a claim for securities fraud under the strict requirements of the PSLRA.[11]

### B.  Count I: Securities Fraud - Control Person Liability

Although not set forth as a separate Count, Meide's securities fraud claim against Fiskenbaum and Anthony appears to be premised on a theory of control person liability under § 20 of the Exchange Act.  See SAC ¶¶ 99, 108, 124.  Pursuant to § 20(a):

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . , unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  However, "[b]ecause a primary violation of the securities law is an essential element of a § 20(a) derivative claim, a plaintiff who pleads a § 20(a) claim can withstand a motion to dismiss only if the primary violation is pleaded with legal sufficiency."

---

[11] The Court notes that "[c]orporations have no state of mind of their own, rather, the scienter of their agents must be imputed to them."  See Thompson v. RelationServe Media, Inc., 610 F.3d 628, 635 (11th Cir. 2010).  Although Meide fails to adequately allege scienter as to any of the individual Defendants, he could theoretically create a strong inference of scienter as to Pulse or Evolution AI. Id.  However, in this case, there are no other allegations that could give rise to an inference of scienter with respect to these companies separate from that of the individual Defendants, and as such, Meide's securities fraud claim as to Pulse and Evolution AI fails as well.

In addition, the Court notes that while pro se Defendant Dana Tejeda did not file her own motion to dismiss, she is similarly situated to the moving Defendants, and the claims against her are integrally related to the claims of the moving Defendants.  Throughout the entire Second Amended Complaint, Meide does not allege that Tejeda ever took any action or made any statements independently of the other Defendants. Indeed, her name is always paired with that of Defendant Natale.  See SAC ¶¶ 24, 26, 34, 42, 53, 56, 100-01.  As such, the Court finds it appropriate to dismiss the securities fraud claim as to all Defendants.  See Courboin v. Scott, 596 F. App'x 729, 735 (11th Cir. 2014) ("A district court may on its own motion dismiss an action as to defendants who have not moved to dismiss where such defendants are in a position similar to that of moving defendants or where claims against such defendants are integrally related."); see also Savales v. Waters, Case No. 3:19-cv-523-J-32PDB, 2020 WL 1138529, at *7 n.3 (M.D. Fla. Mar. 9, 2020).

Thompson v. RelationServe Media, Inc., 610 F.3d 628, 635-36 (11th Cir. 2010).  Because

Meide fails to properly allege his § 10(b) claim for securities fraud against all Defendants,

Meide's derivative § 20(a) claim, to the extent he pleads one, must also fail.  Id.; see also

Mizzaro, 544 F.3d at 1255; Garfield, 466 F.3d at 1261.

### C.  Counts II – VI: State Law Claims

Having determined that Meide's federal securities fraud claim is due to be

dismissed, the Court next considers whether to continue to exercise supplemental

jurisdiction over the remaining state law claims.  In Counts II through VI of the Second

Amended Complaint, Meide asserts claims for relief under Florida state law.  See SAC at

28-34.  "The decision to exercise supplemental jurisdiction over pend[e]nt state claims rests

within the discretion of the district court."  Raney v. Allstate Ins. Co., 370 F.3d 1086, 1088-

89 (11th Cir. 2004).  Pursuant to 28 U.S.C. § 1367(c), the Court may decline to exercise

jurisdiction over a state claim if:

> (1) the claim raises a novel or complex issue of State law,

> (2) the claim substantially predominates over the claim or claims over which
> the district court has original jurisdiction,

> (3) the district court has dismissed all claims over which it has original
> jurisdiction, or

> (4) in exceptional circumstances, there are other compelling reasons for
> declining jurisdiction.

28 U.S.C. § 1367(c).  Notably, "[a]ny one of the section 1367(c) factors is sufficient to give

the district court discretion to dismiss a case's supplemental state law claims."  Parker v.

Scrap Metal Processors, Inc., 468 F.3d 733, 743 (11th Cir. 2006).  However, upon

determining that it has the discretion under § 1367(c) to decline jurisdiction, "[a district

court] should consider the traditional rationales for pendent jurisdiction, including judicial

economy and convenience in deciding whether or not to exercise that jurisdiction." <u>Palmer v. Hosp. Auth. of Randolph Cnty.</u>, 22 F.3d 1559, 1569 (11th Cir. 1994).  Upon due consideration, the Court finds that judicial economy and convenience would not be served by retaining jurisdiction over Meide's state law claims.  Thus, the Court declines to exercise supplemental jurisdiction over these claims.

For the reasons set forth above, the Court has determined that the federal claim in Count I of the Second Amended Complaint, over which the Court has original jurisdiction, is due to be dismissed.  What remains are uniquely state law claims that are best addressed by the state courts.  Although this case has been pending for an extended period of time, Meide has spent most of his time in federal court attempting to draft a viable complaint.  <u>See</u> Docs. 85, 88.  The Court has not issued any dispositive rulings pertaining to the state law claims, and discovery has been stayed since July 25, 2019.  <u>See</u> Order (Doc. 76).  Thus, the procedural posture of the case weighs in favor of declining jurisdiction to allow the case to proceed fully in state court.  Moreover, when, as here, the federal claims are dismissed prior to trial, the Eleventh Circuit Court of Appeals has "encouraged district courts to dismiss any remaining state claims."  <u>Raney</u>, 370 F.3d at 1089; <u>Busse v. Lee Cnty.</u>, 317 F. App'x 968, 973-74 (11th Cir. 2009) ("Since the district court 'had dismissed all claims over which it has original jurisdiction,' it therefore had the discretion not to exercise supplemental jurisdiction over [Appellant's] state law claims.  28 U.S.C. § 1367(c)(3).  Furthermore, we expressly encourage district courts to take such action when all federal claims have been dismissed pretrial.").  <u>See</u> <u>also</u> <u>Carnegie-Mellon Univ. v. Cohill</u>, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent

jurisdiction doctrine- judicial economy, convenience, fairness, and comity- will point toward declining to exercise jurisdiction over the remaining state-law claims.").

Upon consideration of the § 1367 factors and the "traditional rationales for pendent jurisdiction, including judicial economy and convenience," see Palmer, 22 F.3d at 1569, the Court declines to exercise supplemental jurisdiction over Meide's remaining state law claims.  Accordingly, Counts II through VI of the Second Amended Complaint are due to be dismissed without prejudice to refiling in the appropriate state court.[12]

## VII.  Sanctions

Finally, the PSLRA mandates that:

> In any private action arising under this chapter, upon final adjudication of the action, the court shall include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion.

15 U.S.C. § 78u-4(c)(1) (emphasis added).  Moreover, "[i]f the court makes a finding under paragraph (1) that a party or attorney violated any requirement of Rule 11(b) . . . as to any complaint, responsive pleading, or dispositive motion, the court shall impose sanctions . . . ."  15 U.S.C. § 78u-4(c)(2) (emphasis added).  Accordingly, "the PSLRA's provisions eliminate a district court's discretion on two fronts: (1) in choosing whether to conduct the

---

[12] The Court notes that Meide will suffer no harm from the Court's decision to decline supplemental jurisdiction because federal law provides for the tolling of the state limitations period while a state claim is pending in federal court.  Specifically, 28 U.S.C. § 1367(d) provides that:

> [t]he period of limitations for any claim asserted under subsection (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period.

As such, even if the statute of limitations has otherwise run on Meide's state law claims, Meide has at least thirty days to refile his claims in state court.  See Dukes v. Georgia, 212 F. App'x 916, 917-18 (11th Cir. 2006); Dusek v. JPMorgan Chase & Co., 132 F. Supp. 3d 1330, 1354 n.18 (M.D. Fla. 2015).

Rule 11(b) inquiry and (2) in determining whether to impose sanctions following a finding of a Rule 11(b) violation."  See Thompson, 610 F.3d at 636; see also Ehlert v. Singer, 245 F.3d 1313, 1320 (11th Cir. 2001) (remanding case where district court failed to make the Rule 11 findings expressly required by the PSLRA).  Notably, in Thompson, the Eleventh Circuit instructs that a district court may not dispense with this obligation in a perfunctory manner, but rather, a court must make the "extensive" sanctions findings mandated by the PSLRA.  Thompson, 610 F.3d at 639 ("It is not until this case, however, that we emphasize just how extensive the district court's sanctions findings must be in the PSLRA context.").  For example, the Thompson court noted that on remand, the district court should "further develop the record" on issues such as: whether the parties, as opposed to their attorneys, violated Rule 11, "whether the lawyers violated Rule 11(b)(1) by filing the complaints for improper purposes (a subjective analysis that will likely require testimony), or whether the [party to be sanctioned] can rebut the PSLRA's presumptive award of attorneys' fees.[13]"  Id. at 639.

        In light of the findings mandated by the Eleventh Circuit, the Court is unable to make the required sanctions determination absent further development of the record and briefing by the parties.  Although Defendant Laura Anthony and former Defendant Michael Pollaccia a/k/a Michael Anthony filed a motion for sanctions on November 16, 2018, see Defendants Laura Anthony's and Michael Anthony's Motion for Rule 11 Sanctions and

---

[13] Specifically, the PSLRA requires a court to "adopt a presumption" that if Rule 11 is violated, the appropriate sanction is an award to the opposing party of the reasonable attorneys' fees and other expenses. 15 U.S.C. § 78u-4(c)(3)(A).  This presumption may be rebutted if the sanctioned party can show that an award of attorneys' fees and expenses will impose "an unreasonable burden" or would be "unjust," and that the failure to make the award would not "impose a greater burden on the party in whose favor sanctions are to be imposed . . . ." 15 U.S.C. § 78u-4(c)(3)(B).  Alternatively, the presumption may be rebutted if the Rule 11(b) violation was "de minimis."  Id.  If the presumption is rebutted, "the court shall award the sanctions that the court deems appropriate . . . ." 15 U.S.C. § 78u-4(c)(3)(C).

Incorporated Memorandum of Law (Doc. 43; Anthony Motion for Sanctions), this Motion is premised on the filing of the Initial Complaint and does not address the proceedings that have occurred in this matter since that time.  Moreover, the Court has not heard from the other Defendants on the propriety of PSLRA sanctions in this case.  As such, further briefing will be necessary on this issue.  However, given that the majority of Meide's claims were dismissed without prejudice to re-filing in state court, the Court finds it appropriate to refer the parties to mediation prior to the expenditure of any additional resources on this case.  Nevertheless, rather than further delay the resolution of this case, the Court will proceed with the dismissal of this action and entry of judgment while reserving jurisdiction to conduct the mandatory sanctions review.  In light of the foregoing, it is

> **ORDERED:**
>
> 1.  Defendant Laura Anthony's Motion to Dismiss Second Amended Complaint With Prejudice (Doc. 96), Defendants Centineo, Natale, Agnes King and John King's Motion to Dismiss Second Amended Complaint (Doc. 94) and the Motion to Dismiss Second Amended Complaint and Incorporated Memorandum of Law of Defendants Pulse Evolution Corporation, John Textor, Evolution AI Corporation, Jordan Fiksenbaum, and Frank Patterson (Doc. 98) are **GRANTED** to the extent set forth below.
>
> 2.  Plaintiff's Supplement to Motion for Substitution of Real Party in Interest with Certification of Good-Faith Conference (Doc. 127) is **DENIED, as moot**.
>
> 3.  Plaintiff's Supplement to Motion for Leave to File Second Amended Complaint with Certification of Good Faith Conference (Doc. 128) is **DENIED.**
>
> 4.  Count I of Plaintiff's Second Amended Complaint is **DISMISSED**.

5. Counts II-VI of Plaintiff's Second Amended Complaint are **DISMISSED, without prejudice** to refiling in the appropriate state court.  As set forth in 28 U.S.C. § 1367(d), the period of limitations for this claim is tolled "for a period of 30 days after it is dismissed unless State law provides for a longer tolling period."

6. The Clerk of the Court is **directed** to enter Judgment in favor of Defendants Pulse Evolution Corporation, John Textor, Gregory Centineo, Julie Natale, Dana Tejeda, Agnes King, John King, Evolution AI Corporation, Jordan Fiksenbaum, Laura Anthony, and Frank Patterson, and against Plaintiff Scott Meide on Count I of the Second Amended Complaint.

7. The Court reserves jurisdiction to determine whether sanctions are appropriate.

8. On or before **October 23, 2020**, the parties shall file a notice informing the Court of the date of the mediation.  If the matter is not resolved at mediation, the Court will set a deadline for the filing of sanctions motions.

9. The Clerk of the Court is further **directed** to terminate all pending motions and deadlines as moot and close the file.

**DONE AND ORDERED** in Jacksonville, Florida this 4th day of September, 2020.

MARCIA MORALES HOWARD
United States District Judge

lc11

Copies to:

Counsel of Record
Pro Se Parties

41